JUDGE NATHAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PDV SWEENY, INC. and PDV TEXAS, INC.

Petitioners,

v.

CONOCOPHILLIPS COMPANY formerly doing
business as PHILLIPS PETROLEUM COMPANY
and SWEENY COKER INVESTOR SUB, LLC
formerly doing business as SWEENY COKER
INVESTOR SUB, INC.

Respondents.

**14 CV 5183**

No. 1:14-cv-_____

<u>Oral Argument Requested</u>



RECEIVED
JUL 1 1 2014
U.S.D.C. S.D. N.Y.
CASHIERS

## PETITION OF PDV SWEENY, INC. AND PDV TEXAS, INC.
## TO VACATE ARBITRAL AWARD

PDV Sweeny, Inc. ("PDV Sweeny") and PDV Texas, Inc. ("PDV Texas," collectively

the "Petitioners") respectfully submit this Petition pursuant to Sections 10 and 307 of the Federal

Arbitration Act (the "FAA"), 9 U.S.C. §§ 1-12 and 301-307, *et seq.* (2009) to vacate the Partial

Arbitral Award rendered in ICC Case No. 16982/JRF/CA/ASM (C-17336/JRF), dated April 14,

2014 (the "Award"). A true and accurate copy of the Award is attached as "**Exhibit 1**" to the

Declaration of Joseph D. Pizzurro, dated July 11, 2014 (the "Pizzurro Declaration").

### PRELIMINARY STATEMENT

1.      This case presents the classic example of an arbitral tribunal rendering an award

that violates a fundamental and well-established public policy – the policy against the

enforcement of contractual penalty clauses. The Award validates the forfeiture of Petitioners'

entire joint venture interest, conceded by Respondents to be worth hundreds of millions of

dollars, as the remedy for a delay in the payment of a liquidated sum of just over $6.9 million.

That result violates the public policy of New York, the governing law of the contract. It violates

the public policy of all Fifty States of the United States.  And it violates the public policy of the United States as well.

2.     The arbitration at issue involved disputes arising in the context of a joint venture between ConocoPhillips Company ("ConocoPhillips") on the one hand, and Petróleos de Venezuela, S.A. ("PDVSA") and certain of its subsidiaries on the other, relating to the enhancement and operation of, and supply of crude oil to, certain refining facilities located within a larger oil refinery owned by ConocoPhillips in Texas.[1]  The joint venture was governed by a web of interlocking agreements governing the establishment, operation and supply of the venture.  As set forth more fully below, the arbitration, conducted under the auspices of the International Chamber of Commerce ("ICC"), involved two separate proceedings that were consolidated pursuant to the provisions of the applicable arbitration agreements, and the Parties asserted multiple claims and counterclaims arising under various agreements governing the joint venture.

3.     This Petition is not aimed at the entirety of the Award.  The ruling challenged by this Petition involves the enforcement of a provision of one of the joint venture agreements, the so-called Call Option under the Amended and Restated Transfer Agreement (the "Transfer Agreement"), which permitted ConocoPhillips to acquire Petitioners' joint venture interest upon the occurrence of any one of a number of Call Events.  (*See* **"Exhibit 2"** to the Pizzurro Declaration for a true and accurate copy of the Transfer Agreement.)  One such Call Event is a delay by PDVSA Petróleo, S.A., ("PPSA"), a subsidiary of PDVSA and party to the supply

---

[1] The joint venture, which was formed in 1999, was originally between Phillips Petroleum Company ("Phillips"), on the one hand, and PDVSA and its affiliates, on the other.  In 2002, Phillips was succeeded by ConocoPhillips when Phillips merged with Conoco, Inc. to form ConocoPhillips.  More recently, in May 2012, ConocoPhillips completed a major corporate restructuring, whereby it transferred all of its downstream assets, including all of its interests in the joint venture, to Phillips 66 Company (which at the time of the transfer was a wholly owned subsidiary of ConocoPhillips).  Phillips 66 Company was subsequently spun off to the shareholders of ConocoPhillips to constitute a stand-alone publicly traded corporation.

agreement pursuant to which the venture receives crude oil, of more than 90 days in making any payment which becomes due under that supply agreement, regardless of the amount.  (*See* Pizzurro Decl. Ex. 2, Exhibit A, p. A-1 (definition of Call Event).)  Here there was a delay of a payment of approximately $6.9 million which triggered ConocoPhillips' exercise of the Call Option, and, as set forth more fully below, ConocoPhillips' acquisition of Petitioners' joint venture interest for no payment whatsoever.  The Transfer Agreement specifically provided that the exercise of the Call Option was ConocoPhillips' "sole and exclusive remedy . . . for such Call Event," *i.e.* the delay in payment.  (*Id.*, Section 4.1.)

   4.  In the arbitration, Petitioners asserted, *inter alia*, that the Call Option constituted an impermissible penalty, that violated public policy and that the tribunal should declare ConocoPhillips' exercise thereof to be invalid.  The tribunal rejected Petitioners' argument.  Although the tribunal had no quarrel with the proposition that contractual penalties violate public policy, it ruled that, because in its view the Call Option provision was not a liquidated damages clause, it could not constitute a penalty as a matter of law.  (*See* Pizzurro Decl. Ex. 1, ¶ 211.) Thus, the exercise of the Call Option by ConocoPhillips was deemed to be valid.

   5.  The Award results in the enforcement of a contractual penalty and as such constitutes a violation of public policy.  As set forth below, a violation of public policy is a recognized basis under applicable law to set aside the Award.  Furthermore, this case represents the rare instance where the Court is to give no deference to the Award or the rationale of the tribunal.  The Court must conduct its own *de novo* review to determine whether the Call Option is a penalty, the enforcement of which violates public policy.  Well-established precedent leaves no room for doubt on that score.  That portion of the Award should be vacated.

## THE PARTIES AND OTHER RELEVANT ENTITIES

6.      Petitioner PDV Sweeny is a Delaware corporation.  It is a wholly owned subsidiary of PDV Holding, Inc. ("PDV Holding") and an indirect wholly owned subsidiary of PDVSA.  PDV Sweeny was a limited partner, together with Respondent Sweeny Coker Investor Sub, LLC ("Sweeny Sub"), in Merey Sweeny, L.P., a Delaware limited partnership.

7.      Petitioner PDV Texas is a Delaware corporation.  It is a wholly owned subsidiary of PDV Holding and an indirect wholly owned subsidiary of PDVSA.  PDV Texas was a member, together with Respondent ConocoPhillips, in Sweeny Coker L.L.C. ("Sweeny Coker"), a Delaware limited liability company.  Sweeny Coker was the general partner of Merey Sweeny, L.P.

8.      Respondent ConocoPhillips, formerly doing business as Phillips Petroleum Company, is a Delaware corporation and the parent company of Sweeny Sub.

9.      Respondent Sweeny Sub, formerly doing business as Sweeny Coker Investor Sub, Inc., is a Delaware corporation and a wholly owned subsidiary of ConocoPhillips.

10.      PDVSA is a Venezuelan corporation wholly owned by the Venezuelan government and is the national oil company of Venezuela.  Although not a party to this proceeding to vacate a portion of the Award, it was a party in the arbitration proceedings and a party to certain of the joint venture agreements.

11.      PPSA is a Venezuelan corporation wholly owned by PDVSA.  Although not a party to this proceeding to vacate a portion of the Award, it was a party in the arbitration proceedings and a party to certain of the joint venture agreements, including the crude oil supply agreement with ConocoPhillips.

## JURISDICTION

12.     The Award falls under the Inter-American Convention on International

Commercial Arbitration of January 30, 1975 (the "Inter-American Convention"), 104 Stat. 448,

1438 U.N.T.S. 249, and thus this Court has subject matter jurisdiction pursuant to Section 302 of

the FAA, 9 U.S.C. § 302 (2009).[2]

13.     The Award meets the requirements of both Sections 202 and 305 of the FAA, 9

U.S.C. §§ 202, 305.  Pursuant to Section 202, it arises out of a purely commercial relationship

which not only envisaged performance abroad but also was reasonably related to a foreign state.[3]

Pursuant to Section 305, a majority of the parties to the arbitration are citizens of States that have

ratified or acceded the Inter-American Convention and those States are member States of the

Organization of American States ("OAS").[4]  ConocoPhillips, Sweeny Sub, PDV Sweeny and

---

[2] Section 302 of the FAA incorporates Section 203 of the FAA, 9 U.S.C. § 203, which provides:

> An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States.  The district courts of the United States (including the courts enumerated in section 460 of title 28) shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy.

