UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PDV SWEENY, INC. and PDV TEXAS, INC., | Case No. 14-cv-5183 (AJN) (FM) |
| Petitioners, | |
| v. | **<u>Oral Argument Requested</u>** |
| CONOCOPHILLIPS COMPANY formerly doing business as PHILLIPS PETROLEUM COMPANY and SWEENY COKER INVESTOR SUB, LLC formerly doing business as SWEENY COKER INVESTOR SUB, INC., | |
| Respondents. | |

**RESPONDENTS' MEMORANDUM OF LAW
IN OPPOSITION TO PETITION TO VACATE
AND IN SUPPORT OF CROSS-PETITION TO CONFIRM,
RECOGNIZE, AND ENFORCE THE ARBITRATION AWARD**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................ii

PRELIMINARY STATEMENT ..............................................................................................1

BACKGROUND TO THE PETITIONS ...................................................................................3

    A.    THE AGREEMENTS ......................................................................................3

        1.    The Supply Agreements ............................................................5

        2.    The Transfer Agreement, the Call Option, and the Put Option ...............5

    B.    THE TRIBUNAL HELD THAT THE CONOCOPHILLIPS PARTIES PROPERLY TERMINATED THE JOINT VENTURE AFTER THE PDVSA PARTIES CUT OFF THE JOINT VENTURE'S SUPPLY AND FAILED TO CURE THEIR CONTRACTUAL BREACHES. .....................................................................................7

    C.    THE ARBITRATION PROCEEDINGS ..............................................................9

        1.    The PDVSA Parties Commenced and Fully Participated in the Arbitration. ..........9

        2.    The Tribunal Received Extensive Evidence on the Merits of the Dispute. ...........11

    D.    FINDINGS OF THE TRIBUNAL RELEVANT TO THE PETITION .............................12

    E.    THE FINAL AWARD ...................................................................................15

JURISDICTION ...................................................................................................................16

ARGUMENT ........................................................................................................................17

    I.    THE PETITION CONFUSES KEY PRINCIPLES GOVERNING VACATUR AND CONFIRMATION OF INTERNATIONAL ARBITRAL AWARDS. ...............17

    II.    THE MERITS REVIEW SOUGHT BY THE PETITION IS UNAVAILABLE. .........20

    III.    THE AWARD IS NOT CONTRARY TO PUBLIC POLICY AND MUST THEREFORE BE ENFORCED. .....................................................................22

    A.    THE COURT'S REVIEW IS LIMITED AND DEFERENTIAL. ..................................22

    B.    ENFORCEMENT OF THE PARTIAL AWARD WOULD NOT "VIOLATE THE MOST BASIC NOTIONS OF MORALITY AND JUSTICE." .............................................24

    IV.    AFTER DENYING THE PETITION, THE COURT SHOULD CONFIRM THE AWARDS. ...........................................................................................29

CONCLUSION .....................................................................................................................30

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*4 Third Ave. Leasehold, LLC v. Permanent Mission of UAE to United Nations*,
 133 F. App'x 768 (2d Cir. 2005) ................................................................................28

*A. Halcoussis Shipping Ltd. v. Golden Eagle Liberia Ltd.*,
 No. 88 CIV. 4500 (MJL), 1989 WL 115941 (S.D.N.Y. Sept. 27, 1989) ..................25

*In re Arbitration Between Interdigital Commc'ns Corp. and Samsung Elecs. Co.*,
 528 F. Supp. 2d 340 (S.D.N.Y. 2007) .......................................................................18

*Banco de Seguros del Estado v. Mut. Marine Office, Inc.*,
 344 F.3d 255 (2d Cir. 2003) ......................................................................... 19, 25, 26

*Banco de Seguros del Estado v. Mut. Marine Offices, Inc.*,
 230 F. Supp. 2d 362 (S.D.N.Y. 2002), *aff'd* 344 F.3d 255 (2d Cir. 2003) ..............16

*Banco de Seguros del Estado v. Mut. Marine Offices, Inc.*,
 230 F. Supp. 2d 427 (S.D.N.Y. 2002), *aff'd* 344 F.3d 255 (2d Cir. 2003) ..............23

*Banco de Seguros del Estado v. Mut. Marine Offices, Inc.*,
 257 F. Supp. 2d 681 (S.D.N.Y. 2003) .......................................................... 17, 19, 29

*Beljakovic v. Melohn Props., Inc.*,
 No. 04 Civ. 3694(JMF), 2012 WL 5429438 (S.D.N.Y. Nov. 7, 2012) ....................18

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*,
 No. 13 Civ. 2581(RWS), 2014 WL 1388519 (S.D.N.Y. Apr. 9, 2014) ....................17

*Cellu-Beep, Inc. v. Telecorp Commc'ns, Inc.*,
 No. 13 Civ. 7236(NRB), 2014 WL 3585515 (S.D.N.Y. July 18, 2014) ........... 20, 21, 22

*Changzhou AMEC Eastern Tools & Equip. Co. v. E. Tools & Equip., Inc.*,
 No. EDCV 11-00354 VAP, 2012 WL 3106620 (C.D. Cal. July 30, 2012) ..............23

*D.H. Blair & Co. v. Gottdiener*,
 462 F.3d 95 (2d Cir. 2006) ..................................................................................22, 29

*Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*,
 333 F.3d 383 (2d Cir. 2003) ......................................................................................21

*F. Hoffmann-La Roche Ltd. v. Qiagen Gaithersburg, Inc.*,
 730 F. Supp. 2d 318 (S.D.N.Y. 2010) .......................................................................29

*Gatzonis v. Vallotis*,
    67 A.D.3d 443 (N.Y. App. Div. 2009)........................................................................27

*GFI Brokers, LLC v. Santana*, Nos. 06 Civ. 3988(GEL), 06 Civ. 4611(GEL),
    2009 WL 2482130 (S.D.N.Y. Aug. 13, 2009)...........................................................28

*Hall Street Assocs., L.L.C. v. Mattel, Inc.*,
    552 U.S. 576 (2008) ................................................................................... 18, 19, 29

*Harry Hoffman Printing, Inc. v. Graphic Commc'ns, Int'l Union, Local 261*,
    912 F.2d 608 (2d Cir. 1990) ......................................................................................16

*JMD Holding Corp. v. Cong. Fin. Corp.*,
    4 N.Y.3d 373 (N.Y. 2005).........................................................................................28

*Jock v. Sterling Jewelers, Inc.*,
    646 F.3d 113 (2d Cir. 2011) ......................................................................................19

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
    364 F.3d 274 (5th Cir. 2004) ...............................................................................24, 25

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*,
    878 F. Supp. 2d 459 (S.D.N.Y. 2012).......................................................................24

*Lamberti v. Angiolillo*,
    73 A.D.3d 463 (N.Y. App. Div. 2010).......................................................................28

*Laminoirs-Trefileries-Cableries de Lens, S.A. v. Southwire Co.*,
    484 F. Supp. 1063 (N.D. Ga. 1980) ..........................................................................26

*Local 97, Int'l Bhd. of Elec. Workers, A.F.L.-C.I.O. v. Niagara Mohawk Power
    Corp.*, 196 F.3d 117 (2d Cir. 1999)......................................................................19, 23

*Metro Funding Corp. v. WestLB AG*,
    No. 10 Civ. 1382(CM), 2010 WL 1050315 (S.D.N.Y. Mar. 19, 2010)....................28

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985) ............................................................................................18, 29

*Porzig v. Dresdner, Kleinwort, Benson, North America LLC*,
    497 F.3d 133 (2d Cir. 2007) ................................................................................18, 19

*Republic of Argentina v. BG Grp. PLC*,
    764 F. Supp. 2d 21 (D.D.C. 2011), *aff'd* 555 F. App'x 2 (D.C. Cir. 2014).........22, 26

*Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins. Co.*,
    668 F.3d 60 (2d Cir. 2012)........................................................................................29

*Schwartz v. Merrill Lynch & Co.*,
   665 F.3d 444 (2d Cir. 2011) ..................................................................................18

*Seed Holdings, Inc. v. Jiffy Int'l AS*, Nos. 13 Civ. 2284(JGK), 13 Civ. 2755(JGK),
   2014 WL 1141717 (S.D.N.Y. Mar. 21, 2014) .........................................................18

*T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*,
   592 F.3d 329 (2d Cir. 2010) ..............................................................................18, 21

*Telenor Mobile Commc'ns AS v. Storm LLC*,
   584 F.3d 396 (2d Cir. 2009) ........................................................................ 19, 22, 24

*TermoRio S.A. v. Electranta S.P.*,
   487 F.3d 928 (D.C. Cir. 2007) ..............................................................................24

*Transmarine Seaways Corp. of Monrovia v. Marc Rich & Co.*,
   480 F. Supp. 352 (S.D.N.Y. 1979) ....................................................................19, 23

*Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*,
   41 N.Y.2d 420 (N.Y. 1977) ....................................................................................27

*United Paperworkers Int'l Union v. Misco, Inc.*,
   484 U.S. 29 (1987) ........................................................................................ 23, 24, 25