[3] Section 202 provides:

> An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention.  An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.  For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

[4] Section 305 provides:

> When the requirements for application of both the Inter-American Convention and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 [the "New York Convention"], are met, determination as to which Convention applies shall, unless otherwise expressly agreed, be made as follows:
>
> (1) If a majority of the parties to the arbitration agreement are citizens of a State or States that have ratified or acceded to the Inter-American Convention and are member States of the Organization of American States, the Inter-American Convention shall apply.
>
> (2)  In all other cases the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall apply.

PDV Texas are all corporations organized under the laws of Delaware and therefore citizens of

the United States.  PDVSA and PPSA are corporations organized under the laws of Venezuela.

Both the United States and Venezuela are member States of the OAS and have ratified the Inter-

American Convention.[5]

## VENUE

14.      Pursuant to Section 204 of the FAA, venue properly lies in the Southern District

Court of New York because the place of arbitration under the arbitration agreement in this case

was New York, New York.[6]

## FACTUAL BACKGROUND

15.      In the 1990s, ConocoPhillips, along with its subsidiary, Sweeny Sub (collectively,

the "COP Parties"), partnered with PDVSA and its subsidiaries, PPSA, PDV Texas and PDV

Sweeny (collectively, the "PDVSA Parties"), to design, construct, own, supply and operate

certain refining facilities within the confines of a large refining complex owned by

ConocoPhillips in Old Ocean, Texas, referred to as the Sweeny refinery (the "Joint Venture").

The main contribution from the PDVSA side was the supply of crude oil.   The ConocoPhillips

side provided the refining and operational expertise.   The Joint Venture gave ConocoPhillips the

---

[5] The question of whether the Inter-American Convention or the New York Convention applies is not a material issue once it is established that they both apply under Section 202 of the FAA.  The courts have held that there are no substantive differences between the two Conventions.  *See Productos Mercantiles e Industriales, S.A. v. Faberge U.S.A.*, 23 F.3d 41, 45 (2d Cir. 1994) (finding that "Congress intended the Inter-American Convention to reach the same results as those reached under the New York Convention").

[6] Section 204 of the FAA, 9 U.S.C. § 204, which is incorporated by reference under Section 302 of the FAA, provides that:

> An action or proceeding over which the district courts have jurisdiction pursuant to Section 203 of this title may be brought in any such court in which save for the arbitration agreement an action or proceeding with respect to the controversy between the parties could be brought, or in such court for the district and division which embraces the place designated in the agreement as the place of arbitration if such place is within the United States.

competitive advantage of being able to convert lower-cost heavy sour crude oil into high-value

end products and a long-term source of lower-cost crude oil from Venezuela.

16.     The total cost of the project was estimated at approximately $537.5 million. The

PDVSA Parties and the COP Parties jointly financed, designed and constructed a vacuum unit, a

delayed coker and certain ancillary facilities (the "Joint Venture Refining Facilities"),

reconfiguring the refinery to process heavy sour crude oil supplied by PPSA.

17.     The Joint Venture Refining Facilities were owned equally by the Petitioners and

the COP Parties through Merey Sweeny, L.P. Each of the two limited partners of Merey

Sweeny, L.P., Sweeny Sub and PDV Sweeny, owned a 49.5% interest, and the general partner of

Merey Sweeny, L.P., Sweeny Coker, owned a 1% interest. PDV Texas and ConocoPhillips each

owned a 50% membership interest in Sweeny Coker. The interest of PDV Sweeny in Merey

Sweeny, L.P. and the membership interest of PDV Texas in Sweeny Coker are collectively

defined in the Transfer Agreement as the "PDV Sweeny/PDV Texas Joint Venture Interest"

(hereinafter also referred to as "Petitioners' Joint Venture Interest"). (*See* Pizzurro Decl. Ex. 2,

Section 2.1(a).)

18.     As part of the Joint Venture, PPSA began supplying crude oil under a long-term

crude oil supply contract, the Amended and Restated Crude Oil Supply Agreement (the

"COSA"), to the unit at the Sweeny refinery that was upgraded by the Joint Venture, namely,

Unit 25.1. (*See* **Exhibit 3**" to the Pizzurro Declaration for a true and accurate copy of the

relevant portions of the COSA.)

19.     The COSA, which is governed by Venezuelan law, is one of the many

interlocking agreements that were signed when the Joint Venture was formed in 1999. Those

agreements also included the Amended and Restated PDVSA Crude Oil Supply Agreement

Guarantee between PDVSA and ConocoPhillips (the "COSA Guarantee") and the Amended and

Restated Supplemental Crude Oil Supply Agreement between PDVSA and ConocoPhillips (the

"SCOSA").  Under the COSA Guarantee, PDVSA guaranteed PPSA's obligations under the

COSA.  And under the SCOSA, PDVSA assumed the obligation to supply Replacement Crude

Oil or pay Seller Damages in the event that PPSA could not supply crude oil under the COSA

due to measures or actions by the Venezuelan Government that directly discriminate against

ConocoPhillips.  (*See* "**Exhibit 4**" to the Pizzurro Declaration for a true and accurate copy of the

SCOSA.)

20.     From the crude oil that was supplied to the Sweeny refinery by PPSA under the

COSA, ConocoPhillips would derive long residue and supply it to the Joint Venture Refining

Facilities.  The Joint Venture would process ConocoPhillips' long residue and convert it to short

residue, extract and take title to the petroleum coke derived as a byproduct, and redeliver the

lighter products derived from processing to ConocoPhillips.  The Joint Venture would then sell

the petroleum coke to third parties and collect a monthly processing fee and a fixed monthly

commitment fee from ConocoPhillips as compensation for processing long residue as well as for

its commitment to render the processing services.  The vast majority of the Joint Venture's

revenues came from the monthly processing fee paid by ConocoPhillips.

**The Underlying Contracts**

21.     This dispute arises out of the Transfer Agreement, another one of the various

contracts executed in 1999 which governed the Joint Venture.  The Transfer Agreement, which is

governed by New York law, establishes restrictions on the transfer of Joint Venture interests.  It

sets forth two categories of transfers of a Joint Venture interest:  authorized transfers and

mandatory transfers.  Authorized transfers, which are subject to certain conditions and

exceptions, refer to the right of a joint venture party to voluntarily transfer its interest.

Mandatory transfers refer to situations where a party causes a compulsory transfer of the other

joint venture party's Joint Venture Interest as an extraordinary remedy in the event of the

occurrence of any of a series of stipulated events. (*See* Pizzurro Decl. Ex. 2, Article IV.)

      22.     For ConocoPhillips, that remedy is referred to as the Call Option and the

stipulated events which trigger the Call Option are referred to as Call Events. (*Id.*, Section 4.1.)

Upon the occurrence of any Call Event, ConocoPhillips has the right to exercise the Call Option

to acquire the PDV Sweeny/PDV Texas Joint Venture Interest as a remedy for the Call Event.

(*Id.*)

      23.     The definition of "Call Event" in Exhibit A of the Transfer Agreement is as

follows:

> (i) any transfer by PDV Sweeny or PDV Texas in violation of the
> Transfer Agreement; (ii) the failure by PDV Sweeny to make a
> Pre-Completion Capital Contribution or a Mandatory Post-
> Completion Capital Contribution within ninety (90) days of the
> due date therefor pursuant to the Partnership Agreement; (iii) a
> breach by [PPSA] of any of its payment obligations under the
> [COSA] which remains uncured for ninety (90) days; (iv) a breach
> by PDVSA of any of its payment obligations under the [SCOSA]
> which remains uncured for ninety (90) days; (v) a breach by
> PDVSA under the PDVSA New York Guarantee or the PDVSA
> Venezuela Guarantee which remains uncured for ninety (90) days;
> (vi) any event the result of which is that PDV Texas or any
> permitted transferee of its LLC Interest ceases to be a direct or
> indirect wholly-owned subsidiary of PDVSA or (vii) any event the
> result of which is that PDV Sweeny or any permitted transferee of
> its Partnership Interest ceases to be a direct or indirect wholly-
> owned subsidiary of PDVSA, except in either case as set forth in
> Section 3.3(b) or Section 3.3(c).