*Urban Archaeology Ltd. v. Dencorp Invs., Inc.*,
   12 A.D.3d 96 (N.Y. App. Div. 2004) ......................................................................28

*Vaughn v. Leeds, Morelli & Brown, P.C.*,
   315 F. App'x 327 (2d Cir. 2009) ............................................................................18

*W.R. Grace & Co. v. Local Union 759*,
   461 U.S. 757 (1983) ...................................................................................... 19, 23, 26

*Wallace v. Buttar*,
   378 F.3d 182 (2d Cir. 2004) ...................................................................................20

*Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*,
   103 F.3d 9 (2d Cir. 1997).......................................................................................22

*Yukos Capital S.A.R.L. v. OAO Samaraneftegaz*,
   963 F. Supp. 2d 289 (S.D.N.Y. 2013)................................................................23, 24

*Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*,
   126 F.3d 15 (2d Cir. 1997)........................................................................... 16, 17, 18

*Zurich Am. Ins. Co. v. Team Tankers A.S.*,
   No. 13cv8404, 2014 WL 2945803 (S.D.N.Y. June 30, 2014) ...........................20, 22

**Statutes**

9 U.S.C. § 9 ................................................................................................................................1

9 U.S.C. § 10 ........................................................................................................ 1, 2, 17, 18, 29

9 U.S.C. § 11 ..............................................................................................................................29

9 U.S.C. § 203 ............................................................................................................................16

9 U.S.C. § 204 ............................................................................................................................17

9 U.S.C. § 207 .........................................................................................................................1, 29

9 U.S.C. § 302 ........................................................................................................ 1, 16, 17, 29

9 U.S.C. § 305 ............................................................................................................................16

9 U.S.C. § 307 ..............................................................................................................................1

Respondents ConocoPhillips Company ("ConocoPhillips") and Sweeny Coker Investor Sub, LLC ("Sweeny Sub" and, together with ConocoPhillips, the "Respondents" or the "ConocoPhillips Parties") respectfully submit this Memorandum of Law: (*a*) in opposition to the Petition by PDV Sweeny, Inc. ("PDV Sweeny") and PDV Texas, Inc. ("PDV Texas" and, together with PDV Sweeny, the "Petitioners") pursuant to Sections 10 and 307 of the Federal Arbitration Act (the "FAA") to vacate the Partial Award rendered in ICC Case No. 16982/JRF/CA/ASM (C-17336/JRF), dated April 14, 2014 (the "Partial Award"); and (*b*) in support of Respondents' cross-petition to confirm, recognize, and enforce the Partial Award and a Final Award, dated August 18, 2014 (together, the "Awards"), pursuant to Sections 9, 207, and 302 of the FAA.

## PRELIMINARY STATEMENT

The Petition is an attempt by an unsuccessful claimant in an international arbitration to relitigate legal issues that are properly *res judicata* between the parties and have this Court conduct an impermissible *de novo* review of the arbitral tribunal's decision. The Court should reject the Petition as inconsistent with the Federal Arbitration Act and the well-defined policy in favor of the finality of arbitral resolution—a policy that applies with special force to international commerce.

Petitioners here, along with fellow arbitration claimants Petróleos de Venezuela, S.A. ("PDVSA," the national oil company of Venezuela) and PDVSA Petróleo, S.A. ("PDVSA Petróleo," and, together with PDV Sweeny, PDV Texas, and PDVSA, the "PDVSA Parties"), commenced an arbitration in 2010 under the rules of the International Court of Arbitration of the International Chamber of Commerce ("ICC"). The PDVSA Parties sought to invalidate the ConocoPhillips Parties' termination of a joint venture relationship that had broken down as a

1

result of the PDVSA Parties' prolonged, uncured breaches of their contractual obligations. After a proceeding that lasted more than four years and included thousands of pages of pleadings and supporting documents, the arbitral tribunal issued the Partial Award, dismissing the PDVSA Parties' claims and declaring the joint venture properly terminated by ConocoPhillips.

The Petition seeks to reprise legal arguments considered and rejected in the arbitration, ostensibly on the basis that enforcing the Partial Award would violate public policy, which, if true, could (the Petition asserts) make the Partial Award subject to a narrow—and virtually never recognized—exception to the strong presumption in favor of enforcing arbitral awards.

The Petition makes two fundamental errors:

*First*, the Petition invokes the incorrect body of law. The Inter-American Convention on International Commercial Arbitration of January 30, 1975, 104 Stat. 448, 1438 U.N.T.S. 245 (the "Inter-American Convention"), just as the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"), does not provide any basis for vacatur of an arbitral award. The only proper basis for such an action is Section 10 of the Federal Arbitration Act ("FAA"), and that provision does not permit vacatur for a claimed "public policy" violation (which in any event is not present here).

*Second*, the premise of the Petition is that a vacatur action provides a party license to reargue the merits of an unsuccessful case. That premise is false, and the Petition concedes as much by observing that "ordinarily the erroneous interpretation of a contractual provision is not enough to justify vacatur of an arbitral award . . . ." (Petition at ¶ 82.) The thrust of the Petition therefore becomes that the tribunal did not merely "get it wrong" (an outcome that, the Petition rightly notes, would not support vacatur), but that it got it *so wrong* that the Partial Award constitutes a violation of "public policy." The FAA does not permit the "do-over" sought by the

Petition.

Even if "public policy" were a basis on which to vacate an award, vacatur would not be warranted here.  The key to understanding the flaw in the Petition's generic appeal to "public policy" is understanding what "public policy" means in the context of review of an arbitral award.  *All* laws embody "public policy" in the most reductionist sense.  However, to vacate an arbitral award as offensive to public policy, the Petition must show, not that the result might be different under *some* polity's laws, but that enforcing *this* Award would violate the most basic notions of morality and justice in the United States, by contradicting an explicit, well-defined, and dominant public policy.  Were the standard otherwise, the losing party in an arbitration could always seek a full merits review under the guise of "public policy."  This country's "most basic notions" of public policy are not implicated here, let alone violated.  The Petition should be denied.

Once the vacatur Petition has been denied, the FAA directs this Court summarily to confirm the Partial Award, as sought by Respondents' cross-petition.  Confirmation of the Final Award, dated August 18, 2014, is likewise warranted under the FAA.

## BACKGROUND TO THE PETITIONS[1]

### A.   THE AGREEMENTS

The ConocoPhillips Parties and the PDVSA Parties formed the Merey Sweeny, L.P. joint venture ("Merey Sweeny" or the "Joint Venture") in the late 1990s for the construction and operation of specialized oil refining facilities within the Sweeny Refinery, a complex then owned by Phillips Petroleum Company ("Phillips") in Old Ocean, Texas.  (Dkt. No. 4-1, Declaration of Joseph D. Pizzurro, dated July 11, 2014 ("Pizzurro Decl."), Ex. 1 ("Partial Award") at ¶¶ 1, 110–

---

[1]      Unless stated otherwise, all facts are taken from the Partial Award.

11.)[2]  At that time, PDVSA had been seeking a long-term supply agreement with a major U.S. refiner, and ConocoPhillips hoped to gain a competitive advantage by processing lower-cost, heavy, sour crude oil into saleable products.  (*Id.* at ¶ 110.)

In their discussions, the parties proposed two related commercial relationships.  *First*, PDVSA Petróleo would supply to ConocoPhillips monthly volumes of a heavy crude oil blend known as "Merey 16" under a long-term supply agreement.  (*See id.* at ¶¶ 111, 119, 204.) *Second*, the Joint Venture would process and refine the Merey 16, with any profits of the Joint Venture split equally between the ConocoPhillips Parties and the PDVSA Parties.  (*See id.* at ¶ 111, 115.) The parties' commercial relationship came to be governed by a complex suite of agreements negotiated between sophisticated parties with sophisticated external counsel.  The PDVSA Parties were represented by Cleary Gottlieb Steen & Hamilton LLP.  (*Id.* at ¶¶ 117, 182, 206, 260.)

The costs of building and upgrading the refinery equipment necessary to process Merey 16 amounted to approximately $537.5 million.  (*Id.* at ¶¶ 112–13.)  As joint venture partners, the PDVSA Parties and the ConocoPhillips Parties bore those costs equally, financing most of the project through the issuance of debt.  (*See id.* at ¶ 113.)

The Joint Venture generated revenue as follows:  ConocoPhillips first processed the crude oil it purchased from PDVSA Petróleo, generating a by-product known as long residue. (*Id.* at ¶¶ 115, 120.)  ConocoPhillips then paid the Joint Venture a monthly Processing Fee to refine that long residue further into marketable by-products.  (*See id.* at ¶ 115.)  After covering operating expenses, any remaining revenue from the Processing Fee and certain other smaller

---

[2]     Conoco Inc. and Phillips merged to form ConocoPhillips on August 30, 2002.   For the Court's convenience, all references to Phillips are designated as "ConocoPhillips" as the successor in interest to Phillips. (*See* Partial Award at ¶ 109 n.5.)

sources of revenue was distributed as profit equally to the Joint Venture partners.