(*Id.*, Exhibit A.)

      24.     The two types of Call Events that are relevant to this action are those set forth in

clauses (iii) and (iv) of the definition of Call Event. Under (iii), a breach by PPSA of any

payment obligation under the COSA, which remains uncured for 90 days, constitutes a Call

Event. Similarly, under (iv), a breach by PDVSA of any payment obligation under the SCOSA,

which remains uncured for 90 days, constitutes a Call Event. Thus, ConocoPhillips could exercise the Call Option based on the failure to make any payment, regardless of the amount, within 90 days after it was due under the COSA or SCOSA.

25.      The Transfer Agreement states that the purchase price upon the exercise of the Call Option is to be determined in accordance with one of two stipulated formulae under Section 4.1. ConocoPhillips has the sole right to choose which formula applies. Under the first formula, the purchase price equals half of 80% of the Fair Value of Merey Sweeny, L.P., which is to be determined based on the expected future net cash flows of the partnership. The second formula, on the other hand, does not measure the value of the interest and establishes the purchase price as 80% of the sum of the PDVSA Parties' capital contributions to the Joint Venture and any outstanding subordinated obligations of the PDVSA Parties, minus all distributions from the Joint Venture to the PDVSA Parties.

26.      Section 4.1 of the Transfer Agreement provides that the exercise of the Call Option constitutes "the sole and exclusive remedy of [ConocoPhillips] and its Affiliates for such Call Event." (Id.) In other words, where the Call Event is a failure to meet a payment obligation under the COSA or SCOSA, in lieu of receiving those payments, ConocoPhillips is entitled to Petitioners' Joint Venture Interest.

27.      The exercise of the Call Option does not result in the automatic termination of PPSA's obligation to supply crude oil from Venezuela to the Sweeny refinery under the COSA. In addition to the acquisition of Petitioners' Joint Venture Interest, Section 4.1 of the Transfer Agreement provides that upon the exercise of the Call Option, ConocoPhillips has the option to require PPSA to continue to perform the COSA.

28.      The COSA contains its own set of remedies in the event that PPSA inexcusably fails to supply crude oil. Under those circumstances, the COSA requires PPSA to pay Seller

Damages.  (*See* Pizzurro Decl. Ex. 3, Section 2.7.)  The amount of Seller Damages is calculated according to a precise formula that is set forth in Section 2.7 of the COSA.  (*Id.*)

29.      The COSA also provides a specific remedy for delays in the payment of Seller Damages.  According to Section 2.8 of the COSA, any amount of Seller Damages not paid when due bears interest at a contract rate as of the date payment was due until the date that payment is made.  (*See* Pizzurro Decl. Ex. 3, Section 2.8.)

30.      Those same remedies are also contained in the SCOSA.  Thus, if PDVSA fails to supply Replacement Crude Oil under the SCOSA, the SCOSA provides that PDVSA must pay Seller Damages to ConocoPhillips, in accordance with the formula set forth in Section 2.7 of the COSA.  (*See* Pizzurro Decl. Ex. 4, Section 2.1.)  And, like the COSA, any amount of Seller Damages not paid when due bears interest at the contract rate as of the date when payment was due until the date that payment is made.  (*Id.*, Section 2.6.)

**The Genesis of the Dispute**

31.      Starting in January 2009, PPSA curtailed its supply of crude oil to various purchasers, including ConocoPhillips, and declared force majeure under the COSA due to cutbacks in the production and export of crude oil by Venezuela.  During the months that followed, by various letters sent to PPSA and PDVSA, ConocoPhillips claimed Seller Damages for the months of January, March, April, June, July and August 2009.  While PPSA and PDVSA did not pay those claims, ConocoPhillips never mentioned the possibility that the delay in payment could constitute a Call Event under the Transfer Agreement.

32.      By letter dated August 28, 2009, ConocoPhillips informed PDV Sweeny and PDV Texas that it was exercising its Call Option under Section 4.1 of the Transfer Agreement based upon the breach by PPSA and PDVSA of their obligation to pay Seller Damages for the months of January and March 2009.  The total amount of those claims was $6,930,761.  PPSA and

PDVSA immediately offered ConocoPhillips full payment of the amount due. ConocoPhillips declined.

33.     In exercising the Call Option, ConocoPhillips chose the formula under Section 4.1 of the Transfer Agreement which yielded a Call Option price of $0 for the Petitioners' entire Joint Venture Interest, even though its true value was in the hundreds of millions of dollars. Thus, upon the exercise of the Call Option, ConocoPhillips took Petitioners' Joint Venture Interest without paying a single dollar. And the Petitioners have been deprived of their Interest in the Joint Venture ever since.

34.     Although the COP Parties purported to end the Petitioners' participation in the Joint Venture, ConocoPhillips did not terminate the COSA or SCOSA. Regular shipments of crude oil under the COSA resumed in October 2009 and have continued to date.

**The Arbitration**

35.     In accordance with the arbitration clause of the Transfer Agreement, on February 25, 2010, the Petitioners commenced an arbitration under the ICC Rules against the COP Parties, seeking, among other things, a declaration that ConocoPhillips' purported exercise of the Call Option was invalid and ineffective (the "Call Option Claim").[7]

36.     On August 16, 2010, ConocoPhillips commenced a separate arbitration against PPSA and PDVSA, alleging that PPSA under the COSA, and PDVSA under the COSA Guarantee, had breached an obligation to jointly calculate a discount to the price of crude oil sold under the COSA (the "Lookback Adjustment Claim").

37.     Subsequently, in accordance with the agreements that governed the two separate arbitrations, the PDVSA Parties requested the arbitral tribunal that had been constituted to decide

---

[7] Afterwards, the PDVSA Parties presented two additional claims which are not relevant to this action.

the Call Option Claim to consolidate the two arbitrations.  By order dated December 17, 2010, the tribunal granted that request and the two arbitrations were consolidated into one proceeding.

38.     After consolidation, ConocoPhillips restyled its Lookback Adjustment Claim as a counterclaim, and submitted a number of additional counterclaims against PPSA and PDVSA, including a counterclaim for damages arising out of the breach of the obligation by PPSA under the COSA, and PDVSA under the SCOSA, to pay Seller Damages during the months of January and March 2009, which was the same breach that triggered the Call Option.

39.     The parties submitted a series of briefs on their claims and counterclaims. Petitioners challenged the validity and exercise of the Call Option based on a number of theories, including that the Call Option constituted an unenforceable penalty as a matter of public policy under each of the well-established tests under New York law.  First, the damages flowing from the breach that triggered the Call Option, which was the failure to pay approximately $6.9 million in Seller Damages within 90 days that they were due under the COSA and SCOSA, were readily ascertainable at the time the parties entered into the agreements.  Second, the remedy of the Call Option – *i.e.*, the acquisition of Petitioners' Joint Venture Interest worth hundreds of millions of dollars for $0 – was grossly disproportionate to the foreseeable damages flowing from the failure to pay approximately $6.9 million in Seller Damages within 90 days.  And third, the Call Option remedy applied indiscriminately regardless of the magnitude of the breach of the payment obligation under the COSA or SCOSA.

40.     The COP Parties never disputed the extraordinary value of Petitioners' Joint Venture Interest.  In fact, the COP Parties submitted an expert report that valued Petitioners' Joint Venture Interest in the range of $352 million to $540 million at the time that ConocoPhillips exercised the Call Option.  (*See* "**Exhibit 5**" to the Pizzurro Declaration for a true and accurate copy of the Report Concerning the Value of Merey Sweeny L.P. by Garfield L.

Miller, III, Aegis Energy Advisors Corp., dated August 6, 2012, submitted by the COP Parties in ICC Case No. 16982/JRF/CA/ASM (C-17336/JRF).)

41.     The tribunal held a hearing on the merits in New York City on December 8 through 12, 2012, and the parties subsequently submitted another round of briefs.

42.     On April 23, 2014, the ICC delivered a copy of the Award to the parties. (*See* Pizzurro Decl. Ex. 1.)  The Award conclusively resolved all the requests for relief by the parties with the exception of claims for costs of the arbitration and interest that has accrued on the counterclaims.  The tribunal reserved those issues for its Final Award, which it has yet to issue.