On June 18, 1999, the ConocoPhillips Parties and the PDVSA Parties executed a series of contracts to memorialize the relationship described above, including: (*a*) the Crude Oil Supply Agreement ("COSA") between ConocoPhillips and PDVSA Petróleo; (*b*) the Supplemental Crude Oil Supply Agreement ("SCOSA") between ConocoPhillips and PDVSA; and (*c*) the Project Documents governing the Joint Venture, including the Transfer Agreement, which set forth the terms and conditions for any transfer of the parties' respective interests in the Joint Venture. (*Id.* at ¶¶ 116–17, 271.)

### 1.    The Supply Agreements

Under the COSA, governed by Venezuelan law, PDVSA Petróleo committed to supply ConocoPhillips with a monthly volume of contractually defined Merey Crude Oil or a pre-determined substitute. The parties agreed that if PDVSA Petróleo reduced or ceased the supply of crude oil, it would be liable to ConocoPhillips for damages, defined as "Seller Damages," which would be calculated under a formula set forth in the COSA. (Partial Award at ¶ 119; Dkt. No. 4-10, Pizzurro Decl., Ex. 3 ("COSA") at § 2.7.) In addition, the SCOSA, governed by New York law, explicitly incorporated the Seller Damages provisions of the COSA and obligated PDVSA to step into the shoes of PDVSA Petróleo and either provide Replacement Crude Oil or pay Seller Damages in the event of an unexcused supply failure by PDVSA Petróleo. (Partial Award at ¶ 121; Dkt. No. 4-11, Pizzurro Decl., Ex. 4 ("SCOSA") at § 2.6.)

### 2.    The Transfer Agreement, the Call Option, and the Put Option

The Transfer Agreement among PDV Sweeny, PDV Texas, ConocoPhillips, and Sweeny Sub (the four parties to this action), governed by New York law, provided two general categories of transfers of the parties' interests in the Joint Venture. Article III governed authorized voluntary transfers, and Article IV governed Mandatory Transfers—a finite set of circumstances

under which a party could unwind the Joint Venture by mandating the transfer of the interests held by PDV Sweeny and PDV Texas to ConocoPhillips (Partial Award at ¶ 118; Dkt. No. 4-8, Pizzurro Decl., Ex. 2 ("Transfer Agreement") at Arts. III, IV.)   Section 4.1 provided ConocoPhillips with a Call Option, by which it could purchase the interests held by PDV Sweeny and PDV Texas if a Call Event had occurred.  Reciprocally, Section 4.2 provided PDV Sweeny and PDV Texas with a Put Option, whereby they could require ConocoPhillips to purchase their interests if a Put Event had occurred.   (Partial Award at ¶ 196; Transfer Agreement at §§ 4.1, 4.2.)

> The parties defined "Call Event" in Exhibit A to the Transfer Agreement as follows:
>
> (i) any transfer by PDV Sweeny or PDV Texas in violation of the Transfer Agreement; (ii) the failure by PDV Sweeny to make Pre-Completion Capital Contribution or a Mandatory Post-Completion Capital Contribution within ninety (90) days of the due date therefor pursuant to the Partnership Agreement; (iii) a breach by [PDVSA Petróleo] of any of its payment obligations under the Crude Oil Supply Agreement which remains uncured for ninety (90) days; (iv) a breach by PDVSA of any of its payment obligations under the Supplemental Crude Oil Supply Agreement which remains uncured for ninety (90) days; (v) a breach by PDVSA under the PDVSA New York Guarantee or the PDVSA Venezuela Guarantee which remains uncured for ninety (90) days; (vi) any event the result of which is that PDV Texas or any permitted transferee of its LLC Interest ceases to be a direct or indirect wholly-owned subsidiary of PDVSA or (vii) any event the result of which is that PDV Sweeny or any permitted transferee of its Partnership Interest ceases to be a direct or indirect wholly-owned subsidiary of PDVSA, except in either case as set forth in Section 3.3(b) or Section 3.3(c) [governing authorized transfers].

(Partial Award at ¶ 195; Transfer Agreement, Exhibit A at A-1.)  As the tribunal observed, each of the enumerated triggers of a Call Event refers to (*a*) an uncured default on a payment obligation, (*b*) a breach of an agreement, or (*c*) some other situation "which the parties agreed [was] unsatisfactory to them and in which they did not want to continue their Joint Venture." (Partial Award at ¶ 197.)

> Reciprocally, the parties defined "Put Event" to encompass (*a*) a breach of the

ConocoPhillips Parties' payment obligations that remained uncured for 90 days (sub-provisions (ii), (iii), (vi) and (vii)), (*b*) unauthorized transfers by the ConocoPhillips Parties ((i) and (viii)), or (*c*) failures by ConocoPhillips to fulfill its obligations as processor and operator ((iv) and (v)). (*See* Transfer Agreement, Exhibit A at A-5.)

If a Call Event occurred, ConocoPhillips had the right, within 90 days, to purchase the entire interest of PDV Sweeny and PDV Texas in the Joint Venture. Section 4.1 of the Transfer Agreement gave ConocoPhillips the right to elect either of two alternative formulas for calculating the purchase price, requiring the PDVSA Parties to relinquish their interest in the Joint Venture for an amount equal to either: (x) one half of 80% of the contractually defined Fair Value of their interest; or (y) 80% of the difference between the amount the PDVSA Parties had contributed to the Merey Sweeny joint venture and the amount that they had received from the venture in the form of dividends. (Partial Award at ¶ 165; Transfer Agreement § 4.1.)

Section 4.2, meanwhile, contained reciprocal formulas in the event that PDV Sweeny and PDV Texas opted to force the sale of their interests to ConocoPhillips via the Put Option. (*See* Transfer Agreement § 4.2.)

### B.   THE TRIBUNAL HELD THAT THE CONOCOPHILLIPS PARTIES PROPERLY TERMINATED THE JOINT VENTURE AFTER THE PDVSA PARTIES CUT OFF THE JOINT VENTURE'S SUPPLY AND FAILED TO CURE THEIR CONTRACTUAL BREACHES.

Merey Sweeny became a successful refining venture shortly after its launch. In less than ten years after the agreements had been executed, both the ConocoPhillips Parties and the PDVSA Parties had received over *$1.1 billion* in cumulative distributions, more than four times the amounts of their respective initial contributions. (*See* Partial Award at ¶ 168.)

Despite the profitability of the Joint Venture, the tribunal found, on December 31, 2008, the PDVSA Parties announced their intention immediately to discontinue deliveries of Merey

Crude Oil to ConocoPhillips.  (*Id.* at ¶ 124.)  The tribunal held that the supply cutoff was a breach of the PDVSA Parties' obligations under the COSA and the SCOSA.  (*Id.* at ¶¶ 329, 333.) Furthermore, the tribunal found, other U.S. refiners had continued to receive crude oil from PDVSA Petróleo (*id.* at ¶ 331), meaning that the supply cutoff discriminated against ConocoPhillips—which, incidentally, was pursuing a high-profile $30 billion claim against Venezuela under the International Centre for Settlement of Investment Disputes ("ICSID") system. (*See id.* at ¶¶ 131–33, 285(b).)

As the supply cutoff dragged on, the ConocoPhillips Parties timely submitted written demands to the PDVSA Parties claiming Seller Damages for January, March, April, June, July, and August 2009.  (*Id.* at ¶ 129.)  Meanwhile, ConocoPhillips sought to obtain alternate supplies of crude for Merey Sweeny to process in order to mitigate the effects of the cutoff.  (*See id.* at ¶¶ 128–31.)

The PDVSA Parties neither paid nor challenged the appropriateness or calculation of Seller Damages.  (*Id.* at ¶ 134.)  Thus, the tribunal held, under the COSA, Seller Damages claimed for January 2009 became payable on the contractual Damages Due Date of March 2, 2009. (*Id.* at ¶ 129; *cf.* COSA § 2.8(d).)  When the PDVSA Parties did not pay the January 2009 Seller Damages within 90 days of the Damages Due date—*i.e.*, by June 1, 2009—a Call Event arose pursuant to the Transfer Agreement.  (*See* Partial Award at ¶¶ 135, 334(g); Transfer Agreement, Exhibit A at A-1.)  Similarly, Seller Damages claimed for March 2009 became payable on April 30, 2009.  When those also went unpaid for 90 days, a second Call Event arose. Because Section 4.1 of the Transfer Agreement gave ConocoPhillips a 90-day window in which to exercise the Call Option following a Call Event, the tribunal held that two overlapping Call Option windows were open as of August 2009, for unpaid Seller Damages incurred, respectively,

in January and March 2009.  (*See* Partial Award at ¶¶ 135–36; Transfer Agreement § 4.1.)