**The Award**

43.     The portion of the Award that is challenged in this action is the tribunal's dismissal of the Call Option Claim in its entirety.[8]  The tribunal declared that ConocoPhillips "properly exercised the Call Option on August 28, 2009, and that COP and Sweeny Sub thereby validly acquired the Merey Sweeny interests of PDV Texas and PDV Sweeny on that date" and refused to nullify ConocoPhillips' exercise of the Call Option. (*See* Pizzurro Decl. Ex. 1, ¶ 497(a).)  The rationale of the tribunal, which finds no support in the law, was that a contractual provision must first be found to be a liquidated damages provision as a prerequisite to a determination of whether the clause constitutes a penalty prohibited by public policy. (*See id.* at ¶¶ 188, 211.)  This holding not only ignored applicable law, it enabled the tribunal to forego any analysis of whether the Call Option provision, as applied in this case, ran afoul of the traditional tests that must be applied to determine if a contract provision constitutes a penalty.  As the tribunal itself stated: "Having determined that the Call Option provision is not a liquidated damages clause, the tribunal does not find it necessary to consider whether the clause is a

---

[8] The tribunal's entire analysis on the issue of whether the Call Option is an unenforceable penalty appears in paragraphs 188 to 211 of the Award.

penalty." (*See id.* at ¶ 211.) The tribunal therefore abdicated its responsibility to determine whether in fact there was a violation of public policy and upheld the exercise of the Call Option by ConocoPhillips.

## ARGUMENT

### THE AWARD MUST BE PARTIALLY VACATED
### BECAUSE IT IS CONTRARY TO PUBLIC POLICY

**The Applicable Law**

44.     Petitioners seek to set aside the portion of the Award that upholds ConocoPhillips' exercise of the Call Option based on the tribunal's conclusion that the Call Option does not constitute a penalty. The effect of that decision is to validate and enforce the exercise of a contract provision that violates public policy. As such, that part of the Award must be vacated pursuant to the provisions of the Inter-American Convention as well as the FAA, 9 U.S.C. § 10, and the judicial precedents decided thereunder.

45.     Article 5(2)(b) of the Inter-American Convention empowers this Court to vacate an arbitral decision if "[t]he recognition or execution of the decision would be contrary to the public policy ('ordre public') of that State."

46.     Furthermore, Article 5(1)(e) of the Inter-American Convention provides that a court may refuse to recognize and execute the decision if the decision "has been annulled or suspended by a competent authority of the State in which, or according to the law of which, the decision has been made." Here, the Award was rendered in New York. Because this case involves a nondomestic award rendered in the United States, the Court may also apply domestic arbitral law, here Chapter 1 of the FAA and the cases decided thereunder, to a motion to vacate that award. *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 20-23 (2d Cir. 1997).

47.     In determining whether to vacate an award as a violation of public policy, the

courts engage in a two-step inquiry.  First, the court must identify the public policy at issue.

*Banco De Seguros Del Estado v. Mutual Marine Office, Inc.*, 344 F.3d 255, 264 (2003).  The

public policy must be well defined and dominant as "ascertained by reference to the laws and

legal precedents and not from general considerations of supposed public interests."  *United*

*Paperworks Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 43 (1987) (internal quotations

omitted).  Second, the court must determine whether enforcement of the arbitration award would

violate that public policy.  *Id.* at 43-44.  As set forth below, this second step involves a *de novo*

review of the award.  The arbitral tribunal's analysis and conclusions are entitled to no

deference.

### The Public Policy against Contractual Penalties Is Well Defined and Dominant

48.     The applicable public policy in this case is the well-established prohibition on

the enforcement of contractual penalties.  This is the public policy of the State of New York

and it is the policy of the United States as a whole.  It is expressed in the statutes and judicial

decisions of all Fifty States.  (*See* Appendix A hereto setting forth citations to authority in

each of the States rejecting the enforcement of contractual penalties as a violation of public

policy.)  This public policy against the enforcement of contractual penalties finds clear and

consistent expression in both the Restatement (First) of Contracts § 339 (1932) and the

Restatement (Second) of Contracts § 356(1) (1981).  And this public policy is part of the

federal common law of contracts, as it was expressed in Supreme Court decisions prior to

*Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938),[9] as well as in cases old and recent

---

[9] *See Kothe v. R.C. Taylor Trust*, 280 U.S. 224, 226 (1930) ("[A]greements to pay fixed sums plainly without reasonable relation to any probable damage which may follow a breach will not be enforced."); *Bignall v. Gould*, 119 U.S. 495, 498 (1886) ("By the rules now established, at law as well as in equity, the sum of $10,000, named in this bond, is a penalty only, and not liquidated damages.").

applying the federal common law of contracts to private agreements with federal agencies,[10]

and in maritime contracts.[11]

49.    The expression of this uniform and well-defined public policy is aptly set forth by

the New York Court of Appeals in *Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 41

N.Y.2d 420, 424 (N.Y. 1977) as follows:

> A clause which provides for an amount plainly disproportionate to
> real damage is not intended to provide fair compensation but to
> secure performance by the compulsion of the very disproportion.
> A promisor would be compelled, out of fear of economic
> devastation, to continue performance and his promisee, in the
> event of default, would reap a windfall well above the actual harm
> sustained.  As was stated eloquently long ago, to permit parties, in
> their unbridled discretion, to utilize penalties as damages 'would
> lead to the most terrible oppression in pecuniary dealings.'
> (internal citations omitted).

50.    Contractual penalties are unenforceable "regardless of how freely and willingly

they were entered into" or the degree of sophistication of the parties and their counsel. *Interface

Group-Nevada, Inc. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 145 F.3d

124, 135 (3d Cir. 1998) (applying New York law); *In re Ionosphere Clubs, Inc.*, 262 B.R. 604,

617 (Bankr. S.D.N.Y. 2001) ("Although both parties were represented by sophisticated counsel a

court must not enforce an otherwise invalid liquidated damages provision merely because it was

freely negotiated by sophisticated counsel.  Contracts that are void against public policy are

unenforceable regardless of how freely and willingly they are entered into.") (internal citations

and quotations omitted); *Zuckerman v. Vanu, Inc.*, No. MICV2010-00967, 2013 WL 1799859, at

---

[10] *See Priebe & Sons, Inc. v. United States*, 332 U.S. 407, 413 (1947) ("[A]n exaction of punishment for a breach which could produce no possible damage has long been deemed oppressive and unjust."); *K-Con Building Sys., Inc. v. United States*, 107 Fed. Cl. 571, 594 (Fed. Cl. 2012) (explaining that courts will decline to enforce a stipulated remedy that "is plainly without reasonable relation to any probable damages which may follow a breach, or is so extravagant, or so disproportionate to the amount of property loss, as to show that compensation was not the object aimed at").

[11] *See A-1 Indus., Inc. v. Barge Rig #2*, 1979 AMC 1486, 1491-92 (E.D. La. 1979) (stating that a stipulated remedy which operates as a penalty must be "voided").

*2, 7 (Mass. Super. Ct. Jan. 28, 2013) (declining to enforce a contractual penalty that provided for double recovery of actual damages, even where both parties were represented by counsel with substantial experience); *Holt's Cigar Co. v. 222 Liberty Assocs.*, 591 A.2d 743, 749 n.6 (Pa. Super. Ct. 1991) (explaining that "regardless of the equality of the parties' bargaining strengths and sophistication," the "law is quite definitive" that the effect of a stipulated remedy cannot be to penalize). The prohibition against penalties cannot be waived even by contract. *Interface Group-Nevada, Inc.*, 145 F.3d at 136 (finding that "[t]he mere fact that TWA warranted the enforceability of the provision cannot negate the underlying public policy"). This is because the public policy against contractual penalties "touch[es] upon matters of substance related to the public welfare rather than aspects of the bargaining process between the parties." *See* RESTATEMENT (SECOND) OF CONTRACTS Ch. 8, Intro. Note.

51.     Indeed, courts have also had occasion to recognize that the public policy against penalties is well defined and dominant in their review of arbitral awards. *See Yukos Capital S.A.R.L. v. OAO Samaraneftegaz*, 963 F. Supp. 2d 289, 300 n.8 (S.D.N.Y. 2003) (stating that the public policy against penalties is "a well-defined and specific principle expressed in case law"); *Laminoirs-Trefileries-Cableries de Lens, S.A. v. Southwire Co.*, 484 F. Supp. 1063, 1069 (N.D. Ga. 1980) (declining to enforce an award that adopted a penal interest rate rather than a compensatory one in violation of the public policy against penalties).