Representatives of the parties met several times throughout this period, but the PDVSA Parties never resumed supply or paid Seller Damages.  (*See* Partial Award at ¶¶ 130–33.)  As a result, ConocoPhillips exercised the Call Option on August 28, 2009.  (*Id.* at ¶ 136.)  The tribunal held that ConocoPhillips had possessed the right to do so for nearly three months before it chose to exercise the Call Option.  (*See id.* at ¶¶ 254, 334(g), 335.)  Because the PDVSA Parties had received dividends from Merey Sweeny (over $1.1 billion) well in excess of their contributions (less than $270 million), ConocoPhillips exercised its right to elect (y) under Section 4.1 of the Transfer Agreement to determine the cash amount to be paid to the PDVSA Parties for their joint venture interests.  (*Id.* at ¶ 165.)  This contractually predetermined formula did not require any cash to change hands, but it did require that ConocoPhillips assume the PDVSA Parties' outstanding debt obligations, which amounted to approximately $195 million.[3] (*Id.* at ¶ 169.)

### C.   THE ARBITRATION PROCEEDINGS

#### 1.   The PDVSA Parties Commenced and Fully Participated in the Arbitration.

Petitioners commenced an arbitration under the ICC Rules of Arbitration (the "ICC Rules") on February 25, 2010 (ICC Case No. 16982).  (Partial Award at ¶¶ 29–30.)  As set out below, the ensuing proceedings lasted more than four years and included several rounds of written pleadings and a week-long evidentiary hearing before the tribunal ultimately issued the

---

[3]   Accordingly, the Petition's repeated assertion that Respondents acquired the Petitioners' interest in the Joint Venture for "$0" is incorrect, as the ConocoPhillips Parties assumed the obligation to service almost $200 million in additional debt, and relieved the PDVSA Parties of that obligation.  (*See, e.g.*, Petition at ¶ 39.)  Similarly misleading is the Petition's statement that the ConocoPhillips Parties "never disputed the extraordinary value of Petitioners' Joint Venture Interest."  (*Id.* at ¶ 40.)  In fact, throughout the arbitration proceedings, Petitioners asserted—without evidentiary support—that their interest was worth $750 million, a claim that Respondents vigorously disputed.  (*See, e.g.*, Partial Award at ¶¶ 6, 185–86.)

reasoned, 172-page Partial Award now challenged by the Petition.

The parties appointed a distinguished panel of international arbitrators to hear the case. The ConocoPhillips Parties appointed the tribunal's only U.S. lawyer, the Honorable Abraham D. Sofaer, a former judge of this Court and former Legal Adviser of the United States Department of State. The PDVSA Parties appointed Bruno W. Boesch, who has an extensive practice as an international commercial arbitrator and serves as chair of an ICC task force on trusts and arbitration. Co-arbitrators Sofaer and Boesch then nominated as chairman David R. Haigh, Q.C., an experienced arbitrator of high standing who specializes in energy disputes and has served as the chairman of the Canadian National Committee for the ICC and a director of the American Arbitration Association. (*See generally* Partial Award at ¶¶ 31–46.)[4] That the Award was unanimous in concluding that the Call Option is an enforceable termination provision is not without moment, inasmuch as it means that the arbitrator appointed by the PDVSA Parties agreed with Respondents on all matters relevant to the Petition and rejected Petitioners' arguments in their entirety.

The resulting arbitration consisted of several sets of claims and counterclaims, only one of which is relevant here: the PDVSA Parties' claim that the Call Option was invalid (the "Call Option Claim"), which PDVSA pursued under four different theories, including the "unenforceable penalty" argument addressed in the Petition (as well as theories of breach of fiduciary duty, breach of implied covenant of good faith and fair dealing, and excusal by *force majeure*). (Partial Award at ¶¶ 2–4.) On April 3, 2013, Petitioners agreed that they had received a reasonable opportunity to present their cases with respect to the claims which they now seek to

---

[4]        For Judge Sofaer's biography, *see* http://www.hoover.org/fellows/abraham-d-sofaer. For Mr. Haigh, *see* http://www.bdplaw.com/david-r-haigh-q-c. For Mr. Boesch, *see* http://www.froriep.com/professionals/partners/bruno-w-boesch.

place at issue again. (*Id.* at ¶ 102.)

### 2. The Tribunal Received Extensive Evidence on the Merits of the Dispute.

From May 3, 2011, when the tribunal executed the Terms of Reference that defined the scope of issues to be determined in the arbitration, until the tribunal rendered the Partial Award on April 14, 2014, the parties submitted several rounds of written pleadings. The PDVSA Parties submitted approximately 350 pages of briefing, seven fact witness statements, two expert reports, 97 fact exhibits, and 109 legal authorities.[5] The ConocoPhillips Parties submitted approximately 500 pages of briefing, ten fact witness statements, three expert reports, 115 exhibits, and 91 legal authorities.[6]

The tribunal convened an evidentiary hearing that lasted five days, from December 8–12, 2012, during which it heard opening statements by counsel as well as the testimony of nine fact and two expert witnesses. (*See* Partial Award at ¶ 96.)[7]

After receiving the parties' post-hearing briefs on March 1, 2013, the tribunal deliberated

---

[5]    These include the PDVSA Parties' Statement of Claim dated August 3, 2011; Reply to Statement of Defense, Statement of Defense to Counterclaims and Statement of New Claims dated May 23, 2012 ("Reply"); Rejoinder to Counterclaims and Reply in Support of New Claims dated October 8, 2012; Opening Skeleton argument dated December 3, 2012; and Post-Hearing Brief dated March 1, 2013. (*See* Partial Award at ¶¶ 69, 77, 92, 93, 100; Declaration of Sam Prevatt, dated August 29, 2014 ("Prevatt Decl.") at ¶ 3 and Exs. A–C, Excerpts from PDVSA Parties' Statement of Claim, Reply, and Post-Hearing Brief.) Given the scale of the arbitral record, Respondents have submitted only excerpts required for factual background or otherwise relevant to the limited nature of the Court's review. Respondents can, of course, provide complete versions of any submission, transcript, or ruling in the arbitration should the Court so request.

[6]    These include the ConocoPhillips Parties' Statement of Defense and Counterclaims dated December 20, 2011 ("Statement of Defense"); Rejoinder, Reply to Counterclaims and Statement of Defense to New Claims dated August 6, 2012 ("Rejoinder"); Rejoinder to New Claims dated November 14, 2012; Opening Skeleton argument dated December 3, 2012; and Post-Hearing Memorial dated March 1, 2013. (*See* Partial Award at ¶¶ 72, 88, 93, 94, 100; Prevatt Decl. at ¶ 3 and Exs. D–F, Excerpts from ConocoPhillips Parties' Statement of Defense, Rejoinder, and Post-Hearing Memorial.)

[7]    The Partial Award inadvertently omitted reference to Mr. Rodrigo Favela Fierro, who also testified on behalf of the PDVSA Parties. (*Cf.* Partial Award at ¶ 372.)

for more than a year before issuing the 172-page Partial Award.[8]  The Award definitively decided the merits of the parties' claims, leaving only the matters of interest and costs to be resolved after further submissions.  (Partial Award at ¶¶ 495–97.)  The Petition does not challenge the tribunal's decision regarding the PDVSA Parties' remaining three theories on the Call Option Claim, or its decisions on the parties' other claims and counterclaims.

On August 18, 2014, the tribunal issued the Final Award, which was then dispatched to the parties by the ICC on August 22, 2014.  (Prevatt Decl. at ¶ 11 and Ex. G ("Final Award").)  The Final Award grants the ConocoPhillips Parties interest on the sums awarded in the Partial Award and requires the PDVSA Parties to indemnify the ConocoPhillips Parties for 40 percent of the legal fees and costs they incurred in the arbitration.  (Final Award at ¶¶ 30, 32, 49, 54.)

### D.   FINDINGS OF THE TRIBUNAL RELEVANT TO THE PETITION

During the arbitration, the ConocoPhillips Parties argued, across 53 pages in three substantive written pleadings, that the Call Option is valid and enforceable under New York law because it is a joint venture termination provision rather than a liquidated damages clause.  Alternatively, even if the Call Option were analyzed as a liquidated damages clause, they argued, it is enforceable under New York law and does not constitute an impermissible penalty.  (*See* Partial Award at ¶¶ 178–87; Prevatt Decl., Exs. D–F, Excerpts from ConocoPhillips Parties' Statement of Defense, Rejoinder, and Post-Hearing Memorial.)

The PDVSA Parties argued, across 36 pages in three substantive written pleadings, that the Call Option constitutes a contractual penalty clause that is unenforceable under New York law.  (*See* Partial Award at ¶¶ 172–77; Prevatt Decl., Exs. A–C, Excerpts from PDVSA Parties'

---

[8]       Pursuant to the ICC Rules, the Partial Award was scrutinized and approved by the ICC International Court of Arbitration before being signed by the tribunal, as was the Final Award.  *See* ICC Arbitration Rules (1998), Art. 27, *available at* http://www.jus.uio.no/lm/icc.arbitration.rules.1998/portrait.pdf.

Statement of Claim, Reply, and Post-Hearing Brief.)