**Standard of Review**

52.     While the legal analysis and conclusions of arbitrators are ordinarily entitled to a high degree of deference, that deferential approach to judicial review does not apply where the question is one of public policy, because the courts are obligated to refrain from enforcing contracts that are contrary to public policy. *W.R. Grace and Co. v. Local Union 759, Int'l Union of United Rubber Workers*, 461 U.S. 757, 766 (1983) ("If the contract as interpreted by [the

arbitrator] violates some explicit public policy, we are obliged to refrain from enforcing it."). As stated by the Supreme Court, "the question of public policy is ultimately one for resolution by the courts." *Id.*

53.     Accordingly, the courts apply a *de novo* review to determine whether the award creates "an explicit conflict with other laws and legal precedents" and thus "violates an identifiable public policy." *Local 97, Intern. Broth. Of Elec. Workers, A.F.L.-C.I.O. v. Niagara Mohawk Power Corp.*, 196 F.3d 117, 125 (2d Cir. 1999). As the court stated *In re Transmarine Seaways Corp. of Monrovia*, 480 F. Supp. 352, 358 (S.D.N.Y. 1979), "[w]hen public policy is asserted as a basis for vacating an arbitration award, the court is required to make its own, independent evaluation."

54.     Thus, if the contractual provision at issue is one which the court could not enforce or give effect to had the action been brought before it in the first instance, the court cannot enforce or give effect to an arbitral award upholding such an agreement. "The Court will not wield its power to enforce contracts which would be wholly unenforceable under domestic laws." *Changzhou AMEC Eastern Tools & Equipment Co., Ltd. v. Eastern Tools & Equipment Inc.,* No. EDCV 11-00354, 2012 WL 3106620, at *19 (C.D. Cal. July 30, 2012).

**The Award Violates the Public Policy against Contractual Penalties**

55.     As set forth above, because the challenge to the Award involves public policy, this Court is tasked with undertaking a *de novo* review of the tribunal's legal analysis to determine if in fact the Award results in the enforcement of a contractual penalty. Therefore, this Court can, and indeed must, conduct its own legal analysis of the Call Option provision at issue to independently conclude whether or not it constitutes a penalty under applicable law. The tribunal's analysis and conclusions, which were flawed in many respects, are entitled to no deference. Furthermore, the issue of whether a contractual provision constitutes an

unenforceable penalty is a pure question of law. *See Vernitron Corp. v. CF 48 Assocs.*, 104

A.D.2d 409, 409, 478 N.Y.S.2d 933, 934 (N.Y. App. Div. 2d Dep't 1984). Thus, the Courts' *de*

*novo* review is unfettered by any deference normally accorded to an arbitrator's findings of fact.

*Changzhou AMEC Eastern Tools & Equipment Co.,* 2012 WL 3106620, at *5 (explaining that

the arbitrator's findings about the validity of the underlying agreement cannot control the Court's

ruling on the merits of whether the award contravenes public policy); *In re Transmarine Seaways*

*Corp. of Monrovia*, 480 F. Supp. at 358 (rejecting the argument that the court was precluded

from considering a duress defense based on the arbitral panel's determination that duress was not

present, because "[w]hen public policy is asserted as the basis for vacating an arbitration award,

the court is required to make its own, independent evaluation").

     56.    There are three objective and "well-established" tests to determine whether a

contractual remedy constitutes an unenforceable penalty as a matter of public policy. *Truck*

*Rent-A-Center*, 41 N.Y.2d at 425. The first test is whether the amount of actual loss was readily

ascertainable at the time that the parties entered into the contract. *Cent. Irrigation Supply v.*

*Putnam Country Club. Assocs.*, 57 A.D.3d 934, 935-36, 871 N.Y.S.2d 319, 320-21 (N.Y. App.

Div. 2d Dep't 2008); *Raisin Mem. Trust v. Casey*, 945 A.2d 1211, 1215 (Maine 2008); *Phillips v.*

*Phillips*, 820 S.W.2d 785, 788 (Tex. 1991); *Piccott's Rest. v. Gracie's Inc.*, No. 86C-MR-115,

1988 WL 15338, at *1 (Del. Super. Ct. Feb. 23, 1988). The second test is whether the stipulated

remedy does not bear a reasonable proportion to the loss foreseeable by the parties at the time

they entered into the contract. *Truck-Rent-A-Center*, 41 N.Y.2d at 425; *Raisin Mem. Trust*, 945

A.2d at 1215; *Phillips*, 820 S.W.2d at 788; *Piccott's Rest.*, 1988 WL 15338, at *1. And the third

test is whether the stipulated remedy applies indiscriminately regardless of the magnitude of the

underlying breach. *Lenco, Inc. v. Hirschfeld*, 247 N.Y. 44, 51 (N.Y. 1928); *Seidlitz v.*

*Auerbach*, 230 N.Y. 167, 172-74 (N.Y. 1920); *see also Kalenka v. Taylor*, 896 P.2d 222, 229

(Alaska 1995).  If any of those tests is met, the stipulated remedy constitutes an unenforceable penalty as a matter of public policy.

57.      In applying the tests, the courts give no weight to the label or form of the contractual provision that is alleged to constitute a penalty.  *See Truck Rent-A-Center*, 41 N.Y.2d at 425 (stating that "it is not material whether the parties themselves have chosen to call the provision one for 'liquidated damages,' as in this case, or have styled it as a penalty"); *TAL Fin. Crop. v. CSC Consulting, Inc.*, 844 N.E.2d 1085, 1093 (Mass. 2006) (declining to enforce a stipulated remedy which the contract referred to as "liquidated damages for loss of a bargain and not as a penalty"); *Grooms v. Rice*, 429 P.2d 298, 300 (Colo. 1967) ("The language used by the parties is not controlling, and though a sum is designated as 'liquidated damages,' it may be construed as a penalty.").  And "where there is doubt as to whether a provision constitutes an unenforceable penalty or a proper liquidated damage clause, it should be resolved in favor of a construction which holds the provision to be a penalty."  *Willner v. Willner*, 145 A.D.2d 236, 240-41, 538 N.Y.S.2d 599, 602 (N.Y. App. Div. 2d Dep't 1989); *see also Trilegeant Corp. v. Sitel Corp.*, No. 09 Civ. 6492, 2013 WL 2181193, at *10 (S.D.N.Y. May 20, 2013) ("[T]he Court is persuaded that in all events, in doubtful cases . . . Courts have tended to favor the construction that makes the sum payable a penalty rather than liquidated damages"); *Bell v. Ebadat,* No. 08 Civ. 8965, 2009 WL 1803835, at *2 (S.D.N.Y. June 16, 2009) (applying the principle that any doubts as to whether a stipulated remedy constitutes an unenforceable penalty "should be resolved in favor of a construction which holds that the provision is a penalty"); *Abb's Moving Serv., Inc. v. Wooldridge*, 612 So.2d 449, 451-52 (Ala. 1993) (explaining that where there is doubt as to whether a stipulated remedy is enforceable or an unenforceable penalty, courts "will pronounce the stipulated sum a penalty"); *Star Fin. Corp. v. Howard Nance, Co.*, 508 S.E.2d 534, 536 n.2 (N.C. Ct. App. 1998) ("If there is doubt whether a sum is in fact a

penalty or liquidated damages, courts are inclined to hold that it is a penalty.") (internal quotations omitted).

> ### The Arbitral Tribunal Erroneously Refused to Apply the "Well-Established" Tests and Enforced the Penal Consequences of the Call Option

58.     In issuing the Award, the tribunal erroneously refused to apply any of the three tests to determine whether the Call Option constitutes an unenforceable penalty and enforced ConocoPhillips' exercise of the Call Option pursuant to which it acquired Petitioners' Joint Venture Interest without paying a single dollar as a remedy for PPSA and PDVSA's failure to pay approximately $6.9 million in Seller Damages.

59.     At the outset, the tribunal described the framework of its analysis to determine whether the Call Option is a penalty as follows:

> [T]he correct legal framework for this issue is the one presented by the [COP Parties], which is to determine, firstly, whether the Call Option provision in the Transfer Agreement is a liquidated damages clause, and secondly, if it is found to be a liquidated damages clause whether it operates as a penalty.