The tribunal carefully analyzed the arguments of the parties, including the PDVSA Parties' arguments relating to the notion that the Call Option constituted an unenforceable penalty under New York law. The tribunal held that the PDVSA Parties' arguments were unavailing because "the text of the Call Option provision clearly shows that it is a termination provision." (Partial Award at ¶ 206.) The tribunal noted that the Call Option and the reciprocal Put Option each "operates as a termination provision allowing the non-breaching party to exit the Joint Venture," rather than as a liquidated damages clause. (*Id.* at ¶ 201.) In conducting its analysis, the tribunal observed that such termination provisions are "often found in joint venture agreements where [as here] one party is the operator of the joint venture." (*Id.* at ¶ 196.) Rather than imposing liquidated damages, the Call and Put Options "set out when and how a joint venturer can unwind or transfer its interest in the Joint Venture—effectively ways to 'terminate' or 'end' its participation in the Joint Venture." (*Id.*) Notably, the tribunal found no other unwinding provisions in any of the agreements related to Joint Venture. (*Id.* at ¶ 205.)

In addition to the textual analysis summarized above, the tribunal made key factual findings regarding the negotiation history that corroborated its determination that the Call Option is a termination provision. *First*, the tribunal found that the Call and Put Options were originally proposed and drafted by the PDVSA Parties and their sophisticated outside counsel (Cleary Gottlieb), who labeled the draft provision as a "PDVSA Termination Proposal." The PDVSA Parties circulated the proposal during negotiations with a note explaining that the purpose of the Call and Put Options was to allow for the dissolution of the joint venture at the election of the non-breaching partner:

> [T]he only realistic remedy for a material breach of any of the Project Documents
> is a remedy that permits the injured party to unwind the joint venture on favorable

terms. Under this proposal, Phillips and PDVSA would each have the option to
unwind the joint venture in the event of a material breach of any of the Project
Documents (including the Crude Oil Supply Agreement) by the other (or any of
its affiliates, other than the Joint Venture).

(Partial Award at ¶¶ 206–07 (quoting PDVSA Termination Proposal dated May 7, 1998).)
*Second*, although an initial draft of the Transfer Agreement would have required the exercising
party to notify the defaulting party of a material breach and then give that party 30 days to cure,
that provision was removed during negotiations. (Partial Award at ¶ 259.) *Third*, the second
formula in Section 4.1—*i.e.*, the option "(y)" that ConocoPhillips selected upon exercising the
Call Option—was included in the Transfer Agreement at the insistence of the *PDVSA Parties*,
who were aware that they "might receive a low cash payout (or no cash payout) depending on
the formula to be applied." (*Id.* at ¶¶ 209, 260 (quoting witness testimony).) That formula
ultimately enabled ConocoPhillips to exercise the Call Option without making a cash payout
(although ConocoPhillips assumed the PDVSA Parties' outstanding debt obligations of
approximately $195 million), but did so only because by that time the PDVSA Parties had
received dividends in excess of $1.1 billion, roughly four times their initial investment in the
venture. (*Id.* at ¶¶ 165, 168–69.)

Finally, the tribunal found that the ConocoPhillips Parties had "legitimate reasons to
exercise the Call Option" given the difficulties of operating Merey Sweeny in the face of the
PDVSA Parties' intransigence. (Partial Award at ¶ 256.) The PDVSA Parties "had ample
opportunity" to cure their defaults, but instead "persisted in ignoring ConocoPhillips." (*Id.* at
¶ 261.) The tribunal also found that ConocoPhillips had not breached any fiduciary duties owed
to its co-venturer, had not breached any implied covenant of good faith and fair dealing, and that
the PDVSA Parties' conduct could not be excused on grounds of *force majeure*. (*Id.* at ¶¶ 281,
303, 329, 333.) ConocoPhillips thus legitimately exercised the Call Option, thereby acquiring

14

the interests held by PDV Sweeny and PDV Texas and terminating the Merey Sweeny joint venture.  (*See id.* at ¶¶ 201–02, 335.)

Separately from the Call Option claim, the tribunal awarded the ConocoPhillips Parties the Seller Damages that they had claimed for April, June, and July 2009, totaling $5,064,038. That sum did not include Seller Damages for the months that gave rise to Call Events under the Transfer Agreement (*i.e.*, January and March 2009).  (Partial Award at ¶¶ 430–32.)  As noted above, the Petition does not challenge the award of Seller Damages.

## E.    THE FINAL AWARD

In the Final Award, the tribunal awarded the ConocoPhillips Parties pre-Award interest on the April, June, and July 2009 Seller Damages at the rate of 4.875 percent, for a total sum of $1,186,775.31.  (Final Award at ¶¶ 30, 54(a); *cf.* COSA § 2.8(d).)  The tribunal further awarded the ConocoPhillips Parties post-Award interest on unpaid Seller Damages at the same rate of 4.875 percent, running from the Partial Award date of April 14, 2014 until the date of payment. (Final Award at ¶¶ 32, 54(b).)

Finally, the tribunal ordered the PDVSA Parties to pay 40 percent of the ConocoPhillips Parties' legal costs and expenses, making a costs award of $3,709,069.80.  (*Id.* at ¶¶ 49, 54(c).) The tribunal noted that "in international commercial arbitration, the awarding of costs is frequently addressed, at least initially, in terms of which party has prevailed."  (*Id.* at ¶ 36.) Exercising its "broad discretion" under the ICC Rules [9] the tribunal determined that the ConocoPhillips Parties had achieved "relative success" in the arbitration, and therefore shifted 40 percent of their costs to the PDVSA Parties.  (*Id.* at ¶¶ 35, 49.)  The tribunal awarded simple interest on the costs award at the New York statutory rate of 9 percent per annum, following a

---

[9]     Article 31(3) of the ICC Rules provides that the "final Award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties."  *See* ICC Arbitration Rules (1998), Art. 31, *available at* http://www.jus.uio.no/lm/icc.arbitration.rules.1998/portrait.pdf.

30-day grace period.  (*Id.* at ¶¶ 53, 54(e).)

## JURISDICTION

The Court has subject matter jurisdiction over Respondents' cross-petition for confirmation, recognition, and enforcement of the Awards pursuant to Section 302 of the Federal Arbitration Act (the "FAA"), which grants the federal courts subject matter jurisdiction over claims arising under the Inter-American Convention.[10]  *See* 9 U.S.C. § 302 (incorporating 9 U.S.C. § 203); *Banco de Seguros del Estado v. Mut. Marine Offices, Inc.*, 230 F. Supp. 2d 362, 367–68 (S.D.N.Y. 2002) ("*Banco I*"), *aff'd* 344 F.3d 255 (2d Cir. 2003).  The arbitration is subject to the Inter-American Convention because it "arises from a commercial relationship between citizens of signatory nations," the United States and Venezuela.  *Banco I*, 230 F. Supp. 2d at 367.

Where the requirements of both the Inter-American Convention and the New York Convention are met, the Inter-American Convention governs if, as here, a majority of the parties to the arbitration agreement are citizens of States that have ratified the Inter-American Convention and are member States of the Organization of American States.  9 U.S.C. § 305; *Banco I*, 230 F. Supp. 2d at 367 n.4.  Neither convention, however, provides the substantive grounds for vacatur of an arbitral award.  As discussed below, those grounds are limited to those provided by the FAA and judicial precedents applying it.  *See Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 21 (2d Cir. 1997) ("We read Article V(1)(e) of the [New York] Convention to allow a court in the country under whose law the arbitration was conducted to apply domestic arbitral law, in this case the FAA, to a motion to set aside or vacate that arbitral

---

[10]    The FAA does not itself confer federal question jurisdiction.  *Harry Hoffman Printing, Inc. v. Graphic Commc'ns, Int'l Union, Local 261*, 912 F.2d 608, 611 (2d Cir. 1990) ("[W]e have consistently held that Congress did not intend the [FAA] as a grant of jurisdiction.  There must be an independent basis of jurisdiction before a district court may entertain petitions under the [FAA].").

award."); *Banco de Seguros del Estado v. Mut. Marine Offices, Inc.*, 257 F. Supp. 2d 681, 685 (S.D.N.Y. 2003) ("*Banco III*") ("[A] court applying the Inter-American Convention may vacate an arbitration award based on the grounds recognized under the FAA.").

The Court has personal jurisdiction over the parties, and venue properly lies in the Southern District of New York, pursuant to 9 U.S.C. § 302 (incorporating 9 U.S.C. § 204), because the place of arbitration was New York, New York. (*See* Partial Award at ¶ 27.)

## ARGUMENT

### I.   THE PETITION CONFUSES KEY PRINCIPLES GOVERNING VACATUR AND CONFIRMATION OF INTERNATIONAL ARBITRAL AWARDS.

In the United States, two distinct bodies of law govern the status of international arbitral awards. The Petition fails to distinguish between the two, with misleading effect. (*See* Petition at ¶¶ 45–46.) The New York and Inter-American Conventions govern the *recognition and enforcement* of international arbitral awards. A petition to *vacate, set aside, or annul* an arbitral award, however, is governed by the domestic law of the country in which the award was rendered. *See Toys "R" Us*, 126 F.3d at 21 (2d Cir. 1997) (the New York Convention "allow[s] a court in the country under whose law the arbitration was conducted to apply domestic arbitral law, in this case the FAA, to a motion to set aside or vacate the arbitral award. . . . [T]he court may apply FAA standards to a motion to vacate a nondomestic award rendered in the United States."); *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, No. 13 Civ. 2581(RWS), 2014 WL 1388519, at *9 (S.D.N.Y. Apr. 9, 2014).