(*See* Pizzurro Decl. Ex. 1, ¶ 190.) According to the arbitral tribunal, the question of whether a stipulated remedy constitutes an unenforceable penalty is preconditioned on the provision constituting a liquidated damages clause; if the provision does not fit within the definition of a liquidated damages clause, the tests to determine whether a contractual provision constitutes an unenforceable penalty do not apply and the provision is enforceable.[12]

60.     In accordance with that framework, the tribunal answered the first inquiry of whether the Call Option is a liquidated damages clause in the negative because it found that the

---

[12] It is worth noting that the tribunal cited virtually no authority in support of this analysis. The only case cited by the tribunal, *Gatzonis v. Valiotis*, 67 A.D.3d 443, 886 N.Y.S.2d 884 (N.Y. App. Div. 1st Dep't 2009), involved a loan agreement which provided that the borrower could partially repay the loan with his shares in their closely held corporation as an alternative form of loan repayment in the event that he could not repay the loan. And the formula to determine the value of those shares, as explained by the court, was "a means of valuing the consideration plaintiff offered for repayment." 67 A.D.3d at 444, 886 N.Y.S.2d at 884. Thus, the First Department found that those provisions did not constitute a stipulated remedy.

"purpose [of the Call Option] is not compensation or indemnification for a loss or injury following a breach," but rather "the transfer of the Joint Venture interest" in order to allow "the non-breaching party to exit the Joint Venture." (*See* Pizzurro Decl. Ex. 1, ¶¶ 201-202.) The tribunal therefore concluded that it is "not . . . necessary to consider whether the clause is a penalty." (*Id.* at ¶ 211.) In support of that conclusion, the tribunal did not even attempt to evaluate the actual effect of the Call Option. Instead the tribunal relied on certain labels and titles in the Transfer Agreement, the stated purpose of the Transfer Agreement in its recitals, certain documents in connection with the negotiation of the Transfer Agreement, the fact that the formulae to "price" Petitioners' Joint Venture Interest do not aim to value the foreseeable damages, and the degree of sophistication of the parties and their counsel. (*Id.* at ¶¶ 196-209.) The tribunal's interpretation of the law and the contract was rife with error.

61.     The first inquiry of the two-part framework set out by the tribunal – which was the only inquiry by the tribunal since it concluded that the Call Option is not a liquidated damages clause – was erroneous. It is true that much of the case law on the unenforceability of contractual penalties refers to liquidated damages clauses. However, the public policy against penalties is not merely a prohibition of liquidated damages clauses that act as penalties. It is a prohibition on all contractual penalties. *See City of Rye v. Pub. Serv. Mut. Ins. Co.*, 34 N.Y.2d 470, 474-74 (1974). As a matter of law, the only legitimate inquiry is whether the portion of the Call Option provision which allows for the forfeiture of Petitioners' entire Joint Venture Interest as the remedy for the delay in payment of any amount under the COSA or SCOSA operates as a penalty. The tribunal's refusal to conduct that analysis because it concluded that the Call Option was really an exit or termination provision finds no support in the law and in fact is refuted by the relevant authority.

62.     Section 356 of the Restatement (Second) of Contracts contains the classic proposition of law on the unenforceability of contractual penalty clauses based on fundamental notions of public policy.[13]   Although that Section of the Restatement speaks in terms of liquidated damages as penalties, comment c to that Section is explicit in stating that the only inquiry in determining whether a contract provision is a penalty is its effect and not the parties' intent or characterization of the provision:

> *c. Disguised penalties.*  Under the rule stated in this Section, the validity of a term providing for damages depends on the *effect* of that term as interpreted according to the rules stated in Chapter 9. Neither the parties' actual intention as to its validity nor their characterization of the term as one for liquidated damages or a penalty is significant in determining whether the term is valid. Sometimes parties attempt to disguise a provision for a penalty by using language that purports to make payment of the amount an alternative performance under the contract, that purports to offer a discount for prompt performance, or *that purports to place a valuation on property to be delivered.*  Although the parties may in good faith contract for alternative performances and fix discounts or valuations, a court will look to the substance of the agreement to determine whether this is the case or whether the parties have attempted to disguise a provision for a penalty that is unenforceable under this Section.   In determining whether a contract is one for alternative performances, the relative value of the alternative may be decisive. (emphasis added).

63.     Furthermore, there can be no doubt that the Call Option in this case operates as a remedy for a breach of any payment obligation under the COSA or SCOSA and not as an exit or termination provision.  Section 4.1 of the Transfer Agreement states that:

> If [ConocoPhillips] exercises the Call Option, the resulting Transfer following its consummation, shall constitute *the sole and*

---

[13] Section 356(1) of the Restatement (Second) of Contracts states:

> Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss.   A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.

This section of the Restatement (Second) is not only consistent with the law in all 50 states, it has been specifically adopted by decision in 32 states, including New York. (*See* Appendix A hereto.)

> *exclusive remedy* of [ConocoPhillips] and its Affiliates for such
> Call Event. . . .

(*See* Pizzurro Decl. Ex. 2 (emphasis added).)  Thus, the Transfer Agreement provides that the transfer pursuant to the exercise of the Call Option – *i.e.*, ConocoPhillips' acquisition of Petitioners' Joint Venture Interest for $0 – is to be "the sole and exclusive *remedy*" for a Call Event.  And under Exhibit A of the Transfer Agreement, "Call Event" is defined to include "the breach by [PPSA or PDVSA] of any of its payment obligations under the [COSA or SCOSA, respectively] which remains uncured for ninety (90) days."  (*Id.*)

64.     Indeed, the tribunal's own interpretation of the Call Option, made in connection with ConocoPhillips' counterclaim for Seller Damages, makes plain that the tribunal understood that this provision was a remedy for a delay in the payment of any amount of Seller Damages.  The tribunal specifically denied ConocoPhillips' counterclaim for those Seller Damages which gave rise to the Call Event based on its conclusion that the exercise of the Call Option was the contractual remedy for the failure to pay those Seller Damages.

65.     In its analysis of that counterclaim, the tribunal stated:

> The tribunal interprets [Section 4.1] to mean that the Transfer [*i.e.*,
> the acquisition of Petitioners' Joint Venture Interest pursuant to the
> Call Option] is the sole and exclusive *remedy* of ConocoPhillips
> except for damages that had accrued prior to the effective date of
> the Transfer.

(*See* Pizzurro Decl. Ex. 1, ¶ 428 (emphasis added).)  The arbitral tribunal held that "[the COP Parties] cannot recover the Seller Damages for the months of January and March 2009, as these damages would constitute an additional *remedy* 'for such Call Event' which is impermissible from the language of Section 4.1 of the Transfer Agreement."  (*Id.* at ¶ 430 (emphasis added).)  In other words, under the Parties' various contracts, the compensation to which ConocoPhillips was entitled for the failure to pay certain Seller Damages was not the amount of those damages

plus interest. Rather, its remedy was to receive Petitioners' Joint Venture Interest in lieu of those damages. Therefore, under the tribunal's own reasoning, the Call Option operated as a classic penalty in violation of public policy.

66.     The finding that the Call Option is a termination provision as opposed to a stipulated remedy is also undermined by the fact that the exercise of the Call Option did nothing to terminate or even alter the relationship that gave rise to the Call Event. The breach that gave rise to the Call Event was the failure to make a payment under the COSA or SCOSA. But the exercise of that option did not terminate the COSA or SCOSA. Those agreements remain intact. And all of the Parties to the arbitration agreed that the essential contribution to the joint venture from the PDVSA side was the supply of crude oil to be processed at the Sweeny refinery. Thus the exercise of the Call Option did not terminate the most fundamental aspect of the Joint Venture. PPSA and ConocoPhillips remain contractual partners under the COSA.