The significance of the distinction for present purposes is this: by agreeing to an arbitral seat, the parties agree that any judicial challenge to the validity of the resulting arbitral award will be governed by the law of that jurisdiction—here, Section 10 of the FAA. Accordingly, in this case Section 10 of the FAA and the cases applying it provide the exclusive grounds for

vacatur; the Inter-American Convention supplies the standards for recognition and enforcement, but *does not provide* authority or a basis for vacatur. *See Toys "R" Us*, 126 F.3d at 23 (the State in which an award is made may "set aside or modify an award in accordance with its domestic arbitral law"); *Seed Holdings, Inc. v. Jiffy Int'l AS*, Nos. 13 Civ. 2284(JGK), 13 Civ. 2755(JGK), 2014 WL 1141717, at *10 (S.D.N.Y. Mar. 21, 2014).

Courts applying the FAA consistently take into account the "emphatic federal policy in favor of arbitral dispute resolution," which "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). In view of that "emphatic" policy, Congress has authorized the courts to vacate arbitral awards only in those limited circumstances specified in Section 10 of the FAA. *See* 9 U.S.C. § 10.[11]

There is no "public policy" basis for vacatur under Section 10 of the FAA. *Porzig v. Dresdner, Kleinwort, Benson, North America LLC*, 497 F.3d 133, 139 (2d Cir. 2007) (declining to expand the "narrow" path to vacatur to include non-statutory bases such as an award being "contrary to an explicit public policy"); *Vaughn v. Leeds, Morelli & Brown, P.C.*, 315 F. App'x 327, 330 (2d Cir. 2009) ("We have not recognized any . . . non-statutory bases for vacatur" other than manifest disregard of the law.); *In re Arbitration Between Interdigital Commc'ns Corp. and Samsung Elecs. Co.*, 528 F. Supp. 2d 340, 349 (S.D.N.Y. 2007); *Beljakovic v. Melohn Props., Inc.*, No. 04 Civ. 3694(JMF), 2012 WL 5429438, at *2 & n.3 (S.D.N.Y. Nov. 7, 2012).[12] Even

---

[11]     Even when considering claims arising under the extra-statutory "manifest disregard of the law" doctrine (which is itself in doubt following the Supreme Court's decision in *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008)), courts in this Circuit have held that the doctrine constitutes, at most, a judicial gloss on the enumerated grounds under 9 U.S.C. § 10, and does not therefore empower a court to look beyond the grounds for vacatur enumerated in the FAA. *See T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339–40 (2d Cir. 2010); *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 452 (2d Cir. 2011).

[12]     The Petition cites older cases in which courts in this Circuit facing public policy arguments appear to have conflated the distinction between a vacatur petition and a confirmation and enforcement petition. *See Local 97, Int'l*

in the context of a defense to the confirmation and recognition of an award (which is sought here by Respondents), a court may refuse to enforce an arbitral award under the narrow "public policy" exception only in the rare case in which enforcement of the award would violate the "most basic notions of morality and justice" in the United States. *Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 411 (2d Cir. 2009); *see also Banco de Seguros del Estado v. Mut. Marine Office, Inc.*, 344 F.3d 255, 264 (2d Cir. 2003) ("*Banco IV*").

This Court's review of the Awards, like all judicial review under the FAA of any decision within the competence of arbitrators, is "highly deferential" and weighted in favor of the enforcement of awards. *See Banco III*, 257 F. Supp. 2d at 686. Courts vacate awards only in cases of "egregious departures from the parties' agreed-upon arbitration" or "extreme arbitral conduct." *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008). The FAA provides for "just the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway" and to prevent arbitration from becoming "merely a prelude to a more cumbersome and time-consuming judicial review process." *Id.* at 588. Here, there is no dispute that the Call Option Claim was a matter submitted to the tribunal and within the arbitrators' competence. Accordingly, the Court's review must be highly deferential. *See Jock v. Sterling Jewelers, Inc.*, 646 F.3d 113, 122 (2d Cir. 2011) ("In other words, as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, a court's conviction that the arbitrator has committed serious error in resolving the disputed issue

---

*Bhd. of Elec. Workers, A.F.L.-C.I.O. v. Niagara Mohawk Power Corp.*, 196 F.3d 117, 125 (2d Cir. 1999) (observing that "[a] court may vacate an arbitral award on public policy grounds," but overturning district court's vacatur under the Supreme Court's *enforcement* analysis articulated in *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766 (1983)); *Banco de Seguros del Estado v. Mut. Marine Office, Inc.*, 344 F.3d 255, 264 (2d Cir. 2003) (applying enforcement analysis to petition to vacate on public policy grounds, with no mention of "vacatur" in the public policy portion of the decision); *Transmarine Seaways Corp. of Monrovia v. Marc Rich & Co.*, 480 F. Supp. 352, 358 (S.D.N.Y. 1979) (conflating "refusing enforcement" under New York Convention with "vacating an arbitration award" for public policy reasons). In subsequent cases, however, the Second Circuit has been unequivocal in "declin[ing]" to broaden the "path to vacatur of an arbitration award" to include non-statutory grounds, including that an award is "contrary to an explicit public policy." *Porzig*, 497 F.3d at 139.

does not suffice to overturn his decision.") (internal citation omitted).

## II.   THE MERITS REVIEW SOUGHT BY THE PETITION IS UNAVAILABLE.

The Petition seeks to have the Court review the merits of the Partial Award under the guise of a "public policy" argument.  But the FAA does not permit a party to an arbitration to obtain a merits review of the resulting arbitral award, and a court may not vacate an award merely because it believes the arbitral tribunal made a mistake of law.  To the contrary, "the award should be enforced, despite a court's disagreement with it on the merits, if there is a *barely colorable justification* for the outcome reached."  *Wallace v. Buttar*, 378 F.3d 182, 190 (2d Cir. 2004) (quoting *Banco IV*, 344 F.3d at 260 (internal quotations and alteration omitted)); *Zurich Am. Ins. Co. v. Team Tankers A.S.*, No. 13cv8404, 2014 WL 2945803, at *5 (S.D.N.Y. June 30, 2014); *Cellu-Beep, Inc. v. Telecorp Commc'ns, Inc.*, No. 13 Civ. 7236(NRB), 2014 WL 3585515, at *4 (S.D.N.Y. July 18, 2014).

Ignoring that well-settled principle, the Petition's public policy challenge is in fact a barely disguised attack against the tribunal's conclusions of law:

- "The tribunal rejected Petitioners' argument. . . . [I]t ruled that, because in its view the Call Option provision was not a liquidated damages clause, it could not constitute a penalty as a matter of law."  (Petition at ¶ 4.)

- "The holding not only ignored applicable law, it enabled the tribunal to forego any analysis of whether the Call Option provision, as applied in this case, ran afoul of the traditional tests that must be applied to determine if a contract provision constitutes a penalty."  (*Id.* at ¶ 43.)

- "The tribunal's interpretation of the law and the contract was rife with error."  (*Id.* at ¶ 60.)

- "The first inquiry of the two-part framework set out by the tribunal . . . was erroneous." (*Id.* ¶¶ 60–61.)

- "The tribunal got it backwards."  (*Id.* at ¶ 70.)

At its core, the Petition argues that the tribunal got the law wrong when it concluded that the Call Option is a termination provision.  The Petition invokes the language of public policy, but its attempt to obtain a merits review is in reality a "manifest disregard of the law" challenge—a judge-made (and now-suspect) non-statutory basis for vacatur.  Petitioners avoid invoking the manifest disregard doctrine, though, because they are well aware that review for manifest disregard is "severely limited" and "highly deferential to the arbitral award."  *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir. 2003) (finding that from 1960 to 2003, the Second Circuit vacated for manifest disregard in only four out of at least 48 cases); *see* New York City Bar Committee on International Commercial Disputes, *The "Manifest Disregard of Law Doctrine and International Arbitration in New York* 6 (Aug. 2012)[13] (collating manifest disregard cases post-dating *Duferco*; vacatur was similarly rare); *Cellu-Beep*, 2014 WL 3585515, at *4 (noting the "extreme deference" afforded to arbitrators in the manifest disregard context).  In fact, "*no* international arbitral award rendered in New York has *ever* been set aside in the Second Circuit on the ground of manifest disregard."  New York City Bar Committee on International Commercial Disputes at 2.

Had Petitioners more candidly cast the Petition in terms of manifest disregard rather than seeking to disguise it as an appeal to public policy, they would have been unable to meet their high burden of proof. The party seeking vacatur based on manifest disregard of the law "bears a heavy burden, as awards are vacated on grounds of manifest disregard only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent."  *T.Co Metals*, 592 F.3d at 339; *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.,*

---

[13]      *Available at* http://www2.nycbar.org/pdf/report/uploads/20072344-ManifestDisregardofLaw--DoctrineandInternationalArbitrationinNewYork.pdf.