67.     The irrelevance of labels is illustrated by *Hassett v. Revlon, Inc. (In re O.P.M. Leasing Services, Inc.)*, 23 B.R. 104 (Bankr. S.D.N.Y. 1982). In that case, a lease agreement for computer equipment contained a provision referred to as the "Dollar Option," which provided the lessee with an option to extend the term of the lease for 96 months at a rental rate of one dollar per month in the event that the lessor failed to pay the monthly maintenance charge on the leased equipment and failed to cure such default within 60 days. The lease agreement also entitled the lessee to the actual damages flowing from the failure to pay the monthly maintenance, in addition to the right to exercise the Dollar Option. After the lessor failed to pay the monthly maintenance charge, the lessee exercised the Dollar Option and kept the computer equipment for an additional 60 months for the price of one dollar per month. Thereafter, the lessor's trustee in bankruptcy filed an action to recover the leased equipment. Applying the well-established tests under New York law, the court held that the Dollar Option constituted an

unenforceable penalty. The fact that the remedy for the breach of the maintenance charge was referred to as an "option" was of no relevance whatsoever to the court's analysis.

68.     Accordingly, the arbitral tribunal in this case should have never given weight to the fact that the Article which provides for the Call Option is entitled "Mandatory Transfers," the fact that the recitals of the Transfer Agreement refer to the Parties' "desire to provide for certain restrictions" on the transfer of interests, the fact that the Transfer Agreement also contained a Put Option, the fact that there were other ways to trigger the Call Option, or the fact that there were no other related contracts regulating the transfers of assets.

69.     Nor should the tribunal have given weight to the fact that the Call Option is characterized as an option to "purchase" Petitioners' Joint Venture Interest at a "price" calculated in accordance with one of the stipulated formulae. Much like the Dollar Option in the *Hassett v. Revlon*, those terms are nothing more than labels. They do nothing to negate the penal effect of the Call Option. As shown by the exercise of the Call Option in this case, there was no "purchase" of Petitioners' Joint Venture Interest for a "price" because the stipulated formula chosen by ConocoPhillips yielded a price of $0 for Petitioners' Joint Venture Interest. Under the Call Option provision, ConocoPhillips was entitled to seize an interest worth hundreds of millions of dollars due to the breach by PPSA and PDVSA of the obligation to pay a relatively insignificant debt of approximately $6.9 million. This is exactly the kind of disguised penalty that the Restatement (Second) of Contracts condemns.

70.     The tribunal's reliance on the fact that the formula to determine the "price" of the Petitioners' Joint Venture Interest did not aim to measure damages was also misplaced. The lack of relationship between the actual loss and the stipulated remedy does not serve to avoid penalty analysis or save the stipulated remedy. On the contrary, it establishes that the stipulated remedy does not attempt to proportion damages to the foreseeable loss. The tribunal got it backwards.

*Hassett v. Revlon* is also illustrative on this point. In that case, the Dollar Option held to constitute an unenforceable penalty did not aim to measure damages for the failure to pay a maintenance charge on the leased equipment. It simply allowed the lessee to keep the computer equipment, which was worth $100,000, at the price of $1 per month, for an additional term of 96 months (almost 5 years) because the lessor had failed to pay a maintenance charge of $3,350. The value of the Dollar Option had absolutely no relationship to the actual loss. But that lack of relationship did not serve to avoid penalty analysis or save the Dollar Option. On the contrary, based on that fact, the court found the effect of the Dollar Option was "plainly disproportionate to any potential loss" and therefore an unenforceable penalty. 23 B.R. at 112-13.

71.    Finally, the degree of sophistication of the parties or their counsel should have been immaterial in the tribunal's analysis. As discussed earlier, the public policy against penalties cannot be waived by sophisticated parties or counsel, even expressly by contract. *See Interface Group-Nevada*, 145 F.3d at 136; *see also* RESTATEMENT (SECOND) OF CONTRACTS Ch. 8, Intro. Note. *Interface Group-Nevada* involved a lease agreement between sophisticated entities, TWA and Interface, for the lease of two airplanes. The contract contained a "Remedies" clause that included a formula to calculate the amount of liquidated damages in the event of breach. Furthermore, the contract stated that the stipulated remedy was "not a penalty" and contained the following warranty of enforceability:

> TWA . . . herewith represents, warrants and agrees that *the liquidated damages clause found at Section 17 of this New Lease (as was Section 17 of the Old Lease) is valid, enforceable and negotiated at arms length by parties of equal bargaining power, with the harm difficult to estimate, and based on reasonable valuations as known or possible in the future.*

145 F.3d at 134 (emphasis in original). Following TWA's bankruptcy, TWA contended that the stipulated remedy was a penalty and thus void as contrary to public policy. The court held that

even though the parties had expressly agreed otherwise, the clause was in fact an unenforceable penalty under New York law.  The court rejected Interface's argument that the clause was enforceable because TWA was sophisticated and well represented by counsel, stating that "[t]he mere fact that TWA warranted the enforceability of the provision cannot negate the underlying public policy" against contractual penalties.  *Id.* at 136.

<u>An Application of Any of the Three Tests Establishes That the Call Option Is a Penalty</u>

72.     As set forth above, the tribunal refused to engage in the required analysis of the effect of the Call Option in order to determine if its exercise constituted a penalty.  That analysis entails an application of the three tests:  whether the actual damages were readily ascertainable at the time the parties entered into the agreements; whether the remedy is grossly disproportionate to the foreseeable actual losses; and whether the remedy applies indiscriminately to any and all breaches.  The Call Option violates public policy if it meets any of those tests.  Here it meets all three.

*(1) The Actual Damages Were Readily Ascertainable*

73.     The agreements themselves establish that the loss was readily ascertainable at the time the parties entered into contract.  The Call Event here was a delay in the payment of certain Seller Damages which by definition was a calculable and calculated sum derived from a specific formula contained in the COSA.  (*See* Pizzurro Decl. Ex. 3, Section 2.7.)

74.     It is self-evident that the damages flowing from the failure to pay a liquidated sum are not difficult to ascertain.  Such damages are "easily ascertainable by, inter alia, 'calculating the interest accrued from the time of the breach.'"  *Motichka v. Cody*, 5 A.D.3d 185, 187, 773 N.Y.S.2d 46, 48 (N.Y. App. Div. 1st Dep't 2004).  It is the "general rule that a failure to pay a sum of money due will rarely, if ever, justify a further sum, in excess of interest, to be paid by way of liquidated damages.  On the contrary, such a requirement is likely to be condemned as a

penal forfeiture which the law will not recognize." *Gilad Realty Corp. v. Ripley Pitkin Ave., Inc.*, 48 A.D.2d 683, 368 N.Y.S.2d 228 (N.Y. App. Div. 2d Dep't 1975) (quoting *Manhattan Syndicate, Inc. v.* Ryan, 14 A.D.2d 323, 327, 220 N.Y.S.2d 337, 337 (N.Y. App. Div. 1st Dep't 1961)).  Courts therefore readily strike down stipulated remedies that provide for more than interest for the failure to pay a liquidated amount that is due and payable, because it is clear that "the true purpose of the provision is to 'secure performance by threat of a large payment rather than to provide a reasonable assessment of probable damages.'" *Motichka*, 5 A.D.3d at 187, 773 N.Y.S.2d at 48 (quoting *Quaker Oats Co. v. Reilly*, 274 A.D.2d 565, 566, 711 N.Y.S.2d 498 (N.Y. App. Div. 2d Dep't 2000)); *see, e.g., Bui v. Indus. Enter. of Am., Inc.*, 41 A.D.3d 238, 238, 836 N.Y.S.2d 870, 871 (N.Y. App. Div. 1st Dep't 2007) (holding that a provision in a promissory note calling for the payment of $2,000 a day if the defendant failed to timely pay a judgment was an unenforceable penalty); *Willner*, 145 A.D.2d at 240-41, 538 N.Y.S.2d at 599 (striking down as a penalty a provision which entitled one party to damages in the amount of $110 per week if the other party failed to cure a default in the payment of alimony and child support within seven days); *Gilad Realty*, 48 A.D.2d at 683-84, 368 N.Y.S.2d at 228 (holding that the liquidated damages clause constituted a penalty where it provided damages in the amount of $375 per month, in addition to rent, for every month that the payment of rent was delayed); *see also Grooms v. Rice*, 429 P.2d 298, 300 (Colo. 1967) (affirming the lower court's holding that "[i]n the case of a contract for the payment of money, a stipulation to pay a fixed sum greatly in excess of the interest" in the event of default constitutes an unenforceable penalty).