103 F.3d 9, 12 (2d Cir. 1997) ("The showing required to avoid summary confirmation of an arbitration award is high, and a party moving to vacate the award has the burden of proof.").

To carry this heavy burden, the Petition would have to demonstrate that: (*a*) the governing law that was allegedly ignored was "well defined," "clear," and "explicitly applicable" to the matter before the tribunal; and (*b*) the tribunal knew of the governing legal principle but intentionally ignored it. *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 111 (2d Cir. 2006); *Zurich Am.*, 2014 WL 2945803, at *4. Here, the Petition does not even suggest that the tribunal deliberately refused to apply a governing legal principle, let alone offer evidence sufficient to overcome the "extreme deference" afforded to the tribunal. *Cellu-Beep*, 2014 WL 3585515, at *4. Nor could the Petition plausibly claim that there is no "barely colorable justification" for the tribunal's detailed analysis and conclusion regarding the nature and effects of the Call Option. Accordingly, the Court should recognize the Petition's challenge to the tribunal's legal reasoning for what it is, a dressed-up manifest disregard plea, and reject it as deficient and unavailing.

## III.   THE AWARD IS NOT CONTRARY TO PUBLIC POLICY AND MUST THEREFORE BE ENFORCED.

### A.   THE COURT'S REVIEW IS LIMITED AND DEFERENTIAL.

Even taking the stated ("public policy") basis for the Petition at face value, the result should be no different.  The Petition misstates the proper standard of review for a public policy challenge and fails to acknowledge the "heavy" burden that Petitioners bear to resist enforcement of the Partial Award.  *Telenor Mobile*, 584 F.3d at 405 (2d Cir. 2009) (affirming district court's denial of motion to vacate on public policy and manifest disregard grounds).  That burden is "high, and infrequently met," and requires that the Petition "clearly show[]" that public policy would be offended if the Partial Award were enforced.  *Republic of Argentina v. BG Grp. PLC*, 764 F. Supp. 2d 21, 32 (D.D.C. 2011), *aff'd* 555 F. App'x 2, 3 (D.C. Cir. 2014) ("Given the

public policy defense's narrow application, the burden of establishing that an arbitral award is contrary to public policy 'is high, and infrequently met.'") (quoting *Ackermann v. Levine*, 788 F.2d 830, 841 (2d Cir. 1986)); *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 43 (1987) ("the violation of such a policy must be clearly shown if an award is not to be enforced.").

Although, as the Petition notes, a U.S. court must make its "own, independent evaluation" of a supposed public policy violation, *Transmarine Seaways*, 480 F. Supp. at 358 (S.D.N.Y. 1979), that evaluation is conducted in a manner that is both cognizant of the burden borne by Petitioners and consonant with the substantial deference to be afforded the international arbitral award in question.  Several recent courts to consider public policy bases for resisting confirmation of such awards have reaffirmed the limited scope of their review.  *See Banco de Seguros del Estado v. Mut. Marine Offices, Inc.*, 230 F. Supp. 2d 427, 429 (S.D.N.Y. 2002) ("*Banco II*"), *aff'd* 344 F.3d 255 (2d Cir. 2003) (declining to apply *de novo* review to arbitral order challenged on manifest disregard and public policy grounds); *Yukos Capital S.A.R.L. v. OAO Samaraneftegaz*, 963 F. Supp. 2d 289, 298 (S.D.N.Y. 2013) (noting that a "court's review of an arbitral award is limited" where an enforcement of an ICC award was opposed on public policy grounds).  Moreover, the Petition does not cite a single case in which a court held that the standard of review is "*de novo*," as the Petition casually, and incorrectly, asserts.[14]  (*See* Petition at ¶¶ 52–54.)

In any event, the Petition's claim that the Court's review should be "unfettered by any

---

[14]  The cases cited in the Petition both did not hold that the standard of review is *de novo* and are readily distinguished.  Each involved either:  (*a*) a contract allegedly agreed under duress, *Transmarine Seaways*, 480 F. Supp. at 358 (S.D.N.Y. 1979) (denying cross-motion to vacate), *Changzhou AMEC Eastern Tools & Equip. Co. v. E. Tools & Equip., Inc.*, No. EDCV 11-00354 VAP, 2012 WL 3106620, at *14–19 (C.D. Cal. July 30, 2012) (declining to enforce award rendered in China where contract at issue was signed under duress); or (*b*) domestic arbitrations concerning specific issues of federal labor law, *W.R. Grace & Co.*, 461 U.S. at 766 (1983) (enforcement of collective-bargaining agreement as interpreted by arbitrator would not compromise public policy requiring obedience to court orders or public policy favoring voluntary compliance with Title VII of the Civil Rights Act), *Niagara Mohawk*, 196 F.3d at 131, 132 (reversing vacatur of award reinstating employee).

deference normally accorded to an arbitrator's findings of fact" is incorrect. (Petition at ¶ 55.) *See Misco*, 484 U.S. at 38, 45 ("The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract. . . . The parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them . . . . Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task.").

## B. ENFORCEMENT OF THE PARTIAL AWARD WOULD NOT "VIOLATE THE MOST BASIC NOTIONS OF MORALITY AND JUSTICE."

Consistent with the limited review just described, the Court's analysis must start with the Call Option *as interpreted by the tribunal*, and then ask only whether the Call Option so interpreted contravened an explicit, well-defined, and dominant public policy and thereby violated the "most basic notions of morality and justice" in the United States. *E.g.*, *Telenor Mobile*, 584 F.3d at 411 (2d Cir. 2009) (not contrary to public policy to force a party to comply with an arbitral award that would allegedly cause that party to violate a foreign judgment); *Yukos Capital*, 963 F. Supp. 2d at 299–300 (S.D.N.Y. 2013); *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 878 F. Supp. 2d 459, 465 (S.D.N.Y. 2012); *TermoRio S.A. v. Electranta S.P.*, 487 F.3d 928, 938 (D.C. Cir. 2007); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 306 (5th Cir. 2004).

The Petition fails to address—much less satisfy—the "most basic notions of morality and justice" standard. That failure is both revealing and dispositive, because that standard defines the narrow boundaries of the public policy exception. Every law reflects, in some reductionist sense, a "public policy," but the relevant jurisprudence demonstrates (as good sense would suggest) that few laws embody "the most basic notions of morality and justice" of the Nation. If every law

cleared that high hurdle, the losing party to *any* arbitration proceeding could seek a full merits review under the guise of "public policy." As the court observed in *A. Halcoussis Shipping Ltd. v. Golden Eagle Liberia Ltd.*, No. 88 CIV. 4500 (MJL), 1989 WL 115941, *2 (S.D.N.Y. Sept. 27, 1989):

> All laws, be they procedural or substantive, are founded on strong policy considerations. Yet not all laws represent this country's "most basic notions of morality and justice." Were it otherwise, the [New York] Convention's public policy exception would eviscerate the very goal of the Convention as a whole—to encourage the recognition and enforcement of commercial arbitration agreements.

In other words, a mere error of law by the tribunal, which is all that the Petition asserts here (and which Respondents deny occurred, as explained below), does not, without more, violate this country's "most basic notions of morality and justice" and justify invoking the narrow public policy exception to enforcement of an arbitral award. *See, e.g.*, *Banco IV*, 344 F.3d at 264 (2d Cir. 2003) (rejecting public policy defense because party "ha[d] simply recycled its contention that the Panels acted in manifest disregard of the law, this time as a public policy claim"); *Karaha Bodas Co.*, 364 F.3d at 306 (5th Cir. 2004) ("Erroneous legal reasoning or misapplication of law is generally not a violation of public policy within the meaning of the New York Convention.").

The Petition's claim that the tribunal's ruling offends public policy to such an extent that vacatur is warranted is deficient for a second reason. In order for public policy to provide the basis for a refusal to enforce an arbitral award, that public policy must be "explicit," "well defined," and "dominant," and be "ascertained by reference to the laws and legal precedents and not form general considerations of supposed public interests." *Misco*, 484 U.S. at 30 (quoting *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766 (1983)); *see also Banco IV*, 344 F.3d at 264. Here, the Petition asserts that a "well-established prohibition on the enforcement of contractual penalties" constitutes such a public policy. (Petition at ¶ 48.) Yet the Petition does

not cite a single case in which a U.S. court vacated or refused to enforce an arbitral award under the public policy exception based on a finding that a contractual provision constituted an unenforceable penalty.[15]

As important, the question decided by the tribunal was not an abstract legal one, to be revisited through the Petition's superficial survey of liquidated damages provisions. (*See* Petition at Appendix A.) The tribunal applied a body of law to a particular contractual provision, on an extensive record that included the drafting history of that provision, and concluded that the Call Option was neither a liquidated damages provision nor a penalty provision. (*See* Partial Award at ¶¶ 188–211.) Even under the flawed approach advanced in the Petition, public policy could be assessed only had the tribunal concluded that the Call Option *was* a penalty or unenforceable liquidated damages provision and enforced it anyway. But the proper inquiry now is only whether the Call Option *as interpreted by the tribunal* violated an explicit, well-defined, and dominant public policy and thereby offended the most basic notions of morality and justice in the United States. *See W.R. Grace & Co.*, 461 U.S. at 766 ("If the contract as interpreted by [the arbitrator] violates some explicit public policy, we are obliged to refrain from enforcing it."); *Argentina v. BG Grp.*, 764 F. Supp. 2d at 31 (D.D.C. 2011) (court's authority to deny recognition under the New York Convention "is limited to situations where the contract *as interpreted* by [the arbitrators] would violate some explicit public policy that is well defined and dominant . . . ." (emphasis and alteration in original) (quoting *Banco IV*, 344 F.3d at 264 (2d Cir. 2003)). Here, the tribunal's interpretation of the Call and Put Options as Joint Venture termination provisions—and *not* penalty or liquidated damages provisions—creates no conflict

---

[15]     The Petition places great weight on *Laminoirs-Trefileries-Cableries de Lens, S.A. v. Southwire Co.*, 484 F. Supp. 1063 (N.D. Ga. 1980) (denying motion to vacate). (Petition at ¶ 51.) That decision is inapposite here, as it stands for the unremarkable proposition that an additional interest rate in the event of late payments might be usurious and therefore unenforceable, even while the remainder of an arbitral award is enforceable. *Laminoirs*, 484 F. Supp. at 1068–69.

whatsoever with any public policy.  (*See, e.g.*, Partial Award at ¶ 206.)