75.    In this case, the breach that triggered the Call Option was the failure to pay a precise amount of money within 90 days, *i.e.*, $6,930,761 in Seller Damages under the COSA or SCOSA.  To the extent that ConocoPhillips suffered any damages as a result of the delay in

payment, the COSA (and the SCOSA) stipulated that ConocoPhillips was entitled to interest

under Section 2.8(d) of the COSA.  (*See* Pizzurro Decl. Ex. 3.)  Notwithstanding the fact that all

losses were readily ascertainable at the time that the parties entered into the agreement, the Call

Option sets forth a different remedy for that same readily calculable loss:  the right to acquire

Petitioners' Joint Venture Interest without paying a single dollar.  Instead of providing a

reasonable assessment of damages, its true purpose was to secure performance of any and all

payment obligations under the COSA or SCOSA by threat of the loss of the entire Joint Venture

Interest.  That is precisely the kind of provision that constitutes an unenforceable penalty.

> ### (2) The Call Option Remedy Is Grossly Disproportionate to the Foreseeable Actual Losses

76.     The Call Option also fails the second test because the remedy – the acquisition of

Petitioners' Joint Venture Interest worth hundreds of millions of dollars without paying a single

dollar – is obviously grossly disproportionate to the foreseeable loss.  It is well settled that courts

will not enforce a stipulated remedy that does not bear a reasonable proportion to the loss that

was foreseeable at the time the parties entered into the contract.  *See Pub. Serv. Mut. Ins. Co.*, 34

N.Y.2d at 472-74 (holding that the $100,000 bond posted by developers with the city to ensure

completion of six buildings by a certain date was not reasonably proportionate to the foreseeable

loss caused by the delay in construction and therefore constituted an unenforceable penalty);

*Quaker Oats*, 274 A.D.2d at 566, 711 N.Y.S.2d at 498 (holding that the stipulated remedy

providing for an additional $125,000 in compensation if the defendant failed to timely pay

$355,000 was grossly disproportionate to the probable actual damages caused by the delay in

payment and therefore constituted an unenforceable penalty); *Vernitron*, 104 A.D.2d at 410, 478

N.Y.S.2d at 934-35 (holding that a provision calling for the payment of one year's rent as a

remedy for any breach of the lease was clearly disproportionate to the foreseeable loss caused by

the breach and therefore constituted an unenforceable penalty); *United Nat'l Funding, LLC v. Volkmann*, 2009 NY Slip Op 52396U, 25 Misc.3d 1233(A), 906 N.Y.S.2d 776, 776 (Sup. Ct. N.Y. Cnty. 2009) (holding that a $25,000,000 liquidated damages provision was unenforceable because, on its face, it was grossly disproportional to any anticipated loss; payment of the full liquidated damages amount could have been triggered by defendant's breach the day after the agreement was executed and the amount bore no nexus to any probable actual loss that plaintiff might have suffered); *see also Rescuecom Corp. v. Chumley*, 5:07-CV-0690, 2011 U.S. Dist. LEXIS 31928, at *32-33 (N.D.N.Y. Mar. 28, 2011) (holding that a provision for liquidated damages calculated to approximate lost future royalties was unenforceable because the amount did not bear a reasonable relationship to the pecuniary harm plaintiff suffered as a result of defendants' breach); *Phillips*, 820 S.W.2d at 790 (declining to enforce a stipulated remedy that provided for recovery of damages in an amount that was ten times the amount of damages actually suffered).

77.     Here, there is an obvious disproportion between failure to pay a liquidated debt of $6,930,761 in Seller Damages within 90 days and the value of Petitioners' Joint Venture Interest, worth hundreds of millions of dollars. The gross disparity in those amounts was uncontested in the arbitration. In fact, the COP Parties submitted a report by an expert that calculated the value of Petitioners' Joint Venture Interest at the time the Call Option was exercised to be in the range of $352 million to $540 million. (*See* Pizzurro Decl. Ex. 5, at 4.) Thus, according to the COP Parties' own expert, the value of Petitioners' Joint Venture Interest was at least $352 million, more than 50 times the actual loss suffered by COP, which was $6.9 million.

(3) *The Call Option Remedy Applies Indiscriminately regardless of the Magnitude of the Breach*

78.     The Call Option also constitutes a penalty under the third test.  Under the Transfer Agreement, a breach by PPSA or PDVSA "of any of its payment obligations" under the COSA or SCOSA "which remains uncured for ninety (90) days" gives rise to the right of ConocoPhillips to exercise the Call Option remedy.  (*See* Pizzurro Decl. Ex. 2, Section 4.1 & Exhibit A (definition of Call Event).)  Thus, a breach of any payment obligation, no matter how small, which remains outstanding for 90 days triggered the Call Option, permitted ConocoPhillips to confiscate the entirety of Petitioners' Joint Venture Interest.  That is untenable as a matter of public policy.

79.     The law establishes that a stipulated remedy that applies indiscriminately irrespective of the size of the breach (*i.e.*, material or *de minimis*) is an unenforceable penalty. *See Lenco, Inc. v. Hirschfield*, 247 N.Y. 44 (N.Y. 1928) (Cardozo, C.J) (holding that a stipulated remedy which entitled a landlord to keep a tenant's entire security deposit in the event of any breach "however minute or unimportant" constituted an unenforceable penalty); *City of New York v. Brooklyn & Manhattan Ferry*, 238 N.Y. 52 (N.Y. 1924) (holding that a clause which provided that the City could seize a $50,000 bond if the Manhattan Ferry Company breached the lease in any way, irrespective of the amount of damages caused by such failure, constituted an unenforceable penalty); *Seidlitz v. Auerbach*, 230 N.Y. 167 (N.Y. 1920) (holding that a contractual remedy which permitted a landlord to keep the security deposit in its entirety when the tenant failed to pay rent for one month constituted an unenforceable penalty); *see also Kalenka v. Taylor*, 896 P.2d 222, 229 (Alaska 1995) (holding that a stipulated remedy which entitled a land developer to $1000 per day for any unapproved construction by the buyer

constituted an unenforceable penalty because it did not distinguish between different degrees of covenant violations).

80.     The Call Option remedy in the Transfer Agreement is of the same kind and nature as those described above, only far more egregious.  A Call Event triggering the Call Option includes a breach by PPSA or PDVSA "of any of its payment obligations" under the COSA or SCOSA "which remains uncured for ninety (90) days."  (*See* Pizzurro Decl. Ex. 2, Section 4.1 & Exhibit A (definition of Call Event).)  That means that a breach of any payment obligation, no matter how small, which remains outstanding for 90 days triggered the Call Option, permitted ConocoPhillips to confiscate the entirety of Petitioners' Joint Venture Interest.  This case is indistinguishable from *Lenco*, *Brooklyn & Manhattan Ferry*, *Seidlitz*, and *Kalenka*.

81.     In sum, the Call Option remedy is a classic penalty under each test.  It provides an extraordinary remedy for damages that were readily ascertainable at the time the parties entered into contract.  The remedy is grossly disproportionate to the foreseeable loss.  And the same stipulated remedy applies to a breach of any payment obligation, large or small.  In light of those facts, it is clear that the effect is to punish and/or discourage a breach.  As such, it constitutes an unenforceable penalty as a matter of public policy.

82.     Thus the tribunal's interpretation of the Call Option provision is wholly untenable.  And although ordinarily the erroneous interpretation of a contractual provision is not enough to justify vacatur of an arbitral award, in this case, that part of the Award must be vacated because the tribunal's decision serves to enforce a penalty in violation of public policy.

83.     WHEREFORE Petitioners respectfully request an Order and Judgment on their Petition as follows:

a)      Vacating the portion of the Award which dismisses the Call Option Claim

and declares that the COP Parties properly exercised the Call Option on August 28, 2009 and

that ConocoPhillips and Sweeny Sub validly acquired Petitioners' Joint Venture Interest;

b)      Awarding Petitioners its attorneys' fees and costs incurred in this

proceeding; and

c)      For such other and further relief as the Court deems proper.

Dated:  New York, New York,
      July 11, 2014

                                       Respectfully submitted,

                                       CURTIS, MALLET-PREVOST, COLT &
                                          MOSLE LLP

By:_____

                                  Joseph D. Pizzurro
                                  Alexandra G. Maier
                                  Robert B. García
                                  Alyssa J. Astiz
                              101 Park Avenue
                              New York, NY 10178
                              (212) 696-6000

                              *Attorneys for Petitioners PDV Sweeny, Inc.
and PDV Texas, Inc.*