Finally, even assuming, *arguendo*, that:  (*a*) the Partial Award is entitled to no deference; (*b*) the Petition had articulated an explicit, well-defined, and dominant public policy; (*c*) a violation of that policy would offend the United States' most basic notions of morality and justice; and (*d*) Petitioners are entitled to a second attempt to plead their "unenforceable penalty" argument on the merits, the Petition still must be denied.   In the underlying arbitration, Respondents demonstrated, by reference to legal authority, textual analysis, and substantial documentary evidence and testimony, that the Call Option is a termination provision rather than a liquidated damages clause (and thus both benign and readily enforceable), and respectfully refer the Court to the parties' pleadings on that issue.  (*See* Prevatt Decl., Exs. A–C, Excerpts from PDVSA Parties' Statement of Claim, Reply, and Post-Hearing Brief; Exs. D–F, Excerpts from ConocoPhillips Parties' Statement of Defense, Rejoinder, and Post-Hearing Memorial.)

In summary, Respondents demonstrated that the Call Option is functionally distinct from a liquidated damages clause, which New York defines as "an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of a breach of the agreement."  *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424 (N.Y. 1977) (cited in Partial Award at ¶ 191).  Especially under the formula invoked by Respondents, the payment to Petitioners was highly variable—and dependent on Petitioners' historical return on their initial investment.  The fact that no cash flowed to Petitioners was not because they were being "penalized," but because they had already earned back four times that investment.

The Call and Put Options bear all the hallmarks of a typical exit provision enforceable under New York law.  *See, e.g.*, *Gatzonis v. Vallotis*, 67 A.D.3d 443, 443–44 (N.Y. App. Div.

2009) (cited in Partial Award at ¶ 203) (provisions requiring the sale of a defaulting party's interest in a closely held company pursuant to an agreed formula are not liquidated damages clauses); *Urban Archaeology Ltd. v. Dencorp Invs., Inc.*, 12 A.D.3d 96, 104–05 (N.Y. App. Div. 2004) (declining to deviate from the terms of an option provision); *Metro Funding Corp. v. WestLB AG*, No. 10 Civ. 1382(CM), 2010 WL 1050315, at *23 (S.D.N.Y. Mar. 19, 2010) (upholding a contractual provision defining a termination event to be the "fail[ure] to perform or observe *any* covenant or agreement . . . under . . . any . . . Transaction Document and such failure continues unremedied for five (5) Business Days . . . ." (emphasis added)); *Lamberti v. Angiolillo*, 73 A.D.3d 463, 463 (N.Y. App. Div. 2010) ("General principles governing option agreements require strict compliance with the terms setting forth the time and manner of the option's exercise.").[16]

---

[16]     Respondents further demonstrated that even if the Call Option were a liquidated damages clause, it would be enforceable under New York law and would not constitute an impermissible penalty. (*See* Prevatt Decl., Ex. D at pp. 117–26, Ex. E at pp. 71–83, and Ex. F at pp. 28–32.)  The trend in New York law is to enforce stipulated damages provisions, particularly where, as here, they were negotiated by sophisticated parties represented by sophisticated counsel.  *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 380–81 (N.Y. 2005); *GFI Brokers, LLC v. Santana*, Nos. 06 Civ. 3988(GEL), 06 Civ. 4611(GEL), 2009 WL 2482130, at *2, 8 (S.D.N.Y. Aug. 13, 2009); *see also 4 Third Ave. Leasehold, LLC v. Permanent Mission of UAE to United Nations*, 133 F. App'x 768, 770 (2d Cir. 2005).  Meanwhile, the PDVSA Parties failed to meet their burden—as does the Petition now—to show that any of the three purported "objective tests" establishes that the Call Option is unenforceable:

- *First*, the Seller Damages were not readily ascertainable *ex ante*, which is precisely why the PDVSA Parties proposed allowing the "injured party to unwind the joint venture on favorable terms" in the event of a material breach of the key agreements, including the COSA.  (*See* Partial Award at ¶¶ 206–07 (quoting PDVSA Termination Proposal.))  Uncertainties regarding that value included market prices of various types of crude oil over a twenty-year period, the magnitude of operating expenses and capital contributions over the life of the Joint Venture, and the point in time at which a breach by the PDVSA Parties might occur.

- *Second*, the Call Option was not grossly disproportionate to the foreseeable loss.  The Petition ignores not only that the Call Option formula took into account the $1.1 billion in prior distributions to the PDVSA Parties (giving the PDVSA Parties a fourfold return on their initial investment), but also that ConocoPhillips assumed $195 million in additional debt obligations and relieved the PDVSA Parties of those same obligations. (*See* Partial Award at ¶¶ 165, 168–69.)  The Petition's proportionality argument further ignores the full extent of the losses caused by the supply cutoff, which ConocoPhillips mitigated through extensive efforts to source alternate crudes.  (*See id.* at ¶¶ 128–31.)

- *Third*, the Call and Put Options may not be exercised indiscriminately for any breach of the agreements.  Rather, the parties defined a limited set of events that could precipitate either a Call Event or a Put Event—all of which, including uncured defaults on payment obligations, amounted to fundamental breakdowns in the

The tribunal, without dissent from the arbitrator appointed by the PDVSA Parties, correctly concluded that the Call Option is a termination provision that is both valid and enforceable under New York law. As correctly interpreted by the tribunal, enforcing the Call Option poses no threat to the public policy of the United States, much less a threat that violates our Nation's most basic notions of morality and justice. To the contrary, *not* enforcing the Partial Award would violate the "emphatic federal policy in favor of arbitral dispute resolution," which "applies with special force in the fields of international commerce." *Mitsubishi Motors*, 473 U.S. at 631 (1985).

## IV.   AFTER DENYING THE PETITION, THE COURT SHOULD CONFIRM THE AWARDS.

Once the Petition has been rejected, the Court should confirm, recognize, and enforce the Partial Award and the Final Award in their entirety. Under Section 9 of the FAA, "a court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected" under one of the grounds prescribed in Sections 10 and 11 of the FAA. *Hall Street*, 552 U.S. at 582 (citing 9 U.S.C. § 9). Similarly, under the Inter-American Convention, a district court is required to confirm the award absent one of the grounds for refusal of recognition or enforcement specified in that Convention. *Banco III*, 257 F. Supp. 2d at 685–86; 9 U.S.C. § 302 (incorporating 9 U.S.C. § 207); *see also Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 78 (2d Cir. 2012) (confirming award under the FAA and the New York Convention). Confirmation usually is a "summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *D.H. Blair*, 462 F.3d at 110; *F. Hoffmann-La Roche Ltd. v. Qiagen Gaithersburg, Inc.*, 730 F. Supp. 2d 318, 330–31, 332 (S.D.N.Y. 2010)

---

parties' relationship as joint venture partners. (Partial Award at ¶ 195; Transfer Agreement, Exhibit A at A-1, A-5.)

(confirming arbitral award that included award of attorneys' fees).

## CONCLUSION

For the foregoing reasons, Respondents respectfully request that the Court reject the Petition to vacate the Partial Award and grant Respondents' cross-petition to confirm, recognize, and enforce the Awards, together with such other relief that the Court deems just and proper.

Dated: New York, New York
   August 29, 2014

        Respectfully submitted,
        FRESHFIELDS BRUCKHAUS DERINGER US LLP

      By: _____

        Michael Lacovara
        Elliot Friedman
        Sam Prevatt
        601 Lexington Avenue
        31st Floor
        New York, New York 10022
        Tel:  212-277-4000
        Fax: 212-277-4001
        michael.lacovara@freshfields.com
        elliot.friedman@freshfields.com
        sam.prevatt@freshfields.com

        *Attorneys for Respondents ConocoPhillips*
        *Company and Sweeny Coker Investor Sub, LLC*