# EXHIBIT 1



23 April 2014/jcn/aee

**16982/JRF/CA/ASM (C- 17336/JRF)**

**1.** PDV SWEENY, INC. (U.S.A.) **2.** PDV TEXAS, INC. (U.S.A.) **vs/ 1.** CONOCOPHILLIPS COMPANY formerly doing business as PHILLIPS PETROLEUM COMPANY (U.S.A.) **2.** SWEENY COKER INVESTOR SUB, INC. (U.S.A.)

CONOCOPHILLIPS COMPANY (U.S.A.) **vs/ 1.** PETROLEOS DE VENEZUELA, S.A. (Venezuela) **2.** PDVSA PETROLEO, S.A. (Venezuela)

---

| | | |
|---|---|---|
| **Counsel: Ms Ana Serra e Moura** | **(Tel:** | **+33 1 49 53 30 28)** |
| **Deputy Counsel: Mrs Juliana Castillo** | **(Tel:** | **+33 1 49 53 28 51)** |
| | **(Fax:** | **+ 33 1 49 53 57 79)** |
| | **(Email:** | **ica1@iccwbo.org)** |

David R. Haigh
Valérie Quintal
BURNET DUCKWORTH & PALMER
1400, 350 - 7th Avenue S.W.
Calgary, Alberta T2P 3N9
Canada

*By email: drh@bdplaw.com; vquintal@bdplaw.com*

Bruno W. Boesch
FRORIEP RENGGLI
17 Godliman Street
EC4V 5BD London
United Kingdom

*By email: bboesch@froriep.ch*

Abraham D. Sofaer
The Hoover Institution
STANFORD UNIVERSITY
434 Galvez Mall
Stanford, California 94305-6010
U. S. A.

*By email: sofaer@hoover.stanford.edu*

Joseph D. Pizzurro
Alexandra G. Maier
Robert B. García
Kelly D. Booth
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178-0061
U. S. A.

*By email: jpizzurro@curtis.com; amaier@curtis.com; robert.garcia@curtis.com; kbooth@curtis.com*

…/…

**INTERNATIONAL CHAMBER OF COMMERCE (ICC)**
**INTERNATIONAL COURT OF ARBITRATION**

33-43 avenue du Président Wilson, 75116 Paris, France
T +33 (0)1 49 53 29 05   F +33 (0)1 49 53 29 33
E arb@iccwbo.org   www.iccarbitration.org

**16982/JRF/CA/ASM (C-17336/JRF)**                                    **Page 2**

---

Lucy Reed
FRESHFIELDS BRUCKHAUS DERINGER US LLP
10 Coller Quay 42-01
Ocean Financial Centre
Singapore 049315
Singapore

*By email: lucy.reed@freshfields.com*

Alexander Yanos
Nigel Blackaby
Giorgio Mandelli
Viren Mascarenhas
FRESHFIELDS BRUCKHAUS DERINGER US LLP
601 Lexington Avenue, 31st floor
New York, NY 10022
U.S.A.

*By email: alex.yanos@freshfields.com;*
*giorgio.mandelli@freshfields.com; nigel.blackaby@freshfields.com;*
*viren.mascarenhas@freshfields.com*

R. Doak Bishop
Craig S. Miles
Wade M. Coriell
KING & SPALDING LLP
1100 Louisiana Street, Suite 4000
Houston, Texas 77002-5213
U.S.A.

*By email: dbishop@kslaw.com; cmiles@kslaw.com; wcoriell@kslaw.com*

Laura M. Robertson
CONOCOPHILLIPS COMPANY
600 North Dairy Ashford Road
Houston, Texas  77079
United States of America

*By email: laura.m.robertson@conocophillips.com*

Dear Mesdames, Dear Sirs,

The Secretariat acknowledges receipt of the following correspondence:

-   Claimants' email dated 22 April 2014, a copy of which was sent directly to Respondent and is enclosed for the members of the Arbitral Tribunal; and

-   Respondents' email dated 22 April 2014, a copy of which was sent directly to Claimant and is enclosed for the members of the Arbitral Tribunal.

In light of the parties' agreement, please find attached a courtesy copy of the Partial Award dated 14 April 2014. Please note that an original of the Partial Award has been already dispatched by courrier to the parties and the members of the Arbitral Tribunal.

.../...

**16982/JRF/CA/ASM (C-17336/JRF)**                                        **Page 3**

---

Please note that this courtesy copy does not trigger any time limit under the Rules.

Yours faithfully,

Ana Serra e Moura
Counsel
Secretariat of the ICC International Court of Arbitration

Encl:   - Electronic copy of the Partial Award dated 14 April 2014
          *(for the parties)*
        - Claimants' email dated 22 April 2014
        - Respondents' email dated 22 April 2014
          *(for the Arbitral Tribunal)*

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 16982/JRF/CA/ASM (C- 17336/JRF)

1. PDV SWEENY, INC. (U.S.A.)

2. PDV TEXAS, INC. (U.S.A.)

vs/

1. CONOCOPHILLIPS COMPANY formerly doing business as PHILLIPS PETROLEUM

COMPANY (U.S.A.)

2. SWEENY COKER INVESTOR SUB, INC. (U.S.A.)

and

CONOCOPHILLIPS COMPANY (U.S.A.)

vs/

1. PETROLEOS DE VENEZUELA, S.A. (Venezuela)

2. PDVSA PETROLEO, S.A. (Venezuela)

This document is an original of the Partial Award rendered in conformity with the Rules of Arbitration of the ICC International Court of Arbitration.

16982/JRF/CA/ASM (C-17336/JRF)

## INTERNATIONAL CHAMBER OF COMMERCE
## INTERNATIONAL COURT OF ARBITRATION

BETWEEN:

### PDV SWEENY, INC. (U.S.A.), PDV TEXAS, INC. (U.S.A.)
### PETRÓLEOS de VENEZUELA, S.A. (Venezuela) and
### PDVSA PETRÓLEO, S.A. (Venezuela)

Claimants

-and-

### CONOCOPHILLIPS COMPANY formerly doing business as PHILLIPS
### PETROLEUM COMPANY (U.S.A.) and SWEENY COKER
### INVESTOR SUB, INC. (U.S.A.)

Respondents/Counterclaimants

# PARTIAL AWARD

Before an Arbitral Tribunal:

### Co-Arbitrators:

| | |
|---|---|
| Bruno Boesch, Esq. | Abraham D. Sofaer, Esq. |
| Froriep LLP | The Hoover Institution |
| 17 Godliman Street | Stanford University |
| London EC4V 5BD | 434 Galvez Mall |
| United Kingdom | Stanford, CA 94305-6010 |
| | U.S.A. |

### Chairman:

David R. Haigh, Q.C.
Burnet, Duckworth & Palmer LLP
#2400, 525 – 8th Avenue S.W.
Calgary, Alberta T2P 1G1
Canada

### Administrative Secretary to the Tribunal: Valérie E. Quintal

| Counsel for the Claimants | Counsel for the Respondents | |
|---|---|---|
| **Curtis, Mallet-Prevost, Colt & Mosle LLP** | **Freshfields Bruckhaus Deringer LLP** | **King & Spalding** |
| Joseph D. Pizzurro | Lucy Reed | R. Doak Bishop |
| Alexandra G. Maier | 10 Collyer Quay 42-01 | Craig S. Miles |
| Dora Straus | Ocean Financial Centre, | Wade M. Coriell |
| Robert B. Garcia | Singapore 049315 | Jamie M. Miller |
| 101 Park Avenue | Nigel Blackaby | Elizabeth M. Silbers |
| New York, New York 10178-0061 | Alexander Yanos | 1100 Louisiana, Suite 4000 |
| U.S.A. | Giorgio Mandelli | Houston, Texas 77002-5213 |
| | Viren Mascarenhas | U.S.A. |
| | 601 Lexington Avenue, 31st Floor | |
| | New York, New York 10022 | |
| | U.S.A. | |

# TABLE OF CONTENTS

A.    INTRODUCTION ................................................................................................ 4

B.    THE PARTIES ................................................................................................... 5

C.    THE PARTIES' REPRESENTATIVES ................................................................. 7

D.    SUBMISSION TO ARBITRATION / APPLICABLE LAW ........................................ 7

E.    PROCEDURAL HISTORY .................................................................................. 13

    ICC Case No. 16982/JRF ...................................................................................... 13

    ICC Case No. 17336/JRF ...................................................................................... 16

    Request for Consolidation ...................................................................................... 17

    Procedural History regarding the Transfer to Phillips 66 ........................................ 21

F.    FACTUAL BACKGROUND ............................................................................... 28

    The Joint Venture .................................................................................................... 29

    The Agreements under the Joint Venture ............................................................... 31

    Events Leading Up to the Exercise of the Call Option............................................ 33

    After the Call Option: the Aggregate Lookback Adjustment Calculation ................. 37

    ConocoPhillips' Corporate Restructuring – the Transfer ....................................... 40

G.    ISSUES TO BE DETERMINED ....................................................................... 43

H.    RELIEF SOUGHT BY THE PARTIES................................................................ 45

    Claimants' Requests for Relief ............................................................................... 45

    Respondents' Requests for Relief .......................................................................... 48

I.    DETERMINATION OF THE ISSUES ............................................................... 52

    Was the Call Option an Unenforceable Penalty?.................................................... 54

        Position of the Claimants ............................................................................... 54

        Position of the Respondents ........................................................................... 56

        Arbitral Tribunal Determination ...................................................................... 59

    Breach of Fiduciary Duty ........................................................................................ 68

        Position of the Claimants ............................................................................... 68

        Position of the Respondents ........................................................................... 71

        Arbitral Tribunal Determination ...................................................................... 72

    Breach of the Implied Covenant of Good Faith and Fair Dealing ........................... 95

        Position of the Claimants ............................................................................... 95

        Position of the Respondents ........................................................................... 98

        Arbitral Tribunal Determination ...................................................................... 99

No Call Event Occurred ........................................................................................ 103

    Position of the Claimants ................................................................................ 104

    Position of the Respondents ........................................................................... 107

    Arbitral Tribunal Determination .................................................................... 108

The Respondents' Counterclaims .......................................................................... 115

Counterclaim I – Aggregate Lookback Adjustment ............................................... 116

    Position of the Respondents ........................................................................... 117

    Position of the Claimants ................................................................................ 119

    Arbitral Tribunal Determination .................................................................... 122

Counterclaim II – Seller Damages Claims .............................................................. 141

    Position of the Respondents ........................................................................... 142

    Position of the Claimants ................................................................................ 143

    Arbitral Tribunal Determination .................................................................... 145

Counterclaim III – Demurrage Claims .................................................................... 147

    Arbitral Tribunal Determination .................................................................... 148

The Claimants' New Claims .................................................................................... 151

New Claim I – Transfer to Phillips 66 is a Breach of the Transfer Agreement ....... 152

    Position of the Claimants ................................................................................ 152

    Position of the Respondents ........................................................................... 153

    Arbitral Tribunal Determination .................................................................... 154

New Claim II – Transfer to Phillips 66 Violates the COSA and SCOSA .................... 155

    Position of the Claimants ................................................................................ 155

    Position of the Respondents ........................................................................... 157

    Arbitral Tribunal Determination .................................................................... 159

Negative Margin Adjustment Issue ....................................................................... 165

    Position of the Claimants ................................................................................ 166

    Position of the Respondents ........................................................................... 167

    Arbitral Tribunal Determination .................................................................... 168

J.     INTEREST ........................................................................................................ 169

K.    COSTS ............................................................................................................. 169

L.     PARTIAL AWARD ............................................................................................ 169

## ABBREVIATIONS AND DEFINED TERMS

| | |
|---|---|
| Aggregate Lookback Adjustment or ALA | As defined in Exhibit D to the COSA |
| Claimants | Together PDV Sweeny, Inc., PDV Texas, Inc., Petróleos de Venezuela, S.A. and PDVSA Petróleo, S.A. |
| Call Event | As defined in Section 4.1 of the Transfer Agreement |
| Call Option | As defined in Section 4.1 of the Transfer Agreement |
| ConocoPhillips | ConocoPhillips Company (formerly Phillips Petroleum Company) and Sweeny Coker Investor Sub, Inc. |
| ConocoPhillips Parties | ConocoPhillips Company (formerly Phillips Petroleum Company) and Sweeny Coker Investor Sub, Inc. |
| COP | ConocoPhillips Company |
| COSA | Amended and Restated Crude Oil Supply Agreement between PDVSA and ConocoPhillips, dated June 18, 1999 |
| COSA Guarantee | Amended and Restated PDVSA Crude Oil Supply Agreement Guarantee, dated June 18, 1999 |
| Crude Oil | As defined in the COSA |
| Damages Due Date | As defined in Section 2.8(d) of the COSA |
| ICC | International Chamber of Commerce |
| ICC Court | International Court of Arbitration of the ICC |
| ICC Rules | ICC Rules of Arbitration, in force as from January 1, 1998 |
| ICSID Arbitration | Request for arbitration filed by ConocoPhillips and some of its subsidiaries with the International Centre for Settlement of Investment Disputes ("ICSID") against Venezuela, in November 2007 |
| Joint Venture | A joint venture formed in 1999 between the Claimants and the Respondents for the construction and operation of enhanced oil refining facilities at ConocoPhillips' refining complex in Sweeny, Texas |
| Joint Venture Interest | As defined in Section 2.1(a) of the Transfer Agreement |

| | |
|---|---|
| LLC Agreement | Second Amended and Restated Limited Liability Company Agreement of Sweeny Coker L.L.C., dated June 18, 1999 |
| Lookback Period | As defined in Exhibit D to the COSA |
| Merey Crude or Merey Crude Oil | As defined in Exhibit B to the COSA |
| Merey Sweeny | Merey Sweeny, L.P. |
| Merey Sweeny Joint Venture | A joint venture formed in 1999 between the Claimants and the Respondents for the construction and operation of enhanced oil refining facilities at ConocoPhillips Company's refining complex in Sweeny, Texas |
| Ministry | Ministero del Poder para la Energia y Petróleo |
| NMA Claim | Negative Margin Adjustment Claim |
| OPEC | Organization of the Petroleum Exporting Countries |
| Operating Agreement | Amended and Restated Operating Agreement between ConocoPhillips and PPSA, dated June 18, 1999 |
| PDVSA | Petróleos de Venezuela, S.A. |
| PDVSA Parties | Together PDV Sweeny, Inc., PDV Texas, Inc., Petróleos de Venezuela, S.A. and PDVSA Petróleo, S.A. |
| PDV Sweeny | PDV Sweeny, Inc. |
| PDV Holding | PDV Holding, Inc. |
| PDV Texas | PDV Texas, Inc. |
| Phillips 66 | Phillips 66 Company |
| PPSA | PDVSA Petróleo, S.A. |
| Processing Agreement | Amended and Restated Processing Agreement between ConocoPhillips and Merey Sweeny L.P., dated June 18, 1999 |
| Put Event | As defined in Section 4.2 of the Transfer Agreement |
| Put Option | As defined in Section 4.2 of the Transfer Agreement |
| Replacement Crude Oil | As defined in Section 2.1 of the SCOSA |
| Respondents | ConocoPhillips Company (formerly Phillips Petroleum Company) and Sweeny Coker Investor Sub, Inc. |

| | |
|---|---|
| Secretariat | Secretariat of the ICC Court |
| Seller Damages | As defined in Section 2.7 of the COSA |
| Sweeny Coker | Sweeny Coker L.L.C. |
| Sweeny Refinery | Refinery in Old Ocean, Texas, owned by ConocoPhillips which is used to process Crude Oil |
| Sweeny Sub | Sweeny Coker Investor Sub, Inc. |
| SCOSA | Amended and Restated Supplemental Crude Oil Supply Agreement between PDVSA and COP, dated June 18, 1999 |
| Transfer | ConocoPhillips' May 1, 2012 transfer of its refining assets, including the Sweeny Refinery and site which contains the units owned by the Joint Venture, together with the interest of COP and Sweeny Sub's interest in Sweeny Coker, LLC and Merey Sweeny, L.P. to Phillips 66 |
| Transfer Agreement | Amended and Restated Transfer Agreement dated June 18, 1999 |
| Venezuela | Bolivarian Republic of Venezuela |
| WTI | West Texas Intermediate |

-4-

## A.    INTRODUCTION

1.    These arbitration proceedings arise out of a joint venture formed in 1999 between the Claimants and the Respondents for the construction and operation of enhanced oil refining facilities at a ConocoPhillips Company's ("COP") refining complex in Sweeny, Texas (the "Merey Sweeny Joint Venture" or "Joint Venture"). The facilities are designed and used to process a blended heavy crude oil with specific characteristics known as Merey Crude, which comes from the Bolivarian Republic of Venezuela ("Venezuela").

2.    The present disputes among these parties followed the announcement, on the last day of December, 2008, by Petróleos de Venezuela, S.A. ("PDVSA"), that it had been instructed by the Ministero del Poder para la Energia y Petroleo (the "Ministry") that, effective January 1, 2009, PDVSA would reduce the output of its crude oil exports, thereby affecting the crude oil supplies to the Merey Sweeny Joint Venture in Texas. Supplies of Merey Crude were interrupted following this announcement. The Respondents subsequently took certain actions against the Claimants under their contracts, including purportedly exercising a Call Option under the Amended and Restated Transfer Agreement dated June 18, 1999 ("Transfer Agreement") by which the Respondents acquired all of the Claimants' interest in the Joint Venture. The Claimants have brought these proceedings, claiming, among other things, that the Respondents' purported exercise of the Call Option was invalid because: (a) such remedy is an unenforceable penalty; (b) the Respondents breached their fiduciary duty; (c) the Respondents breached their duty of good faith and fair dealing; and (d) there was an Event of Force Majeure. The Claimants further dispute the Respondents' claim to certain "Lookback" adjustments which were asserted after the interruption in supply of Merey Crude.

3.    The Respondents advance three counterclaims in this arbitration: (a) Aggregate Lookback Adjustment claims for the months in 2008 and 2009 where Merey Crude was allegedly not the most economical crude oil to refine at the Sweeny Refinery; (b) Seller Damages, as defined in the agreements between the parties;

and (c) certain demurrage claims (now purportedly satisfied except for costs arguments).

4.  Following a corporate reorganization of COP resulting in the transfer of COP's refining assets and Joint Venture interests to Phillips 66 in 2012, the Claimants submitted two additional claims in this arbitration on the basis that the transfer to Phillips 66 was executed in breach of certain of the agreements between the parties.

5.  Finally, the Respondents have asserted a contingent claim in which they seek damages for the so-called Negative Margin Adjustment issue.

6.  The Claimants are seeking an award declaring the PDVSA Parties' Joint Venture interest has remained the property of the Claimants, as well as injunctive and compensatory relief. The Claimants estimated the monetary value of their claim to be US $750,000,000.

7.  The Respondents are seeking Seller Damages in the amount of US $16,487,833, Aggregate Lookback Adjustment damages in the amount of US $253.6 million, and cumulative Negative Margin Adjustment in the amount of US $602,852,737 as of January 2013, the corresponding time value of that amount, as well as applicable interest.

B.  **THE PARTIES**

8.  The Claimant PDV Sweeny, Inc. ("PDV Sweeny") is a wholly-owned subsidiary of PDV Holding, Inc. ("PDV Holding") and an indirect wholly-owned subsidiary of PDVSA. PDV Sweeny is a corporation organized under the laws of Delaware with its principal place of business at 1209 N. Orange Street, Wilmington, Delaware 19801-1196, U.S.A.

9.  The Claimant PDV Texas Inc. ("PDV Texas") is a wholly-owned subsidiary of PDV Holding, an indirect wholly-owned subsidiary of PDVSA, and is organized

under the laws of Delaware with its principal place of business at 1209 N. Orange Street, Wilmington, Delaware 19801-1196, U.S.A.

10.     The Claimant PDVSA is the national oil company of Venezuela and a corporation organized under the laws of Venezuela, with its primary place of business at Avenida Libertador, Edificio Petróleos de Venezuela, La Campiña, Caracas, Venezuela.

11.     The Claimant PDVSA Petróleo, S.A. ("PPSA") is a wholly owned subsidiary of PDVSA and is a corporation organized under the laws of Venezuela, with its primary place of business at Avenida Libertador, Edificio Petróleos de Venezuela, La Campiña, Caracas, Venezuela.

12.     PDV Sweeny, PDV Texas, PDVSA and PPSA are hereinafter collectively referred to as the "Claimants" or the "PDVSA Parties" in this award.

13.     The Respondent, ConocoPhillips Company ("COP"), formerly doing business as Phillips Petroleum Company, is a corporation organized under the laws of Delaware, with its primary place of business at 3036 McCollum Center, 600 North Dairy Ashford, (77079-1175), P.O. Box 2197, Houston, Texas 77252-2197, U.S.A. It is the parent company of Sweeny ("Sweeny Sub").

14.     The Respondent, Sweeny Sub, is a Delaware corporation and a wholly-owned subsidiary of COP, with its primary place of business at 3036 McCollum Center, 600 North Dairy Ashford, (77079-1175), P.O. Box 2197, Houston, Texas 77252-2197, U.S.A.

15.     ConocoPhillips Company and Sweeny Sub are referred to as the "Respondents" or "ConocoPhillips" in this award.

16.     PDV Sweeny and Sweeny Sub have been limited partners, each with 49.5% ownership interest, in Merey Sweeny, L.P. ("Merey Sweeny"), a Delaware limited partnership. PDV Texas and ConocoPhillips, jointly held Sweeny Coker L.L.C. ("Sweeny Coker"), a Delaware limited liability company. Sweeny Coker has a 1%

ownership interest in Merey Sweeny and is the general partner of Merey Sweeny.

## C.   THE PARTIES' REPRESENTATIVES

17.   The Claimants are represented by Joseph D. Pizzurro, Esq., Alexandra G. Maier, Esq., Dora Straus, Esq. and Robert B. Garcia, Esq. of Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, New York, 10178-0061, U.S.A.

18.   The Respondents are represented by Lucy Reed, Esq., of Freshfields Bruckhaus Deringer US LLP, 10 Collyer Quay 42-01, Ocean Financial Centre, Singapore 049315, Nigel Blackaby, Esq., Alexander Yanos, Esq., Giorgio Mandelli, Esq., and Viren Mascarenhas, Esq. of Freshfields Bruckhaus Deringer US LLP, 520 Madison Avenue 34th floor, New York, New York, 10022, U.S.A.

19.   With respect to the Aggregate Lookback Adjustment claim, the Respondents are also represented by R. Doak Bishop, Esq., Craig S. Miles, Esq. and Wade M. Coriell, Esq. of King & Spalding, 1100 Louisiana Street, Suite 4000, Houston, Texas, 77002, U.S.A.

## D.   SUBMISSION TO ARBITRATION / APPLICABLE LAW

20.   As will be explained more fully in the Procedural History portion of this Partial Award, these arbitration proceedings have been commenced by two separate requests for arbitration. The first request was initiated by the Claimants on February 25, 2010, and was assigned ICC Case No. 16982/JRF by the ICC Secretariat. The second request was initiated by the Respondents on August 16, 2010 with respect to the Aggregate Lookback Adjustment claim, and was assigned ICC Case No. 17336/JRF. Upon the application of the Claimants dated October 29, 2010[1] and following full submissions from the parties, the tribunal, by its Order, dated December 15, 2010, ordered the consolidation of the two

---

[1] Request for Consolidation, see ¶5 where the Claimants apply for consolidation pursuant to provisions in the COSA, the Guarantee and the Transfer Agreement.

separate arbitration proceedings, to be conducted thereafter as a single proceeding (the Order for Consolidation). The ICC Secretariat acknowledged the tribunal's Order for Consolidation and the consolidated arbitration was assigned ICC No. 16982/JRF (C-17336/JRF) which later became 16982/JRF/CA (C-17336/JRF).

21.    The Claimants and the Respondents advance different sets of claims which relate, in part, to different agreements. The arbitration clauses and applicable law for the claims are set forth below.

22.    The Transfer Agreement among ConocoPhillips, Sweeny Sub, PDV Sweeny and PDV Texas, dated June 18, 1999, provides as follows:

> Section 6.11 Arbitration
>
> (a)    Any dispute, claim or controversy arising out of or in connection with any of the Project Transaction Documents or their breach, termination or validity ("Dispute") shall be settled exclusively and finally by arbitration conducted by three (3) arbitrators in accordance with the Rules of Arbitration of the ICC (the "ICC Rules") in effect at the time of such proceeding.
>
> (b)    Each of Phillips and PDV Sweeny shall nominate one (1) arbitrator in accordance with the ICC Rules (such arbitrators, the "Nominees"). The Nominees shall then agree within thirty (30) days from the date on which the second (2nd) Nominee was nominated on a third (3rd) person to serve as chairperson of the tribunal. If the Nominees are unable to select a third (3rd) arbitrator within such period, the International Court of Arbitration of the ICC shall select such third (3rd) arbitrator within thirty (30) days of the written request by either Nominee.
>
> (c)    If (i) two (2) or more Disputes arising out of or in connection with any of the Project Transaction Documents are simultaneously pending, (ii) the subject matters of such Disputes involve common questions of law or fact and (iii) the independent resolution of each such Dispute could result in conflicting awards or obligations, such Disputes may be consolidated in a single proceeding. If more than one arbitration proceeding involving any such Disputes are pending, such proceedings shall, at the request of either Phillips or PDV Sweeny, be consolidated and settled in a single arbitration proceeding; provided that the determination of whether such Disputes shall be consolidated shall be determined by the first (1st) arbitration tribunal established to settle any such Dispute. If such Disputes are consolidated and more than one (1)

arbitration tribunal has been established to settle any of such Disputes, Phillips and PDV Sweeny shall, within twenty (20) days of such consolidation, select one (1) of the arbitration tribunals so established to settle the single consolidated arbitration proceeding. If Phillips and PDV Sweeny are unable to select such arbitration tribunal within said 20-day period, the International Court of Arbitration of the ICC shall select such arbitration tribunal within thirty (30) days of the written request by either Phillips or PDV Sweeny.

(d)     Unless otherwise agreed by Phillips and PDV Sweeny, any arbitration proceeding pursuant to this Section 6.11 shall be conducted and any award shall be rendered in New York, New York. Any arbitration proceeding pursuant to this Section 6.11 shall be conducted and any award shall be rendered in the English language.

(e)     Notwithstanding anything to the contrary herein, the arbitration provisions set forth herein, any arbitration proceeding hereunder, and any arbitral award shall be governed by (i) the Federal Arbitration Act, Title 9, U.S. Code, to the exclusion of any state or municipal law of arbitration and (ii) the United Nations Convention on Recognition and Enforcement of Foreign Arbitral Awards of 10 June 1958 and the Inter American Convention on International Commercial Arbitration of 30 January 1975, in each case to the extent such convention is enforceable in the Republic of Venezuela.

Section 6.12 Final Award

(a)     Any award by an arbitration tribunal pursuant to Section 6.11 shall be reduced to writing with the reasons therefor set forth therein and shall be final and binding upon the parties to the relevant Project Transaction Document(s).

(b)     Judgment for execution and enforcement of any award by any such arbitration tribunal may be entered by any court of competent jurisdiction without review of the merits of such award.

(c)     The parties hereto agree that irreparable damage could occur in event that this Agreement were not performed in accordance with its specific terms or were otherwise breached. Accordingly, each of PDV Sweeny and Phillips shall have the right to seek, in aid of arbitration, provisional measures (including a temporary restraining order or preliminary injunction) to prevent a breach of this Agreement from any court of competent jurisdiction to prevent harm. In addition, an arbitration tribunal convened under Section 6.11 shall have the power to grant an injunction or injunctions to prevent breaches of this Agreement, and each of PDV Sweeny and Phillips shall be entitled to enforce specifically the terms and provisions of an award of such arbitration tribunal

providing for such an injunction or injunctions in any court of competent jurisdiction, being in addition to any other remedy to which they are entitled at law or in equity. Except as set forth in Section 4.1 and 4.2 of the Transfer Agreement, all rights, powers and remedies provided under the Project Transaction Documents or otherwise available in respect hereof or at law or in equity shall be cumulative and not alternative, and the exercise of any thereof by any party thereto shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such party.

23.   Section 12.2 of the Amended and Restated Crude Oil Supply Agreement between ConocoPhillips and PPSA, dated June 18, 1999 (the "COSA") provides:

> (a)   Any dispute, claim or controversy arising out of or in connection with any of the Transaction Documents or their breach, termination or validity (a "<u>Dispute</u>") shall be settled exclusively and finally by arbitration conducted by three (3) arbitrators in accordance with the Rules of Arbitration of the ICC (the "<u>ICC Rules</u>") in effect at the time of such proceeding.
>
> (b)   Each of Buyer and Seller shall nominate one (1) arbitrator of such tribunal in accordance with the ICC Rules (such arbitrators, the "<u>Nominees</u>"). The Nominees shall then agree within thirty (30) days from the date on which the second (2nd) Nominee was nominated on a third (3rd) arbitrator to serve as chairperson of the tribunal. If the Nominees are unable to select a third (3rd) arbitrator within such period, the International Court of Arbitration of the ICC shall select such third (3rd) arbitrator within thirty (30) days of the written request by either Nominee.
>
> (c)   If (i) two (2) or more Disputes arising out of or in connection with any of the Transaction Documents are simultaneously pending, (ii) the subject matters of such Disputes involve common questions of law or fact and (iii) the independent resolution of each such Dispute could result in conflicting awards or obligations, such Disputes may be consolidated in a single proceeding. If more than one (1) arbitration proceeding involving any such Disputes are pending, such proceedings shall, at the request of either Buyer or Seller, be consolidated and settled in a single arbitration proceeding; *provided* that the determination of whether such Disputes shall be consolidated shall be determined by the first (1st) arbitration tribunal established to settle any such Dispute. If such Disputes are consolidated and more than one (1) arbitration tribunal has been established to settle any of such Disputes, Buyer and Seller shall, within twenty (20) days of such consolidation, select one (1) of the arbitration tribunals so established to settle the single consolidated arbitration proceeding. If Buyer and Seller are unable to select such arbitration tribunal, the International Court of Arbitration of the ICC

shall select such arbitration tribunal within thirty (30) days of the written request by either Buyer or Seller.

(d)    Unless otherwise agreed by Buyer and Seller, any arbitration proceeding pursuant to this Section 12.2 shall be conducted and any award shall be rendered in New York, New York. Any arbitration proceeding pursuant to this Section 12.2 shall be conducted and any award shall be rendered in the English language.

(e)    Notwithstanding anything to the contrary herein, the arbitration provisions set forth herein, any arbitration proceeding hereunder and any arbitral award pursuant thereto, shall be governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 and the Inter-American Convention on International Arbitration of January 30, 1975, in each case to the extent such convention is enforceable in the Republic of Venezuela.

24.   Section 2.6 of the Amended and Restated Supplemental Crude Oil Supply Agreement between ConocoPhillips and PDVSA, dated June 18, 1999 (the "SCOSA") incorporates Section 12.2 of the COSA:

> "Section 12.2 (Arbitration), except that such Section 12.2 shall also include the following provision at the end thereof:
>
> (f) Notwithstanding anything to the contrary herein, the arbitration provisions set forth herein, and any arbitration proceeding hereunder, shall be governed exclusively by the Federal Arbitration Act, Title 9, U.S. Code to the exclusion of any state or municipal law of arbitration."

25.   Section 13 of the Amended and Restated PDVSA Crude Oil Supply Agreement Guarantee, dated June 18, 1999 (the "Guarantee") provides:

> (a)    Except as otherwise provided in the Transaction Documents, any dispute, claim or controversy arising out of or in connection with any of the Transaction Documents or their breach, termination or validity (a "Dispute") shall be settled exclusively and finally by arbitration conducted by three (3) arbitrators in accordance with the Rules of Arbitration of the ICC (the "ICC Rules") in effect at the time of such proceeding.
>
> (b)    Each of Beneficiary and Guarantor shall nominate one (1) arbitrator in accordance with the ICC Rules (such arbitrators, the "Nominees"). The Nominees shall then agree within thirty (30) days from the date on which the second (2nd) Nominee was nominated on a third (3rd) arbitrator to serve as chairperson of the

tribunal. If the Nominees are unable to select a third (3rd) arbitrator within such period, the International Court of Arbitration of the ICC shall select such third (3rd) arbitrator within thirty (30) days of the written request by either Nominee.

(c)     If two (2) or more Disputes arising out of or in connection with any of the Transaction Documents are simultaneously pending, (ii) the subject matters of such Disputes involve common questions of law or fact and (iii) the independent resolution of each such Dispute could result in conflicting awards or obligations, such Disputes may be consolidated in a single proceeding. If more than one (1) arbitration proceeding involving any such Disputes are pending, such proceedings shall, at the request of the Beneficiary or the Guarantor, be consolidated and settled in a single arbitration proceeding; *provided* that the determination of whether such Disputes shall be consolidated shall be determined by the first (1st) arbitration tribunal established to settle any such Dispute. If such Disputes are consolidated and more than one (1) arbitration tribunal has been established to settle any of such Disputes, Beneficiary and the Guarantor shall, within twenty (20) days of such consolidation, select one (1) of the arbitration tribunals so established to settle the single consolidated arbitration proceeding. If the Beneficiary and the Guarantor are unable to select such arbitration tribunal within said twenty (20) day period, the International Court of Arbitration of the ICC shall select such arbitration tribunal within thirty (30) days of the written request by either the Beneficiary or the Guarantor.

(d)     Unless otherwise agreed by the Guarantor and the Beneficiary, any arbitration proceeding pursuant to this Section 13 shall be conducted and any award shall be rendered in New York, New York. Any arbitration proceeding pursuant to this Section 13 shall be conducted and any award shall be rendered in the English language.

(e)     Notwithstanding anything to the contrary herein, the arbitration provisions set forth herein, any arbitration proceeding hereunder and any arbitral award pursuant thereto, shall be governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 and the Inter-American Convention on International Arbitration of January 30, 1975, in each case to the extent such convention is enforceable in the Republic of Venezuela.

26.     The Transfer Agreement and the SCOSA are governed by the laws of the State of New York and the COSA and the Guarantee are governed by the laws of Venezuela.

27.    The place of arbitration, pursuant to the agreement of the parties, is New York City, New York, U.S.A. The language of the arbitration is English.

28.    There has been no challenge to the validity of these arbitration clauses.

## E.    PROCEDURAL HISTORY

### ICC Case No. 16982/JRF

29.    By correspondence dated February 25, 2010, the Claimants delivered their Request for Arbitration to the International Chamber of Commerce ("ICC") International Court of Arbitration. By correspondence dated March 2, 2010 from the Deputy Secretary General, the ICC International Court of Arbitration ("ICC Court") acknowledged receipt of the Request for Arbitration on March 1, 2010. The Secretariat of the ICC Court ("Secretariat") assigned Case No. 16982/JRF to this arbitration.

30.    By correspondence dated March 8, 2010, the ICC Secretariat notified the Respondents, pursuant to Article 4(5) of the ICC Rules of Arbitration (as of January 1, 1998) ("ICC Rules"), of the Request for Arbitration, and advised, pursuant to Article 5(1) of the ICC Rules, that the Respondents had thirty (30) days to submit an Answer to the Request for Arbitration.

31.    On March 8, 2010, the Secretariat informed Bruno W. Boesch, Esq. that he had been nominated by the Claimants for confirmation as co-arbitrator, and inquired whether he would accept this nomination.

32.    By correspondence dated April 1, 2010, the Secretariat forwarded to the Claimants and Respondents a copy of the Statement of Acceptance, Availability and Independence, and curriculum vitae, of Bruno W. Boesch, Esq. who had been nominated as co-arbitrator by the Claimants.

33.    By correspondence to the Claimants and the ICC Court dated April 8, 2010, the Respondents requested, pursuant to Article 5(2) of the ICC Rules, an extension until May 10, 2010 to submit their Answer to the Request for Arbitration. Further,

pursuant to Articles 5(2) and 8(4) of the ICC Rules, the Respondents nominated Abraham D. Sofaer, Esq. as co-arbitrator.

34.  By correspondence dated April 12, 2010, the Secretariat acknowledged receipt of the Respondents' April 8, 2010 correspondence and granted the Respondents until May 10, 2010 to submit their Answer. Further, the Secretariat informed the parties that unless they advised the Secretariat otherwise by April 19, 2010, the Secretariat would understand that no party was raising any objection to the existence, validity or scope of the arbitration agreement.

35.  By correspondence dated April 12, 2010, the Secretariat informed Abraham D. Sofaer, Esq. that he had been nominated by the Respondents for confirmation, as co-arbitrator, and inquired whether he would accept this nomination.

36.  By correspondence dated April 23, 2010, the Secretariat forwarded to the Claimants and Respondents a copy of the Statement of Acceptance, Availability and Independence, and curriculum vitae, of Abraham D. Sofaer, Esq. who had been nominated as co-arbitrator by the Respondents.

37.  By correspondence dated May 12, 2010, the ICC Secretariat acknowledged receipt of the Respondents' Answer dated May 10, 2010, and forwarded a copy to the Claimants.

38.  By correspondence dated May 19, 2010, the Secretariat informed Bruno W. Boesch, Esq. and Abraham D. Sofaer, Esq. that, pursuant to Article 9(2) of the ICC Rules, the Secretary General confirmed Bruno W. Boesch, Esq. as co-arbitrator upon Claimants' nomination and Abraham D. Sofaer, Esq. as co-arbitrator upon Respondents' nomination, and that such confirmation would be reported to the ICC Court. Further, the Secretariat notified the co-arbitrators that they had been granted thirty (30) days from the date of receipt of this correspondence to jointly nominate the Chairman of the arbitral tribunal.

39.  By correspondence dated June 17, 2010, the Respondents informed the Secretariat, with a copy directly to the Claimants, that after conferring, the parties

had agreed to request that the co-arbitrators be granted two (2) additional weeks, until July 5, 2010, to submit their joint nomination of the Chairman.

40.     By correspondence dated July 1, 2010, the Respondents informed the Secretariat, with a copy sent directly to the Claimants, that after conferring, the parties had agreed to request that the co-arbitrators be granted two (2) additional weeks, until July 19, 2010, to submit their joint nomination of the Chairman.

41.     By correspondence dated July 8, 2010, the Secretariat acknowledged receipt of the Respondents' correspondence dated July 1, 2010, with a copy sent directly to the Claimants and the co-arbitrators, and noted the parties' agreement to grant additional time to the arbitrators for the joint nomination of the Chairman of the arbitral tribunal until July 19, 2010.

42.     By email sent July 14, 2010, Bruno W. Boesch, Esq. informed the Secretariat that:

   (a)     the co-arbitrators had agreed to nominate David R. Haigh, Q.C. as third arbitrator and Chairman; and

   (b)     by letter dated July 7, 2010 David R. Haigh, Q.C. had accepted this nomination, stated his independence and impartiality, and made certain disclosures, which had not given rise to any objections by the parties.

43.     By correspondence dated July 16, 2010, the Secretariat acknowledged receipt of Bruno W. Boesch, Esq.'s July 14, 2010 email, with a copy sent directly to the parties. By correspondence on even date, the Secretariat informed David R. Haigh, Q.C. that he had been jointly nominated by the co-arbitrators for confirmation as Chairman of the arbitral tribunal and inquired whether he would accept this nomination.

44.     By correspondence dated July 20, 2010, the Secretariat forwarded to the parties and co-arbitrators a copy of the Statement of Acceptance, Availability and Independence and curriculum vitae of David R. Haigh, Q.C. The Secretariat

noted that David R. Haigh, Q.C. had advised of facts or circumstances that might be of such a nature as to call into question his independence in the eyes of the parties and invited the parties, in conformity with Article 7(2) of the ICC Rules, to provide any comments by July 27, 2010. The Secretariat also informed the parties that if a party did not provide comments within the time limit granted, it would be considered that, as regards these facts or circumstances, the party did not object to the confirmation of David R. Haigh, Q.C. as an arbitrator in this arbitration.

45. By correspondence from each of the parties dated July 26, 2010, the parties informed the Secretariat that they had no objection to the confirmation of David R. Haigh, Q.C. as Chairman of the arbitral tribunal in these proceedings.

46. By correspondence to David R. Haigh Q.C., Bruno W. Boesch, Esq. and Abraham D. Sofaer, Esq. dated August 4, 2010, with a copy to the Claimants and Respondents, the Secretariat advised that on August 3, 2010 the Secretary General confirmed David R. Haigh, Q.C. as Chairman of the arbitral tribunal, in accordance with Article 9(2) of the ICC Rules, upon the joint nomination of the co-arbitrators. By separate letter on this same date, the Secretariat forwarded the file to the arbitral tribunal in accordance with Article 13 of the ICC Rules.

47. By correspondence dated September 13, 2010, the Secretariat informed the tribunal that at its session of September 9, 2010 and pursuant to Article 18(2) of the ICC Rules, the ICC Court extended the time limit for establishing the Terms of Reference in Case 16982/JRF until November 30, 2010.

**ICC Case No. 17336/JRF**

48. Respondent ConocoPhillips Company delivered a Request for Arbitration to the ICC on August 16, 2010. The ICC Secretariat assigned Case No. 17336/JRF to this arbitration.

49. On September 29, 2010, Respondent ConocoPhillips Company delivered its Amended Request for Arbitration to the ICC in Case 17336/JRF.

50.     By correspondence, dated October 4, 2010, the PDVSA Parties in Case No. 17336/JRF requested that the Secretariat grant an extension until November 5, 2010 to submit their Answer to the Request for Arbitration and, at the same time, alerted the Secretariat to the potential application to consolidate the two arbitrations.

51.     By correspondence dated October 6, 2010, the Secretariat granted the PDVSA Parties in Case No. 17336/JRF until November 5, 2010 to submit their Answer. In addition, it took note of their comments on consolidation and invited the Respondents to submit their comments on or before October 15, 2010.

52.     On October 14, the Respondents provided a response to the October 4, 2010 letter from the PDVSA Parties and disputed that there was any justification for consolidation between the two arbitrations.

53.     By correspondence from the Secretariat dated October 22, 2010, the Secretariat acknowledged, in the context of Case No. 17336/JRF, the correspondence between the parties regarding the consolidation issue.

**Request for Consolidation**

54.     By correspondence dated October 29, 2010, the PDVSA Parties submitted their Request for Consolidation of Case No. 16982/JRF and Case No. 17336/JRF.

55.     By correspondence dated November 3, 2010, the Secretariat acknowledged receipt of the Claimant's Request for Consolidation and granted the PDVSA Parties in Case No. 17336/JRF a further extension until December 15, 2010 to submit their Answer.

56.     By correspondence dated November 4, 2010, the tribunal directed that the process for developing the Terms of Reference in Case 16982/JRF be stayed until after the tribunal's decision on the Request for Consolidation. The tribunal also directed the Respondents to submit their arguments on the consolidation issue by November 12, 2010. Pursuant to those directions, the Respondents

submitted their Response to the Request for Consolidation on November 12, 2010, and the Claimants submitted their Reply in Support of the Request for Consolidation on November 17, 2010.

57. Following correspondence from the parties in which they addressed certain differences and the possibility of oral submissions, the parties and the tribunal held a teleconference on November 24, 2010.

58. On December 15, 2010, Claimants delivered their Answer in Case No. 17336/JRF to the ICC and the tribunal was provided a copy of the Answer under cover of correspondence dated December 23, 2010.

59. By Order dated December 17, 2010, the tribunal granted the Request for Consolidation and ordered that ICC Case No. 16982/JRF and ICC Case No. 17336/JRF be consolidated and determined as a single consolidated arbitration (the Order for Consolidation).

60. By correspondence dated December 23, 2010, the ICC Secretariat acknowledged the Order for Consolidation and confirmed the form of reference for the consolidated arbitration would be 16982/JRF (C-17336/JRF).

61. By correspondence dated January 7, 2011, the Respondents advised that the parties agreed to hold a teleconference with the tribunal for the purpose of discussing a broader timeline for the arbitration prior to holding a meeting to finalize the Terms of Reference and Procedural Timetable.

62. By email dated January 18, 2011, the parties informed the tribunal that they had agreed that the PDVSA Parties would proceed as Claimants and ConocoPhillips would proceed as Respondents in the consolidated arbitration. They also agreed on a timeline for submitting pleadings.

63. The tribunal held a teleconference with the parties on January 19, 2011 to discuss the parties' proposed timeline for the consolidated arbitration. Following the teleconference, on February 4, 2011 the tribunal issued a Procedural Order

setting forth the timetable of the consolidated arbitration up to the Terms of Reference hearing on May 3, 2011.

64.   On January 21, 2011, the ICC informed the tribunal that pursuant to Article 18(2) of the ICC Rules, the ICC Court extended the time limit for establishing the Terms of Reference until March 31, 2011. By correspondence to the ICC dated January 21, 2011, the tribunal explained that the parties and the tribunal could not meet before early May 2011, and requested that the ICC Court further extend the time limit for filing the Terms of Reference until May 31, 2011.

65.   On February 18, 2011, the Respondents filed an Amended Answer with Counterclaims, including the claim that Respondent ConocoPhillips Company had made in Case No. 17336/JRF as one of its counterclaims, together with exhibits.

66.   On March 21, 2011, the Claimants provided their Reply to Counterclaims in accordance with Article 5(6) of the ICC Rules.

67.   During the hearing held in New York on May 3, 2011, the parties and the tribunal finalized and executed the Terms of Reference for the consolidated arbitration. The Terms of Reference were then transmitted to the ICC Court pursuant to Article 23 of the ICC Rules. The ICC Secretariat acknowledged receipt on May 19, 2011 and advised that it would transmit the Terms of Reference to the ICC Court at one of its next sessions, in compliance with Article 18(2) of the ICC Rules.

68.   On May 26, 2011, the tribunal issued Procedural Order No. 1 setting forth general procedural matters and the timetable agreed by the parties and the tribunal on May 3, 2011.

69.   The Claimants delivered their Statement of Claim, dated August 3, 2011, to the ICC Secretariat, with a copy to the tribunal and the Respondents, together with supporting witness statements, exhibits and authorities.

**70.**   On August 19, 2011, the Respondents submitted a Request for Production of Documents, along with a Redfern Schedule. On September 2, 2011, the Claimants objected to the Respondents' Request for Production of Documents. The Respondents replied on September 15, 2011 and the Claimants further commented in a letter dated September 16, 2011. On September 19, 2011, the tribunal issued its Redfern Schedule rulings and directions on the Respondents' Document Requests.

**71.**   By letter dated November 14, 2011, the Chairman made a further conflict disclosure to the parties and proposed the nomination of Ms. Valérie E. Quintal as Administrative Secretary for the tribunal. The Chairman requested the parties' position on these matters. By letter dated November 21, 2011 from the Claimants and by letter dated November 22, 2011 from the Respondents, the parties informed the tribunal that they had no objection to the Chairman continuing to serve on the tribunal. The parties also indicated their agreement to the nomination of Ms. Valérie E. Quintal to serve as the Administrative Secretary. By correspondence dated December 13, 2011, the ICC Secretariat noted the appointment of the Administrative Secretary.

**72.**   By correspondence dated December 20, 2011, the Respondents submitted their Statement of Defence and Counterclaims, together with supporting witness statements, expert reports, exhibits and authorities.

**73.**   By correspondence dated January 6, 2012, the Claimants requested that the demurrage claims contained in Exhibit R-32 and filed with Respondents' Statement of Defence and Counterclaims be struck by reason of being raised after the signing of the Terms of Reference or alternatively, that the Respondents seek approval from the tribunal to bring these claims under Article 19 of the ICC Rules. On January 9, 2012, the Respondents responded and sought leave to proceed with the demurrage claims pursuant to Article 19 of the ICC Rules. The Claimants replied on January 26, 2012.

74.   In Procedural Order No. 2, issued on February 1, 2012, the tribunal denied the Claimants' request to strike the demurrage claims and allowed, pursuant to Article 19 of the Rules, the Respondents' application for leave to proceed with the demurrage claims in their Statement of Defence and Counterclaims.

75.   On January 6, 2012, the Claimants submitted their Request for Document Production and Redfern Schedule in relation to the Respondents' Statement of Defence and Counterclaims. By correspondence dated January 24, 2012, the Respondents objected to the Claimants' Request for Document Production seeking an order from the tribunal denying certain of the Claimants' requests. The Claimants replied on February 2, 2012. On February 14, 2012, the tribunal issued its Redfern Schedule rulings and directions on the Claimants' Document Requests.

76.   Following correspondence from the parties proposing amendments to the Procedural Timetable, on March 6, 2012 the tribunal issued Procedural Order No. 3 and Amended Procedural Timetable to reflect the parties' agreed amendments.

77.   On May 23, 2012, the Claimants filed their Reply to Statement of Defence, Statement of Defence to Counterclaims and Statement of New Claims, together with witness statements, expert reports, exhibits and authorities.

**Procedural History regarding the Transfer to Phillips 66**

78.   By letters dated November 15, 2011, the Respondents notified PDV Sweeny, PDV Texas and the tribunal that ConocoPhillips contemplated transferring to Phillips 66 Company ("Phillips 66") all of its refining assets, including the Sweeny Refinery and Site, and that COP contemplated transferring to Phillips 66 their interests in the Joint Venture (the "Transfer"). The Respondents took the position that the Transfer Agreement was no longer in effect following the Respondents' exercise of the Call Option. Because of the ongoing arbitration, however, the Respondents said they would honor the Transfer Agreement and follow its requirements and thus would only "conditionally transfer" that portion of the Joint

Venture interest held by the Claimants prior to the exercise of the Call Option. The Respondents also notified the tribunal of the contemplated assignments of ConocoPhillips' rights under COSA and the SCOSA.

79.     By correspondence dated November 22, 2011, the Claimants took the position that if the Respondents intended to characterize Philips 66 as a "Qualified Transferee" under Section 2.1(b) of the Transfer Agreement, there was a "Material Litigation" immediately prior to the Transfer with respect to Philips 66, namely these arbitration proceedings, which would be an obstacle to the Transfer. PDV Sweeny and PDV Texas further requested an explanation as to how the requirements for the assignments of the various agreements would be met. In particular, PDV Sweeny and PDV Texas requested an explanation as to how ConocoPhillips would assign its rights under the COSA and the SCOSA without the express consent of PPSA and PDVSA, respectively.

80.     By correspondence dated December 15, 2011, the Respondents replied that they did indeed intend to characterize Phillips 66 as a "Qualified Transferee" pursuant to Section 2.1(b) of the Transfer Agreement and that the planned assignment of ConocoPhillips' rights under the COSA would be done in connection with an "Authorized Transfer" under the terms of the COSA.

81.     By correspondence dated December 29, 2011, the Claimants reiterated their position that there was Material Litigation which created an impediment to the contemplated Transfer pursuant to Section 2.1(b) of the Transfer Agreement. The Claimants also advised that Section 2.1(b) of the Transfer Agreement contained additional requirements which Phillips 66 would have to meet "immediately prior" to the contemplated Transfer. The Claimants said that an assignment by ConocoPhillips of its rights under the COSA would not fall within the definition of an Authorized Transfer and that ConocoPhillips also needed to obtain PDVSA's consent if it were to assign ConocoPhillips' rights under the SCOSA. Neither PPSA nor PDVSA had given such consent.

82.   By correspondence dated January 23, 2012, the Respondents stated that with the closing of the Transfer, there would be no Material Litigation between the Claimants and Phillips 66 because, among other things, Phillips 66 would operate as a stand-alone, publicly traded corporation independent of and separate from the Respondents. The Respondents also confirmed that with the closing of the Transfer, both ConocoPhillips and Phillips 66 would have taken steps to guarantee that their full faith and credit would stand behind any obligations as well as to ensure compliance with the tribunal's rulings. Finally, the Respondents said that while they would review all of their options regarding the assignments of their rights under the COSA, it would be in the best interests of all parties to assign the COSA to Phillips 66.

83.   By correspondence dated April 16, 2012, the Respondents advised that ConocoPhillips' Board of Directors had approved the Transfer to Phillips 66 effective as of May 1, 2012. The Respondents enclosed a number of documents that were to be executed on April 26, 2012 in connection with the Transfer and the assignment of the COSA and the SCOSA to Phillips 66.

84.   By correspondence to the Respondents dated April 26, 2012, the Claimants reiterated their position that the Transfer would violate the terms of the Transfer Agreement and the contemplated assignment of ConocoPhillips' rights under the COSA and SCOSA would be null, void and without effect.

85.   By correspondence to the tribunal dated April 26, 2012, the Claimants (referencing a letter of even date to the Respondents regarding the Transfer) advised that they intended to bring new claims based upon the Transfer and the contemplated assignments of the COSA and the SCOSA (the "New Claims"). The Claimants also stated that they believed that these New Claims should be adjudicated in the existing arbitration. The Claimants requested a conference call to discuss the procedure going forward.

86.   During a May 4, 2012 conference call between the tribunal and the parties, it was agreed that the Claimants could assert the New Claims in the existing arbitration

if (a) the current schedule in the arbitration would be adhered to and (b) the Respondents would have the ability to file a Rejoinder with respect to the New Claims in the first week of November 2012.

87.   Based on the parties' agreement, the tribunal, in Procedural Order No. 4, permitted the Claimants, pursuant to Article 19 of the ICC Rules, to file the New Claims in the arbitration. Procedural Order No. 4 attached an Amended Procedural Timetable reflecting the agreed revised timetable of the parties as well as Supplemental Terms of Reference. The parties and the tribunal agreed to amend the Terms of Reference, dated May 3, 2011 with the Supplemental Terms of Reference pursuant to Article 19 of the ICC Rules. Procedural Order No. 4 was issued accordingly.

88.   By correspondence dated August 6, 2012, the Respondents submitted their Rejoinder, Reply to Counterclaims and Statement of Defence to New Claims, together with accompanying witness statements, expert reports and authorities.

89.   By correspondence to the Respondents dated September 12, 2012, and copied to the tribunal, the Claimants requested the production of certain documents referenced in the Respondents' Privilege Log on the basis that the Respondents waived privilege by relying on these documents in their Rejoinder. The Respondents replied on September 17, 2012, that nothing they stated in the Rejoinder resulted in the waiver of any privilege and that they were under no obligation to produce any of the required documents.

90.   By correspondence dated September 19, 2012, the Claimants requested that the tribunal order the Respondents to produce the documents on which they alleged the Respondents had waived privilege. By correspondence dated September 27, 2012, the Respondents responded that the tribunal should reject the Claimants' application for disclosure of the documents as privilege had not been waived. By correspondence dated October 3, 2012, the Claimants replied. Finally, by correspondence dated October 8, 2012 from the Respondents and

correspondence dated October 9, 2012 from the Claimants, the parties further developed their positions.

91.   In Procedural Order No. 5 dated October 12, 2012, the tribunal denied the Claimants' application for disclosure of the documents on the basis that there was a proper claim of privilege which had not been waived by the Respondents.

92.   On October 8, 2012, the Claimants filed their Rejoinder to Counterclaims and Reply in Support to New Claims, together with witness statements, expert reports, exhibits and authorities.

93.   The parties and the tribunal held a Pre-Hearing Telephone Conference on October 18, 2012 to discuss hearing logistics, including a venue for the hearing, opening skeleton arguments, allocation of time, scope of examination and post-hearing briefs. Following this call, with the assistance of the parties, the tribunal issued the Amended Minutes of the Pre-Hearing Telephone Conference on October 24, 2012.

94.   The Respondents submitted their Rejoinder to New Claims on November 14, 2012, together with exhibits and authorities.

95.   By letter dated November 21, 2012, the PDVSA Parties informed the tribunal that they would raise a jurisdictional challenge regarding ConocoPhillips' alleged new claims for Negative Margin Adjustment relief at the Hearing (the "NMA Claim"). In general terms, the PDVSA Parties submitted that the Respondents were barred from seeking to recover all Negative Margin Adjustment amounts they claimed in their Statement of Defence and Counterclaims because it was not an issue contained in the Terms of Reference and because the tribunal did not have jurisdiction to decide the issue. The Respondents replied on December 3, 2012 that the NMA Claim was not a new claim and was not beyond the tribunal's jurisdiction. On December 5, 2012, the Claimants reaffirmed their earlier arguments.

96.  The Hearing was held in New York City, New York from December 8 to 12, 2012. The tribunal heard from the following witnesses:

    (a)  for the Claimants: Dr. Juan Carlos Boué, Mr. Carlos Rauseo, Ms. Beatriz Blanco and Dr. Bernard Mommer; and

    (b)  for the Respondents: Mr. Kirk A. Austin, Mr. John W. Calvert, Mr. Jeff W. Sheets, Mr. David S. Smith, Mr. Jon R. Weichbrodt and Mr. Blake T. Eskew.

97.  At the Hearing the Chairman indicated that the tribunal did not require further oral submissions from the parties on the NMA Claim and that it would rule on the issue on the basis of the arguments already submitted by the parties up to that point. However, the tribunal invited the parties to comment further, if they wished, in their post-hearing briefs.[2]

98.  By correspondence dated January 31, 2013, the parties submitted their joint proposals for transcript corrections.

99.  By correspondence dated February 21, 2013, the parties informed the tribunal that they had agreed to make separate submissions on March 1, 2013 on whether the tribunal should consider the NMA Claim. On March 1, 2013, the parties made simultaneous submissions on the NMA Claim in conjunction with their post-hearing briefs.

100.  As previously agreed with the tribunal, on March 1, 2013 the parties submitted their post-hearing briefs on the merits of their disputes.

101.  By correspondence dated March 27, 2013, the tribunal indicated that it proposed to determine the merits of this arbitration in the form of a partial award and that after issuance of its partial award, it would invite the parties to provide their

_____

[2] Transcript p.1086.

submissions on costs. The tribunal also communicated its intention to declare the proceedings closed, pursuant to Article 22(1) of the ICC Rules since the parties had had a reasonable opportunity to present their cases.

102.   On April 3, 2013, the Claimants agreed that the parties had had a reasonable opportunity to present their cases with respect to the issues set forth in the Terms of Reference and Procedural Order No. 4. They did not agree, however, that the NMA Claim was properly before the tribunal and noted that they had not had adequate opportunity to present their case with respect to a defence of that claim.

103.   On April 3, 2013, the Respondents agreed that the parties had had a reasonable opportunity to present their cases. They noted that the NMA Claim had been properly briefed.

104.   The tribunal declared the proceedings closed on April 4, 2013 and noted the Claimants' continuing objection to the NMA Claim.

105.   The tribunal observes that the composition of this arbitral tribunal has not been challenged by any party.

106.   The ICC Court initially set the time limit pursuant to Article 24(1) of the ICC Rules within which to render the Final Award for November 3, 2012.[3] Subsequently, the ICC Court extended this date as follows:

   (a)   1st extension until January 31, 2013 granted on October 27, 2011;

   (b)   2nd extension until April 30, 2013 granted on January 24, 2013;

   (c)   3rd extension until July 31, 2013 granted on April 18, 2013;

---

[3] ICC letter dated May 19, 2011 indicates that "Pursuant to Article 24(1) of the Rules, the time limit of six months within which the Arbitral Tribunal must render the Final Award started to run on the date of signature of the Terms of Reference". The Terms of Reference were signed on May 3, 2011.

**(d)**    4th extension until October 31, 2013 granted on July 25, 2013;

**(e)**    5th extension until November 29, 2013 granted on October 31, 2013;

**(f)**    6th extension until January 31, 2014 granted on November 28, 2013;

**(g)**    7th extension until February 28, 2014 granted on January 23, 2014; and

**(h)**    8th extension until April 30, 2014 granted on February 20, 2014.

## F.    FACTUAL BACKGROUND

**107.**    The following factual comments by the tribunal are based on the record presented by the parties and are intended to provide a general context in which to understand and construe the issues which have been raised in this case. The tribunal's specific analysis and determinations will be enlarged upon in more detail in the appropriate sections of this award.

**108.**    PDVSA is the national oil company of Venezuela. Through its various subsidiaries, PDVSA engages in all aspects of the petroleum industry, including the exploration for and production of crude oil and natural gas and the refining, marketing and transportation of crude oil, natural gas and refined petroleum products. PDV Texas and PDV Sweeny are wholly owned subsidiaries of PDVSA, and were formed in Delaware to conduct development activities for the Joint Venture.[4]

**109.**    ConocoPhillips[5] is a major integrated oil and gas company incorporated in Delaware with worldwide exploration and production, as well as chemical and refining operations in the United States and overseas. Sweeny Sub is a wholly

---

[4] Exhibit C-12, Merey Sweeny L.P. and Sweeny Funding Corp. Bond Offering Circular, dated June 11, 1999, pp. 54-55.

[5] ConocoPhillips is the successor in interest to Phillips Petroleum Company.

owned subsidiary of Phillips, formed in Delaware in 1998 to conduct development activities for the Joint Venture.[6]

110.   PDVSA and ConocoPhillips began discussions on a potential partnership in the 1990's. PDVSA was looking to sign long-term supply agreements with a leading U.S. refiner in order to secure its planned increase in production of hydrocarbons. ConocoPhillips was looking to gain a cost-based, competitive advantage in the refining industry by processing lower-cost, heavy sour crude oil at its refinery in Old Ocean, Texas, known as the Sweeny Refinery.[7]

**The Joint Venture**

111.   The negotiations between the parties regarding the Joint Venture started in 1996. Essentially, it was proposed that ConocoPhillips would purchase and Merey Sweeny would refine and process Merey 16, produced by PPSA from a blend of extra-heavy crude oil and light crude oil. In order to refine Merey 16, hydroprocessing and coking were necessary. The PDVSA Parties' main contribution to the Joint Venture would be to supply Merey Crude Oil ("Crude Oil") pursuant to the COSA. ConocoPhillips' main contribution to the Joint Venture would be the operation and maintenance of the oil refining facilities constructed and owned by the Joint Venture. The Crude Oil purchased by ConocoPhillips would be processed by the Joint Venture's refinery and returned to ConocoPhillips, which would pay a processing fee.

112.   The parties developed a joint venture structure that would permit the partners to share the costs of building the coker and related equipment. The following improvements and upgrades to the existing facilities at the Sweeny Refinery were projected:

---

[6] Exhibit C-12, Merey Sweeny L.P. and Sweeny Funding Corp. Bond Offering Circular, dated June 11, 1999, p. 53.

[7] Exhibit C-12, Merey Sweeny L.P. and Sweeny Funding Corp. Bond Offering Circular, dated June 11, 1999, p. 1.

-30-

    **(a)**    the sour crude distillation unit (Unit 25.1) would have to be upgraded to process 165,000 barrels per stream day (BPSD) of heavy sour crude;

    **(b)**    desalters would be converted from series to parallel flow; and

    **(c)**    modifications would have to be made to the Atmospheric Resid Hydro Desulfurization Unit so that it could efficiently process 104,000 BPSD.[8]

**113.**    The total cost of the project was estimated at approximately US $537.5 million. As joint venturers, the PDVSA Parties and ConocoPhillips bore equally the project's pre-completion financial risk associated with the development and construction of the Joint Venture refining facilities. Between 1998 and 2001, the Joint Venture issued bonds, the proceeds from which were used to fund the construction of the Joint Venture refining facilities. Additional expenditures were equally shared between ConocoPhillips and the PDVSA Parties through capital contributions to Merey Sweeny. The Joint Venture Refining Facilities were completed in May 2004 and the bonds issued by Merey Sweeny became non-recourse to the Joint Venture partners. After completion, Merey Sweeny revenues were to be the sole source for payment of the Joint Venture's debts, expenses or expenditures. If any shortfalls occurred, the joint venturers were severally obligated to make their proportionate share of capital contributions.

**114.**    The Joint Venture Refining Facilities were to be owned equally by the PDVSA Parties and ConocoPhillips through Merey Sweeny. Merey Sweeny has two limited partners, Sweeny Sub and PDV Sweeny, each of which owns a 49.5% interest, and a general partner, Sweeny Coker, which owns a 1% interest. PDV Texas and ConocoPhillips each held a 50% membership interest in Sweeny Coker.

**115.**    Merey Sweeny earns income for the Joint Venture by processing what is known as long residue and other feedstock derived from heavy crude. This long residue

---

[8] Exhibit C-12, Merey Sweeny L.P. and Sweeny Funding Corp. Bond Offering Circular, dated June 11, 1999, p. 6.

-31-

is owned by ConocoPhillips which then pays Merey Sweeny a monthly processing fee for refining the long residue. These proceeds are used by the Joint Venture to pay for operating expenses. Any remaining profit of the Joint Venture is shared equally by the limited partners.

**The Agreements under the Joint Venture**

116.   In 1997, the parties signed a document entitled Principles of Agreement which set out their mutual interest in forming a joint venture.[9] This was followed by a series of interrelated contracts governing the Joint Venture, which were signed on June 18, 1999, some of which are the subject of the disputes in this arbitration.

117.   The following contracts are relevant to this dispute:

   (a)   the Amended and Restated Transfer Agreement ("Transfer Agreement") between PDV Sweeny, PDV Texas, COP and Sweeny Sub;

   (b)   the Amended and Restated Crude Oil Supply Agreement ("COSA") between PPSA and COP;

   (c)   the Amended and Restated Supplemental Crude Oil Supply Agreement ("SCOSA") between PDVSA and COP;

   (d)   the COSA Guarantee, between PDVSA and COP;

   (e)   the Amended and Restated Processing Agreement ("Processing Agreement") between Merey Sweeny and COP;

   (f)   the Partnership Agreement governing Merey Sweeny between Sweeny Coker, Sweeny Sub and PDV Sweeny;

_____

[9] Exhibit R-38, Principles of Agreement between Phillips Petroleum Company and Corpoven, S.A., August 22, 1997.

    **(g)**    the Second Amended and Restated Limited Liability Company Agreement ("LLC Agreement") governing Sweeny Coker between COP and PDV Texas; and

    **(h)**    the Amended and Restated Operating Agreement ("Operating Agreement") between Merey Sweeny and COP.

**118.** As part of the Joint Venture structure, the parties agreed that any transfer of their interests in the Joint Venture would be subject to certain terms and conditions. Those terms and conditions are set forth in the Transfer Agreement. In part, this agreement also provides for a Call Option remedy which allows ConocoPhillips to acquire the PDVSA Parties' joint venture interest upon the occurrence of a Call Event. The Transfer Agreement also imposes restrictions on the Respondents' ability to transfer any substantial interest in the Joint Venture. The Transfer Agreement is governed by New York law.

**119.** The COSA is a long-term supply agreement pursuant to which PPSA sells and delivers Crude Oil and ConocoPhillips purchases and receives Crude Oil. Under the COSA, PPSA is obligated to supply a certain volume of Crude Oil every month, unless it is excused from doing so by certain operational limitations which include force majeure. The COSA also contains certain provisions regarding the damages to which ConocoPhillips may be entitled in the event of a failure to deliver the required amount of crude Oil for any month. These amounts, referred to as Seller Damages are calculated pursuant to a formula in the COSA ("Seller Damages"). The COSA is governed by Venezuelan law.

**120.** After purchasing Crude Oil from PPSA, pursuant to the COSA, ConocoPhillips then processes that Crude Oil at its sour crude oil unit of the Sweeny Refinery, referred to as Unit 25.1. At Unit 25.1, ConocoPhillips derives long residue from Crude Oil and supplies it to the Joint Venture refining facilities in accordance with the Processing Agreement.

-33-

121.   A related agreement to the COSA is the SCOSA under which PDVSA is required to provide ConocoPhillips with Replacement Crude Oil from sources outside Venezuela, or to pay ConocoPhillips Seller Damages calculated under the COSA in the event PPSA fails to supply Crude Oil because of force majeure. The SCOSA is governed by New York law.

122.   The LLC Agreement between ConocoPhillips and PDV Texas sets forth the terms and conditions governing Sweeny Coker. It is governed by the laws of the state of Delaware and it establishes an Owner's Committee, an Operating Committee and a Partnership Representative for the Joint Venture. As a general partner, Sweeny Coker is responsible for conducting the affairs of Merey Sweeny.

123.   The day-to-day operations of Merey Sweeny are carried out by ConocoPhillips pursuant to the Operating Agreement. Under the Operating Agreement, which is governed by the laws of the state of New York, ConocoPhillips is responsible for operating the Joint Venture refining facilities as well as providing support services related to the operations of those facilities.

**Events Leading Up to the Exercise of the Call Option**

124.   As noted earlier in this Partial Award, on December 31, 2008, PDVSA informed ConocoPhillips that PDVSA had been instructed by the Ministry that, effective January 1, 2009, PDVSA would reduce the output of its crude oil exports, thereby affecting the Crude Oil supplies to Merey Sweeny. PDVSA's letter stated, in part:

> Pursuant to instructions given by the [Ministry]...PDVSA shall make effective commitment to reduce the output of its crude exports.
>
> On [sic] that regard, PDVSA's Board of Directors has instructed to notify hereby the above mentioned decision to Sweeny, which will affect the crude supplied to your refinery...

This decision will be in force as of the 1st of January 2009, and will continue until further notice.[10]

125. The same day, ConocoPhillips tried to contact PDVSA to find out how the supply of Crude Oil would be affected in January 2009. ConocoPhillips sent an email stating, in part:

> Please advise as soon as possible how the attached may effect (sic) the January 2009 Merey lifting program for Sweeny. Given the PDVSA and ConocoPhillips partnership at Sweeny it is in both companies best interest to maintain Merey supply and prevent reductions in Sweeny crude processing rates. If January supply is reduced at this late date, on top of existing chronic lifting delays, processing rates at Sweeny will be significantly effected (sic)...[11]

126. On January 4, 2009, PDVSA replied "As it was mentioned in the attached letter, Merey lifting program for Sweeny will be afectted [sic], it means that there will not be Merey crude available for Merey refinery."[12]

127. The parties continued to exchange emails and letters, and participated in telephone discussions to address the crude supply issues.[13]

128. Shortly thereafter, ConocoPhillips alerted the PDVSA Parties that it would resort to its rights under the SCOSA. By letter dated January 7, 2009, it stated, in part:

> In the meanwhile, as you know, pursuant to Article 2.1 of the Amended and Restated Supplemental Crude Oil Supply Agreement between ConocoPhillips and PDVSA dated June 18, 1999, in the event that PDVSA Petróleo y Gas, SA fails to supply crude oil as a result of, inter alia, a restraint imposed by the Bolivarian Republic of Venezuela, then PDVSA has an obligation to either: "supply or cause to be supplied, in lieu of such Crude Oil

---

[10] Exhibit R-7, Letter from Fernando Valera (PDVSA) to John Calvert (ConocoPhillips), December 31, 2008.

[11] Exhibit R-61, Emails from John Calvert (ConocoPhillips) to Alfredo Calderón (PDVSA) and Beatriz Blanco (PDVSA), December 31, 2008 – January 5, 2009.

[12] Exhibit R-61, Emails between John Calvert (ConocoPhillips), Alfredo Calderón (PDVSA) and Beatriz Blanco (PDVSA), December 31, 2008 – January 5, 2009.

[13] See Calvert Witness Statement, ¶¶16-19; Exhibit R-62, E-mails from Sharon O'Brien (Merey Sweeny) to Carlos Rauseo (PDVSA) and Carmen Elvira Alvarez (PDVSA), January 2, 2009; Exhibit R-63, E-mails from Sharon O'Brien (Merey Sweeny) to Carlos Rauseo (PDVSA) and Carmen Elvira Alvarez (PDVSA), January 5, 2009; Exhibit C-21, E-mail from Alfredo Calderon, PDVSA, to John Calvert, ConocoPhillips, dated January 4, 2009.

> a Merey Equivalent Volume of crude oil from sources outside Venezuela . . . or . . , pay damages in an amount equal to the damages, if any, that would have been due under Section 2.7 of the Crude Oil Supply Agreement had such failure not been excused under the Crude Oil Supply Agreement."
>
> As a result, we ask that PDVSA immediately propose alternate supplies or confirm its election to pay damages as provided by Section 2.7 of the Crude Oil Supply Agreement. [14]

**129.** On February 20, 2009, ConocoPhillips sought Seller Damages for the Month of January 2009 from PDVSA and PPSA arising from the Crude Oil reduction. Claims for Seller Damages were submitted in the form of Buyer Monthly Reports. Under the COSA, Seller Damages detailed in a Buyer Monthly Report are due within 10 days of the date of the Buyer Monthly Report. ConocoPhillips delivered Buyer Monthly Reports to PPSA and PDVSA for January 2009 in the amount of US $3,152,578, March 2009 in the amount of US $3,778,183, April 2009 in the amount of US $2,174,245, June 2009 in the amount of US $276,713, July 2009 in the amount of US $2,613,080 and August 2009 in the amount of US $4,493,034.[15]

**130.** The parties met on February 27, 2009 and March 10, 2009 in Caracas, Venezuela and on April 15, 2009 in Vienna to discuss various outstanding issues. The tribunal received conflicting versions of what transpired during these meetings.

**131.** Mr. Goff and Mr. Del Pino met in person in Caracas on February 27, 2009 to discuss the cutoff of Crude Oil supply. There appears to have been some discussion as to the relation between the supply cutoff and the ICSID Arbitration.

---

[14] Exhibit R-8, Letter from Gregory J. Goff (ConocoPhillips) to Fernando Valera (PDVSA), January 7, 2009.

[15] Exhibit R-23, Buyer Monthly Report for January 2009, submitted by ConocoPhillips to Petróleo and PDVSA, February 20, 2009; Exhibit R-24, Buyer Monthly Report for March 2009, submitted by ConocoPhillips to Petróleo and PDVSA, April 20, 2009; Exhibit R-25, Buyer Monthly Report for April 2009, submitted by ConocoPhillips to Petróleo and PDVSA, May 19, 2009; Exhibit R-26, Buyer Monthly Report for June 2009, submitted by ConocoPhillips to Petróleo and PDVSA, July 20, 2009; Exhibit R-27, Buyer Monthly Report for July 2009, submitted by ConocoPhillips to Petróleo and PDVSA, August 20, 2009; Exhibit R-28, Buyer Monthly Report for August 2009, submitted by ConocoPhillips to Petróleo and PDVSA, September 18, 2009.

Discussions also focused on the issuance by ConocoPhillips of Buyer Monthly Reports for Seller Damages and the potential supply of alternative crude oil. ConocoPhillips summarized part of the February 27, 2009 meeting in an email dated March 2, 2009:

> In that meeting Mr. Valera indicated that PDVSA would be reviewing your system balances and would soon (by Wednesday March 4) be able to indicate to ConocoPhillips what PDVSA would be able to do to help the crude supply situation into our joint venture facility at Sweeny. As I mentioned at the meeting, it looks like Sweeny will restart the sour unit from the turnaround on/about March 18th. Although ConocoPhillips has arranged some alternative crude oil for the restart, also having Merey (salted or desalted) would help increase the overall rate and mitigate damages due to lack of full Merey supply.[16]

132.  The March 10, 2009 meeting in Caracas included Mr. James Mulva, CEO of ConocoPhillips, Mr. Rafael Ramirez and Dr. Mommer. They met to discuss a number of issues, including the possible settlement of the ICSID Arbitration.

133.  On April 15, 2009, Mr. Sheets, Dr. Mommer, Dr. Boué and Mr. Goff met in Vienna to discuss settlement of the ICSID Arbitration as well as the Merey Sweeny relationship between ConocoPhillips and the PDVSA Parties. ConocoPhillips voiced its concern with the supply cutoff to the Sweeny Refinery and the outstanding Seller Damages. Drs. Mommer and Boué say they were somewhat confused by the message of Mr. Goff and Mr. Sheets, but agreed they would pass on the strong concerns being expressed by ConocoPhillips.

134.  PPSA was able to supply ConocoPhillips with alternative crude oil for the Merey Sweeny Refinery for the months of May 2009 through August 2009. However, neither PPSA nor PDVSA responded to the Buyer Monthly Reports or paid the Seller Damages that had been claimed.

---

[16] Exhibit C-23, E-mail from John Calvert, ConocoPhillips, to Jose Arismendi, PDVSA, dated March 2, 2009.

135.  By August 2009, after more than 90 days had passed since the Seller Damages detailed in the January and March 2009 Buyer Monthly Reports had become due, ConocoPhillips decided to exercise its Call Option based on this Call Event under the Transfer Agreement. It was the Claimants' evidence that they were not aware at this time of the Transfer Agreement and the Call Option. They say ConocoPhillips had not brought the Transfer Agreement and the Call Option to their attention by correspondence or during the meetings in Caracas.

136.  By letter dated August 28, 2009, ConocoPhillips wrote the PDVSA Parties that "[t]he payment obligation detailed in the January 2009 and March 2009 Buyer Monthly Reports have remained uncured for 90 days, giving ConocoPhillips the right to exercise the Call Option at this time."[17] ConocoPhillips noted that the Call Events defined in Exhibit A of the Transfer Agreement had matured and accordingly it was exercising the Call Option in conformity with Section 4.1 of the Transfer Agreement, thus terminating its partnership with the PDVSA Parties. ConocoPhillips further indicated that, pursuant to its rights, it was not opting to terminate the COSA.

137.  On September 2, 2009, the PDVSA Parties sent a letter to ConocoPhillips rejecting the exercise of the Call Option.[18]

138.  PPSA resumed deliveries of Crude Oil under the COSA in September 2009. On February 25, 2010 the Claimants delivered their Request for Arbitration, requesting that the exercise of the Call Option be set aside.

**After the Call Option: the Aggregate Lookback Adjustment Calculation**

139.  ██████████████████████████████████████████████████
      ██████████████████████████████████████████████████

---

[17] Exhibit C-2, Letter from Janet L. Kelly, ConocoPhillips Company, to PDV Sweeny, Inc. and PDV Texas, Inc., dated August 28, 2009.

[18] Exhibit C-3, Letter from José Arismendi, PDV Sweeny and PDV Texas, to Janet L. Kelly, ConocoPhillips, dated Sept. 2, 2009.





-40-

████████████████████████████████████████████████████
███████ █████ ████ ████ █████ ██████ ████████ ███ ████ ████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
██████████████████████████

147.   ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

148.   ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████  ██████
████████████████████████████████████

## ConocoPhillips' Corporate Restructuring – the Transfer

149.   ██  ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████



150.

151.

152.

23

24

25



-43-

## G.    ISSUES TO BE DETERMINED

157.    Under Article 18(1)(d) of the ICC Rules, the Terms of Reference in ICC proceedings frequently list the issues to be decided by the tribunal. In this case, the Terms of Reference simply indicate at paragraph 122:

> Subject to Article 19 of the ICC Rules, the issues to be determined by the Arbitral Tribunal shall be those resulting from the Parties' submissions, including forthcoming submissions, and which are relevant to the adjudication of the Parties' respective claims and defenses. The issues to be determined are therefore not limited by the above summaries of facts and of the Parties' respective positions. These summaries are *without prejudice* to any other or further allegations, arguments, contentions and denials contained in the pleadings or submissions already filed and in such submissions as will be made in the course of this Arbitration.

158.    The tribunal will consider the following general points in this award:

   **(a)**    Examine and determine the relevant contractual and legal framework, and, in particular, the scope of the COSA, the COSA Guarantee, the SCOSA, the Partnership Agreement, the LLC Agreement, and the Transfer Agreement;

   **(b)**    Examine and determine the relevant rights and obligations of the Parties thereunder;

   **(c)**    Examine and determine whether the Claimants are entitled to any or all of the relief that they seek; and

   **(d)**    Examine and determine whether the Respondents are entitled to any or all of the relief that they seek.

159.    In particular, the tribunal will consider the following issues in this award:

   **(a)**    Whether the provisions of the Transfer Agreement permitting ConocoPhillips to acquire the Claimants' Joint Venture Interest based upon a breach of an obligation to pay a calculated amount of Seller

Damages under the COSA or SCOSA constitutes an unenforceable penalty as a matter of New York law;

**(b)** Whether a Call Event occurred;

**(c)** Whether ConocoPhillips, contrary to its alleged fiduciary duty to the Claimants, or alternatively, its alleged duty of good faith and fair dealing, acted in breach of either of those alleged duties in exercising its Call Option right by failing to inform the PDVSA Parties of the existence of the Transfer Agreement or its right to exercise a Call Option, or by knowingly taking advantage of the alleged lack of awareness by the PDVSA Parties of the Transfer Agreement or ConocoPhillips' right to exercise a Call Option;

**(d)** Whether PPSA's obligation under the COSA to supply ConocoPhillips with Crude Oil as defined in that agreement or to pay Seller Damages was excused by an Event of Force Majeure;

**(e)** Whether PPSA's failure to supply Crude Oil under the COSA triggered PDVSA's obligations under the SCOSA to supply Replacement Crude Oil or pay Seller Damages;

**(f)** If the tribunal decides that the Respondents' taking of the Claimants' Joint Venture Interest was invalid, what remedy is available for the Claimants;

**(g)** Whether PPSA had an enforceable obligation under the COSA to participate in a joint calculation of the Aggregate Lookback Adjustment for the second half of 2008 and all of 2009 and, if so, whether PPSA breached this obligation and whether such a breach gives rise to an obligation for PPSA to pay damages under the COSA, or for PDVSA to pay damages under the COSA Guarantee;

**(h)** Whether ConocoPhillips lost any right to an Aggregate Lookback Adjustment for the second half of 2008 and the first half of 2009, because

it did not seek the adjustment "as soon as practicable" pursuant to the COSA;

**(i)** Whether this tribunal is precluded from calculating the Aggregate Lookback Adjustment because contractually, such a calculation of the Aggregate Lookback Adjustment must be done by agreement or expert arbitration;

**(j)** In the alternative, whether any legal ruling and factual findings by the tribunal in this case should be binding on any subsequent expert arbitration that is sought with regard to an Aggregate Lookback Adjustment for the second half of 2008 and all of 2009;

**(k)** Whether ConocoPhillips is entitled to costs for its Third Counterclaim dealing with demurrage claims;

**(l)** Whether the Transfer is a breach of the terms of the Transfer Agreement and whether ConocoPhillips had the right to assign its rights under the COSA and the SCOSA; and

**(m)** Whether the tribunal has jurisdiction to consider the NMA Claim and, if so, whether ConocoPhillips is entitled to recover on the NMA Claim.

## H.   RELIEF SOUGHT BY THE PARTIES

**Claimants' Requests for Relief**

160. The Claimants seek an award against the Respondents as follows:

**(a)** With respect to the Call Option claim:

**(i)** Declaring that Respondents' purported exercise of the Call Option was and is invalid and ineffective and that the PDVSA Parties' Joint Venture Interest as defined in Section 2.1(a) of the Transfer Agreement is, and has remained, the property of Claimants or, in the alternative, that Respondents and/or their affiliates and

subsidiaries have been holding such Joint Venture Interest in constructive trust for the benefit of Claimants and directing Respondents and/or their affiliates and subsidiaries to return such Joint Venture Interest to Claimants;

(ii) Ordering Respondents to provide Claimants with access to, and copies of, all information relating to the operations of the Joint Venture to which Claimants are entitled as partners of the Joint Venture, including the operations and finances of Sweeny Coker and Merey Sweeny from August 28, 2009 until the date of the Award;

(iii) Ordering Respondents to take all actions necessary to recognize Claimants as full partners in the Joint Venture consistent with their status as members of Sweeny Coker and limited partners in Merey Sweeny;

(iv) Ordering such interim relief as may be necessary to preserve Claimants' Joint Venture Interest as well as Claimants' ability to have access to all information of the Joint Venture;

(v) Ordering Respondents, jointly and severally, to restore to Claimants all profits from the operations of Merey Sweeny to which Claimants are entitled in accordance with their Joint Venture Interest, accruing from August 28, 2009 until the date of the Award;

(vi) Ordering Respondents, jointly and severally, to pay to Claimants all consequential damages resulting from Respondents' wrongful conduct;

(vii) Ordering Respondents, jointly and severally, to pay to Claimants pre-award interest on all damages at the New York statutory rate of 9% measured from August 28, 2009 until the date of the Award;

-47-

**(b)**   With respect to the Respondents' counterclaims:

    **(i)**   Dismissing Respondents' counterclaims in their entirety;

    **(ii)**   Declaring that PPSA had no enforceable obligation under the COSA to agree on a joint calculation of the Aggregate Lookback Adjustment for the second half of 2008 and accordingly is not in breach of the COSA;

    **(iii)**   Declaring that PDVSA has no obligation as guarantor to indemnify ConocoPhillips for damages allegedly stemming from PPSA's refusal to calculate the Aggregate Lookback Adjustment;

    **(iv)**   Declaring that ConocoPhillips is not entitled to an Aggregate Lookback Adjustment for the second half of 2008 and the first half of 2009, under the COSA, due to the untimeliness of its request;

    **(v)**   Declaring that an Event of Force Majeure excused PPSA from supplying Crude Oil under the COSA during 2009;

    **(vi)**   Declaring that any expert arbitration that is sought with regard to an Aggregate Lookback Adjustment for the second half of 2008 and all of 2009 must be conducted and resolved in accordance with any legal rulings and factual findings by the tribunal in this case;

    **(vii)**   Dismissing Respondents' claim for Seller Damages against PPSA under the COSA in its entirety;

    **(viii)**   Dismissing Respondents' claim for Seller Damages against PDVSA under the SCOSA in its entirety;

    **(ix)**   Dismissing the Respondents' claims for demurrage in their entirety to the extent that they have been paid;

**(c)**   With respect to the New Claims:

    **(i)**    Declaring that the Transfer by Respondents to Phillips 66 of the Refinery, Site and ConocoPhillips Company's Joint Venture Interest is a breach of the terms of the Transfer Agreement and that Claimants' rights with respect to available relief as a result of that breach are reserved in all respects;

    **(ii)**    Declaring that ConocoPhillips has no right to assign its rights under the COSA without the consent of PPSA and that any purported assignment of ConocoPhillips' rights under the COSA to Phillips 66 is null and void;

    **(iii)**    Declaring that ConocoPhillips has no right to assign its rights under the SCOSA without the consent of PDVSA and that any purported assignment of ConocoPhillips' rights under the SCOSA to Phillips 66 is null and void;

**(d)**    Dismissing the NMA claim of the Respondents;[29]

**(e)**    Ordering Respondents to pay to Claimants all legal costs and fees and other expenses incurred in connection with this Arbitration; and

**(f)**    Granting such other or further relief as may be just and proper.

## Respondents' Requests for Relief

**161.**    The Respondents request an award:

**(a)**    With respect to the Call Option claims:

    **(i)**    Dismissing the claims in their entirety; and

---

[29] Although this relief was not included in the Claimants' original relief sought, the Claimants have indicated their objection to the NMA claim and the tribunal now includes this in the relief requested.

-49-

**(ii)** Declaring that the Respondents properly exercised the Call Option on August 28, 2009, and that ConocoPhillips and Sweeny Sub acquired the Merey Sweeny interests of PDV Texas and PDV Sweeny on that date.

**(iii)** Alternatively, in the event that the tribunal declares that the Respondents' exercise of the Call Option was invalid and orders the Respondents to reinstate the Claimants as partners in the Merey Sweeny joint venture, an Award:

**a.** Declaring that Conoco Philips is entitled to payment by PPSA under the COSA of all Negative Margin Adjustment amounts due for all relevant months until the tribunal renders its Award;

**b.** Ordering PPSA to pay ConocoPhillips the cumulative Negative Margin Adjustment of US $602,852,737 as of January 2013,[30] the corresponding time value of that amount, as well as applicable interest. ConocoPhillips reserves the right to quantify these amounts finally at a later date; and

**c.** Ordering the PDVSA Parties to resume their obligations under the Project Documents and the Financing Documents and to pay the ConocoPhillips Parties for amounts incurred during the period in which the ConocoPhillips Parties assumed those obligations. ConocoPhillips reserves the right to quantify these amounts finally at a later date.

**(b)** With respect to the First Counterclaim:

---

[30] Respondents' Post-Hearing Submissions on NMA Issue, March 1, 2013, p. 1.

-50-

    **(i)**    Declaring that PPSA is in breach of the COSA due to its failure to participate in the joint calculation of the Aggregate Lookback Adjustment as required by Exhibit D to the COSA;

    **(ii)**    Declaring that ConocoPhillips is entitled to the payment by PPSA (under the COSA) and by PDVSA (under the COSA Guarantee) of all Aggregate Lookback Adjustment damages ultimately calculated and claimed based on the facts and contractual and legal grounds submitted; and

    **(iii)**    Awarding Aggregate Lookback Adjustment damages. At present, ConocoPhillips assesses those damages to be in excess of US $253.6 million[31], but it reserves the right to quantify them finally at a later date.

**(c)**    With respect to the Second Counterclaim:

    **(i)**    Declaring that ConocoPhillips is entitled to the payment by PPSA (under the COSA) and by PDVSA (under the SCOSA and the COSA Guarantee) of all Seller Damages calculated and claimed based on the facts and contractual and legal grounds submitted; and

    **(ii)**    Awarding Seller Damages. At present, ConocoPhillips assesses Seller Damages to be in excess of US $16,487,833 million[32], but it reserves the right to quantify them finally at a later date.

**(d)**    With respect to the Third Counterclaim:

---

[31] Respondents' Post-Hearing Brief, ¶12.

[32] Respondents' Post-Hearing Brief, ¶12.

**(i)**   Declaring that PPSA was in breach of the COSA due to its failure timely to pay the demurrage claims submitted by ConocoPhillips under Article 9 of the COSA; and

**(ii)**   Declaring that the ConocoPhillips Parties are entitled to costs with respect to the Third Counterclaim.

**(e)**   With respect to the first New Claim:

**(i)**   Dismissing the first New Claim in its entirety.

**(ii)**   Alternatively, in the event that the tribunal declares that the Respondents' exercise of the Call Option was invalid, and orders the Respondents to reinstate the Claimants as partners in the Merey Sweeny joint venture, an Award declaring that the Transfer was proper and that Phillips 66 now holds the 50 percent Partnership and LLC Interests originally held by ConocoPhillips and Sweeny Sub in the Merey Sweeny joint venture, as well as the Sweeny Refinery and the Site.

**(f)**   With respect to the second New Claim:

**(i)**   Dismissing the second New Claim in its entirety; and

**(ii)**   Declaring that the Transfer was valid and that Phillips 66 Company now holds the interests in the agreements relating to the Merey Sweeny joint venture, including but not limited to the COSA and the SCOSA, previously held by ConocoPhillips and Sweeny Sub.

**(g)**   Ordering the Claimants to pay the Respondents the costs of the arbitration on a full indemnity basis, including legal costs and all fees and other expenses incurred in connection with the arbitration, pursuant to Article 31(1) of the ICC Rules.

**(h)**    Awarding pre-judgment and post-judgment interest on the amounts awarded at the applicable rates.

**(i)**    Granting such additional or other relief as might be just and proper under the law.

## I.    DETERMINATION OF THE ISSUES

162.    Under the Transfer Agreement, ConocoPhillips had certain rights to exercise a Call Option. In particular, that agreement provided in part:

> Section 4.1 <u>Call Event</u>. If a Call Event has occurred, then Phillips shall have the right, during the ninety (90) days following such Call Event, upon notice to PDV Sweeny and PDV Texas, to (i) purchase (directly or indirectly through one or more wholly-owned Affiliates (the "<u>Call Option</u>") the entire PDV Sweeny/PDV Texas Joint Venture Interest at a price equal [...] If Phillips exercises the Call Option, the resulting Transfer following its consummation, shall constitute the sale and exclusive remedy of Phillips and its Affiliates for such Call Event, without prejudice, however, to the right of Phillips to recover damages it suffered prior to such consummation as a result of such Call Event; <u>provided further</u> that, if Phillips exercises the Call Option, it shall also have the option to terminate the Crude Oil Supply Agreement pursuant to Section 11.3 thereof, (which option, if exercised, must be exercised concurrently with the exercise of the Call Option).

163.    There appears to be no dispute that as of August 28, 2009, proper demands for payments in the form of Buyer Monthly Reports for at least the months of January and March 2009, had been made by the Respondents. Nor is there any dispute that the PDVSA Parties did not pay any money in response to those demands and did not, at the time, challenge the validity of those demands. Those amounts were, therefore, due and owing and unpaid for more than 90 days by the end of August 2009. ConocoPhillips was, accordingly, *prima facie* entitled to exercise its rights in respect of the Call Option.

164.    On August 28, 2009, ConocoPhillips notified PDV Sweeny and PDV Texas that it was exercising its Call Option under Section 4.1 of the Transfer Agreement,

thereby terminating the Joint Venture.[33] As it was entitled to do, it elected not to terminate the COSA and pursuant to Section 11.3 of the COSA, ConocoPhillips notified PDV Sweeny and PDV Texas that they would not be terminating the COSA.

165.   Pursuant to Section 4.1 of the Transfer Agreement, ConocoPhillips had the choice under the Call Option to purchase the interests held by PDV Sweeny and PDV Texas in the Joint Venture at either: (a) one-half of 80 percent of the Fair Value (as defined in Exhibit B to the Transfer Agreement) of the Joint Venture; or (b) 80 percent of an amount equal to the sum of the capital contributions made by PDV Sweeny and PDV Texas and the outstanding subordinated obligation of the Joint Venture to PDV Sweeny and PDV Texas, less the distributions made to PDV Sweeny and PDV Texas. ConocoPhillips chose the second formula.

166.   At the outset of the project, the partners projected the total costs of the construction and improvements would be US $537.5 million.[34] Of that US $537.5 million, the partners expected to fund approximately US $107.5 million (i.e., 20 percent) of the cost of developing, financing and constructing the project through equal equity contributions from the partners, and approximately US $430 million (i.e., 80 percent) through debt financing.

167.   In the end, of the expected US $537.5 million in project costs, approximately US $350 million was financed with the issuance of senior bonds to Goldman Sachs and Deutsche Bank in June 1999. In addition, Merey Sweeny incurred US $100 million in long-term debt through tax-exempt bonds issued between 1998 and 2003. ConocoPhillips and the PDVSA Parties each guaranteed 50 percent of the bond obligations.

---

[33] Exhibit C-2, Letter from Janet L. Kelly, ConocoPhillips Company, to PDV Sweeny, Inc. and PDV Texas, Inc., dated August 28, 2009.

[34] Exhibit C-12, Merey Sweeny, L.P. and Sweeny Funding Corp. Bond Offering Circular, dated June 11, 1999. See also Austin Witness Statement, ¶¶16-17.

-54-

**168.** By 2009, the total cumulative distributions made to PDV Sweeny and PDV Texas were approximately US $1.1 billion for each of them.[35] Thus, even though the costs to build the project were in the order of US $537.5 million, under the Section 4.1 formula, the Call Option had become exercisable by ConocoPhillips effectively for no additional consideration.

**169.** In accordance with Section 4.3 of the Transfer Agreement, when ConocoPhillips exercised the Call Option, they notified PDV Sweeny and PDV Texas that they would assume their debt obligations amounting to approximately US $195 million.

**170.** It is in this setting that the tribunal turns to the issues raised with respect to whether ConocoPhillips was otherwise entitled to exercise the Call Option.

**Was the Call Option an Unenforceable Penalty?**

**171.** The first claim the Claimants bring is for a declaration that the Call Option provision in the Transfer Agreement is an unenforceable penalty under New York law.

*Position of the Claimants*

**172.** The Claimants submit that the Call Option remedy acts as a penalty and is therefore void as a violation of public policy under New York law. The Claimants also say such a determination is a pure question of law.

**173.** The Claimants argue that under New York law, the Call Option is a penalty and must be struck down if any one of the following three tests is met:

(a)   the amount of actual loss was capable of precise estimation at the time the parties contracted;

---

[35] Austin Witness Statement, ¶32

-55-

(b)    the stipulated remedy does not bear a reasonable proportion to the loss foreseeable by the parties at the time they contracted; or

(c)    the same remedy applies regardless of the magnitude of the breach.

174.    The Claimants submit that the Call Option remedy fails each of the three tests:

(a)    Firstly, the actual damages are the Seller Damages. The Claimants say the Seller Damages were capable of precise estimation and readily ascertainable at the time the parties contracted. The Claimants argue that Section 2.7 of the COSA provides a formula to calculate such damages. The Claimants contend that the applicable damages are Seller Damages and have nothing to do with the value of their future interest in the Joint Venture.

(b)    Secondly, the Call Option remedy – forfeiture of the Joint Venture Interest (said to be worth US $750,000,000) – is grossly disproportionate to the foreseeable actual losses, i.e., the failure to pay Seller Damages (in the amount of US $6,930,761).[36]

(c)    Thirdly, the Claimants argue that the Call Option remedy indiscriminately applies regardless of the magnitude of the breach. The Call Option is triggered by a failure to meet any payment obligation under the COSA or SCOSA, regardless of amount.

175.    The PDVSA Parties contend that New York public policy consistently condemns penalty clauses and courts resolve any doubt by striking down the provision.[37]

176.    Although the PDVSA Parties' main contribution to the Joint Venture is the supply of Crude Oil, the Call Option is not triggered by a failure to supply Crude Oil. It is triggered by a failure to make any payment under the COSA (or SCOSA).

---

[36] Claimants' Post-Hearing Brief, ¶37.

[37] Claimants' Post-Hearing Brief, ¶45.

ConocoPhillips chose not to terminate the COSA and PPSA continued to supply Crude Oil. Therefore, the Claimants believe the Respondents have penalized the PDVSA Parties simply for failure to make a payment under the COSA or SCOSA.

177. Finally, the Claimants dismiss the Respondents' allegation that the Call Option penalty cannot be struck down because it was freely negotiated by the parties with the aid of sophisticated counsel. The Claimants say the sophistication of the parties or their counsel is of no relevance nor is the label the parties give to the provision; a contract provision that operates as a penalty is void as against public policy no matter how freely and willingly it was entered into.

*Position of the Respondents*

178. The Respondents' answer to the Claimants' submission on this issue is that the Call Option provision is not a liquidated damages clause. It is a termination provision allowing the non-breaching party to exit the Joint Venture.

179. ConocoPhillips argues, in other words, that the parties intended the Call Option provision to serve as a means of terminating the Joint Venture. The parties carefully negotiated the terms of the Call and Put Options. They submitted several drafts showing that they deliberately agreed to remove the notice and cure requirements initially proposed. The PDVSA Parties also circulated an explanatory note titled "PDVSA Termination Proposal" which proposed that the parties should be able to unwind the joint venture on pre-defined terms in the event of material breach.[38] ConocoPhillips removed the notice period from the draft language proposed by the PDVSA Parties. The Claimants accepted this removal.

180. The Respondents note that the parties defined a finite set of events that would trigger a Call Event or Put Event. Section 4.1 of the Transfer Agreement permits,

---

[38] Respondents' Post-Hearing Brief, ¶¶67-69; Exhibit R-41, Fax from Bob Kock (Phillips) to Sarah Ward (Skadden Arps) re: PDVSA Termination Proposal, May 7, 1998.

and Section 4.2 requires, ConocoPhillips to buy out the interests of PDV Sweeny and PDV Texas in Merey Sweeny should the Call Option or Put Option be exercised. Sections 4.1 and 4.2 provide the methodology for calculating the purchase price of the PDVSA Parties' interest in the Joint Venture if the Call Option or Put Option is exercised.[39]

181. The Respondents say this tribunal should not disturb the exercise of the Call Option as New York law does not permit courts to re-write or second-guess the parties' decision regarding what events trigger an exit from the Joint Venture.[40]

182. In the event the tribunal concludes that the Call Option is a liquidated damages clause, the Respondents submit the Call Option is still enforceable under New York law. They say that the trend in New York law supports enforcing stipulated damages clauses, not interpreting them as penalty clauses.[41] New York law generally favors freedom of contract and upholds the bargained-for agreements of the parties. As well, New York courts take into account the relative bargaining power of the parties when addressing the reasonableness of such provisions. In this case, the Respondents say there was equal bargaining power and notes Cleary Gottlieb, a large well-known law firm, represented the PDVSA Parties at the time of the negotiations of the Joint Venture agreements.

183. The Respondents further argue that the Claimants bear the burden of proving that a liquidated damages clause is unenforceable. They contend the Claimants must prove that *(a)* the damages flowing from a material breach were readily ascertainable when the parties entered into the agreement; or *(b)* the liquidated

---

[39] Respondents' Post-Hearing Brief, ¶70.

[40] Respondents' Post-Hearing Brief, ¶74, citing New York case law, Exhibit RL-22, *Urban Archaeology Ltd. v. Dancorp Invs., Inc.,* 12 A.D.3d 96 (N.Y. App. Div. 2004) and Exhibit RL-23, *Lamberti v. Angiolillo,* 73 A.D.3d 463 (N.Y. App. Div. 2010).

[41] Respondents cite to Exhibit RL-25, *JMD Holding Corp. v. Cong. Fin. Corp.,* 4 N.Y.3d 373 (N.Y. 2005); Exhibit RL-55, *Thysenkrupp Elevator Corp. v. Gristede's Foods, Inc.,* 2006 N.Y. Misc. LEXIS 9338, 2006 N.Y. Slip. Op. 30629Um (N.Y. App. Div. Feb. 27, 2009; Exhibit RL-27, *GFI Brokers, LLC v. Santana,* Nos. 06 Civ. 3988(GEL), 06 Civ. 4611 (GEL), 2009 WL 2482130 (S.D.N.Y. Aug 13, 2009); Exhibit RL-56, *Zarsky v. Law Office of Maury B. Josephson,* NO. 1764CV2005, 2006 WL 3751486 (N.Y. Civ. Ct. Dec. 20, 2006); Exhibit RL-57, *Global Crossing Bandwith, Inc. v. OLS, Inc.,* 566 F. Supp. 2d 196 (W.D.N.Y. 2008).

damages amount provided for in the agreement was conspicuously disproportionate to the foreseeable losses.[42]

184. ConocoPhillips argues that the Claimants cannot meet their burden on either of the two prongs of the test. On the first prong, they say the parties could not have readily ascertained in 1999 when they negotiated the agreements, what the fair market value of each partner's interest in the Joint Venture would be in the future. Uncertainties included:

(a) Unpredictability of potential market prices over a 20-year period;

(b) Magnitude of potential operating expenses and capital contributions over the Joint Venture's lifetime; and

(c) Timing of when, over the life of the Joint Venture, a material breach would occur which would affect the valuation.[43]

185. Regarding the second prong, the Respondents argue that the benefit received by the Claimants was not grossly disproportionate to the foreseeable losses. Two reasons were advanced in support of their position: (1) the Claimants have not put forward any evidence showing that their interest actually amounted to US $750 million; (2) the Claimants ignored the following facts:

(a) The Respondents assumed all of the PDVSA Parties' outstanding debt obligations amounting to US $195 million;

(b) The cumulative distributions to the PDVSA Parties had exceeded US $1.1 billion by August 28, 2009, far more than their contributions to the Joint Venture;

---

[42] Exhibit RL-29, *Addressing Sys. & Prods., Inc. v. 498 Seventh, LLC*, 7 N.Y.3d 115 (N.Y. App. Div. 2009) and Exhibit CL-2, *Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420 (N.Y. 1977).

[43] Exhibits R-1, COSA; Exhibit RL-29, *Addressing Sys. & Prods., Inc. v. 498 Seventh, LLC*, 7 N.Y.3d 115 (N.Y. App Div. 2009; Exhibit C-12, *Seidlitz v. Auerbach*, 230 N.Y. 167 (N.Y. 1920); Austin Witness Statement, ¶¶18-20.

(c)     ConocoPhillips has subsidized the Joint Venture in the amount of more than US $548 million since the Call Option exercise;[44] and

(d)     The value of the Merey Sweeny Joint Venture has substantially decreased since 2009 as a result of depressed West Texas Intermediate ("WTI") prices.

186.    The Respondents dispute the value of the Claimants' Joint Venture interest was anywhere near US $750 million.[45]

187.    Accordingly, the Respondents submit that the Call Option provision is enforceable and was validly exercised.

ARBITRAL TRIBUNAL DETERMINATION

188.    The tribunal was presented with two different frameworks for analyzing this issue. The Respondents say the tribunal must first determine whether the Call Option is a liquidated damages clause and if the tribunal finds that it is, then it must determine whether the liquidated damages clause is an unenforceable penalty. On the first question, the Respondents say the Call Option is a termination clause rather than a liquidated damages clause. The Claimants' submissions, on the other hand, focus exclusively on whether Section 4.1 is an enforceable penalty clause, effectively glossing over the preliminary question of whether Section 4.1 is, in fact, a liquidated damages provision. The Claimants say that it does not matter whether the provision is labeled a liquidated damages clause, a termination clause, an option or a remedy. If a provision acts as a penalty, it is unenforceable.[46] According to the Claimants, the tribunal must simply determine whether the contractual provision, here the Call Option, is, in effect, a penalty.

---

[44] Respondents' Post-Hearing Brief, ¶82.

[45] The Respondents also submit expert evidence supporting this conclusion, see Aegis Expert Report.

[46] Statement of Claim, ¶73.

-60-

189.  The tribunal is not satisfied that the analysis should start with determining whether a contractual provision acts as a penalty. The concept in New York law of a liquidated damages clause is one that has been clearly defined in case law over the years. The very concept of unenforceable penalty, based on public policy principles, stems from the initial notion of estimating damages for a breach of an agreement. To find that the concept of unenforceable penalty is independent from the concept of liquidated damages would unduly depart from New York law. The tribunal agrees with the Claimants that the label given to a provision does not matter. It is the *essence* of a provision which matters. Therefore, the first question must be to determine whether a specific provision in a contract is dealing with "compensation which, the parties have agreed, should be paid in order to satisfy any loss or injury flowing from a breach of their contract"– or what is known as liquidated damages.[47]

190.  The tribunal's view is that the correct legal framework for this issue is the one presented by the Respondents, which is to determine, firstly, whether the Call Option provision in the Transfer Agreement is a liquidated damages clause, and, secondly, if it is found to be a liquidated damages clause whether it operates as a penalty. New York case law is clear that in the event a liquidated damages clause acts as a penalty, it is void as against public policy.

191.  There is no ambiguity in the case law on what is a liquidated damages provision. The Claimants cite *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, a New York Court of Appeals case in which the Court summarized the law as follows (citations omitted):

> Liquidated damages constitute the compensation which, the parties have agreed, should be paid in order to satisfy any loss or injury flowing from a breach of their contract. In effect, a liquidated damage provision is an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement...

---

[47] Exhibit CL-2, *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 423-424.

...

> On the other hand, liquidated damage provisions will not be enforced if it is against public policy to do so and public policy is firmly set against the imposition of penalties or forfeitures for which there is no statutory authority. It is plain that a provision which requires, in the event of contractual breach, the payment of a sum of money grossly disproportionate to the amount of actual damages provides for penalty and is unenforceable.

...

> A contractual provision fixing damages in the event of breach will be sustained if the amount liquidated bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation...If, however, the amount fixed is plainly or grossly disproportionate to the probable loss, the provision calls for a penalty and will not be enforced.[48]

192. In order to determine what type of provision Section 4.1 is, consideration must be given to general principles of interpretation of contracts under New York law, including determining the purpose of the provision and its function and role in the context of the Transfer Agreement as a whole. In that regard, the Respondents have submitted convincing arguments that the provision is not in essence a liquidated damages clause, rather, it acts as a termination clause.

193. Here the amounts owing for Seller Damages are simply calculated as being certain amounts owing and outstanding for a prescribed period. There is, therefore, no question of whether the amounts so calculated will be a liquidated amount. It will always be a calculated amount. The question the tribunal must answer is what is the plain meaning of the pertinent parts of the Call Option and what is the commercial objective of that instrument?

194. For ease of reference, Sections 4.1 is copied, in full, below:

> Section 4.1 Call Event. If a Call Event has occurred, then Phillips shall have the right, during the ninety (90) days following such Call Event, upon notice to PDV Sweeny and PDV Texas, to (i)

---

[48] Exhibit CL-2, *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424 ff (N.Y. 1977)

purchase (directly or indirectly through one or more wholly-owned Affiliates (the "Call Option") the entire PDV Sweeny/PDV Texas Joint Venture Interest at a price equal…at Phillips' sole option, either (x) one half of eighty percent (80%) of the Fair Value or (y) eighty percent (80%) of an amount equal to (A) all of the capital contributed to the Partnership and the Company by PDV Sweeny and PDV Texas and any of their respective Affiliates (with interest accruing at the Base Rate from the date of contribution) plus (B) the amount of any outstanding subordinated obligation of the Partnership or the Company to PDV Sweeny and PDV Texas and any of their respective Affiliates (including interest accrued thereon) less (C) all distributions from the Partnership and the Company to PDV Sweeny and PDV Texas or any of its Affiliates (with interest accruing at the Base Rate from the date of distribution) or (ii) request a Fair Value determination pursuant to Article V. If Phillips elects to request that the Fair Value be determined, Phillips or its wholly-owned Affiliates shall have the right, during the sixty (60) day period following determination of the Fair Value pursuant to Article V, upon notice to PDV Sweeny and PDV Texas, to exercise the Call Option at a price equal to, at Phillips' sole option either (x) or (y), as specified above. If Phillips exercises the Call Option, the resulting Transfer following its consummation, shall constitute the sale and exclusive remedy of Phillips and its Affiliates for such Call Event, without prejudice, however, to the right of Phillips to recover damages it suffered prior to such consummation as a result of such Call Event; provided further that, if Phillips exercises the Call Option, it shall also have the option to terminate the Crude Oil Supply Agreement pursuant to Section 11.3 thereof, (which option, if exercised, must be exercised concurrently with the exercise of the Call Option).

**195.** A "Call Event" is defined in Exhibit A to the Transfer Agreement:

"Call Event" means (i) any transfer by PDV Sweeny or PDV Texas in violation of the Transfer Agreement; (II) the failure by PDV Sweeny to make Pre-Certification Capital Contribution or a Mandatory Post-Completion Capital Contribution within ninety (90) days of the due date thereof pursuant to the Partnership Agreement; (iii) a breach by PDVSA P&G of any of its payment obligations under the Crude Oil Supply Agreement which remains uncured for ninety (90) days; (iv) a breach by PDVSA of any of its payment obligations under the Supplemental Crude Oil Supply Agreement which remains uncured for ninety (90) days; (v) a breach by PDVSA under the PDVSA New York Guarantee or the PDVSA Venezuela Guarantee which remains uncured for ninety (90) days; (vi) any event the result of which is that PDV Texas or any permitted transferee of its LLC Interest ceases to be a direct or indirect wholly-owned subsidiary of PDVSA or (vii) any event the result of which is that PDV Sweeny or any permitted transferee of its Partnership Interest ceases to be a direct or

-63-

indirect wholly-owned subsidiary of PDVSA, except in either case
as set forth in Section 3.3(b) or Section 3.3(c).

196.    A careful reading of Sections 4.1 of the Transfer Agreement shows that the
        parties defined a finite set of events that would trigger a Call Option. Section 4.2
        is also relevant here as it is the provision dealing with a Put Option. Section 4.1
        of the Transfer Agreement permits, and Section 4.2 requires, ConocoPhillips to
        buy out the interests of PDV Sweeny and PDV Texas in Merey Sweeny should
        the Call Option or Put Option be exercised. Furthermore, Sections 4.1 and 4.2
        provide the methodology for calculating the purchase price of the PDVSA Parties'
        interest in the Joint Venture if the Call Option or Put Option is exercised.[49]
        Sections 4.1 and 4.2 lay down a termination regime made up of a combination of
        call and put options often found in joint venture agreements where one party is
        the operator of the joint venture. *Prima facie*, these elements are not consistent
        with the characteristics of a liquidated damages clause. Rather, they are
        consistent with the characteristics of a termination provision. The put and call
        options set out when and how a joint venturer can unwind or transfer its interest
        in the Joint Venture – effectively ways to "terminate" or "end" its participation in
        the Joint Venture.

197.    Further, the definition of Call Event in Exhibit A of the Transfer Agreement lists
        the different ways in which a Call Event can occur. Thus, it is not only the non-
        payment of Seller Damages uncured for 90 days which can trigger a mandatory
        transfer. There are six other situations, some of which are breaches of certain
        agreements, some of which are not breaches, as such, but simply situations
        which the parties agreed were unsatisfactory to them and in which they did not
        want to continue their Joint Venture.

198.    The tribunal finds that, on a plain reading of Section 4.1 and the definition of Call
        Event in Exhibit A of the Transfer Agreement, the Call Option provision is a

---

[49] Respondents' Post-Hearing Brief, ¶70.

-64-

proper mandatory transfer of interest provision. In other words, the parties recognized that in these very specific circumstances – *i.e.* when a Call Event occurs – the ConocoPhillips Parties had a right to buy the PDVSA Parties' Joint Venture interest following the formula in Section 4.1. This purchase formula does not fit with the characteristics of a liquidated damages provision. The purchase formula, particularly, is contrary to elements of liquidated damages clause such as "fixing damages in the event of breach" or estimating "the extent of the injury that would be sustained as a result of [a] breach of the agreement". The Put Event provision, Section 4.2, also provides for situations where the PDVSA Parties can obligate ConocoPhillips to purchase their Joint Venture interest. The Call Option provision is not a one-way street, the PDVSA also have their rights under the Put Option provision.

199. In the broader context of the Transfer Agreement, these two sections constitute Article IV of the Transfer Agreement entitled "MANDATORY TRANSFERS". It can be said that the title is also consistent with the fact that these provisions relate to the transfer of a party's Joint Venture interest rather than liquidated damages.

200. In addition, the Preliminary Statements at the beginning of the Transfer Agreement support the tribunal's interpretation that the commercial purpose of these provisions is to permit a co-venturer to exit its joint venture obligations or demand the transfer of the other co-venturer's interest under certain circumstances:

> WHEREAS, the parties hereto desire to provide for certain restrictions on the transfer by Phillips of any substantial interest in the Refinery and the Site, as well as for certain restrictions on the transfer of interests and for certain mandatory transfers of interests, relating to the Partnership Agreement and the LLC Agreement.[50]

---

[50] Exhibit C-1, Transfer Agreement, p.1.

-65-

201. The tribunal finds that the clause at issue effectively operates as a termination provision allowing the non-breaching party to exit the Joint Venture. By exercising a Call Option or a Put Option, the non-breaching party indicates that it no longer wants to continue as a joint venture partner. These sections function as exit provisions. They are not liquidated damages clauses.

202. The purpose of a liquidated damages clause is to set damages in the event of a particular breach of an agreement. The tribunal finds that the fundamental purpose of the Article IV is the transfer of the Joint Venture interest. The Call and Put Options simply provide the formula that will be applied to determine the transfer price of the Joint Venture shares held by the PDVSA Parties. The purpose is not compensation or indemnification for a loss or injury following a breach. Neither the Section 4.1 nor the Section 4.2 formula aims to approximate the damages resulting from the breach of the COSA, SCOSA or the Partnership Agreement that triggers the right to exercise the option – that is the purpose of independent provisions like the Seller Damages provision in Section 2.7 of the COSA.

203. The Respondents cite the case of *Gatzonis v. Valiotis*,[51] a recent New York Court of Appeals case, for the proposition that provisions requiring the sale of a defaulting party's interest in a closely held company pursuant to an agreed formula are not liquidated damages clauses at all, but simply a means for valuing the defaulting party's interest. The tribunal believes this further supports its findings on the fundamental purpose of the Call and Put Options.

204. The tribunal rejects the Claimants' argument that the Call and Put Options do not function as termination provisions because the party exercising the provision does not have to terminate the COSA relationship between the PDVSA Parties and ConocoPhillips. It is irrelevant that the COSA is not terminated – the Transfer Agreement is concerned with the Joint Venture relationship. There is no

---

[51] RL-18, *Gatzonis v. Valiotis*, 67 A.D.3d 443 (2009) at pp. 443-444.

requirement that these provisions terminate all commercial relationships between the parties.

205.   It is further noteworthy that no other provision relating to the unwinding of the Joint Venture is found in any of the related agreements to the Transfer Agreement.

206.   The tribunal finds that the text of the Call Option provision clearly shows that it is a termination provision. Moreover, the evidence presented by the Respondents as to the intention of the parties further supports the tribunal's determination.[52] The parties referred the tribunal to drafts of the Transfer Agreement and specifically to the changes made to the Call and Put Options provisions. The tribunal understands that the negotiation and drafting of the Transfer Agreement was conducted by sophisticated counsel and therefore considers that the parties carefully negotiated the terms of the Call and Put Options.

207.   Moreover, at the time the parties were negotiating these provisions, the PDVSA Parties circulated an explanatory note titled "PDVSA Termination Proposal" which proposed that the parties should be able to unwind the Joint Venture on pre-defined terms in the event of material breach[53]:

> [T]he only realistic remedy for a material breach of any of the Project Documents is a remedy that permits the injured party to unwind the joint venture on favorable terms. Under this proposal, Phillips and PDVSA would each have the option to unwind the joint venture in the event of a material breach of any of the Project Documents (including the Crude Oil Supply Agreement) by the other (or any of its affiliates, other than the Joint Venture).[54]

208.   This note illustrates that the parties had planned to have provisions dealing with the unwinding of the Joint Venture in certain circumstances. Generally, the tribunal accepts that parties will normally want to set out ways to unwind joint

---

[52] Respondents' Post-Hearing Brief, ¶¶68-69; Smith Witness Statement ¶¶40-43.

[53] Respondents' Post-Hearing Brief, ¶¶67-69; Exhibit R-41, PDVSA Termination Proposal, May 7, 1998.

[54] Exhibit R-41, PDVSA Termination Proposal, May 7, 1998 at p. 3.

ventures, mechanisms to exit joint-ventures or transfer joint interests in appropriate circumstances.

209. Mr. Smith testified as to the PDVSA Parties' understanding at the time with regards to the Call Option provision:

> During negotiations, PDVSA's representatives made it clear to me that they understood that while it would always, at a minimum, either get the value of its shares or recoup its initial investment in the joint venture, it nonetheless might receive a low cash payout (or no cash payout) depending on the formula to be applied and the time at which the joint venture was unwound. PDVSA also understood that it would receive the lesser of either a percentage of fair market value or a percentage of "contributions minus distributions" if Phillips exercised the Call Option following a material breach by PDVSA.[55]

210. Again, the tribunal interprets this evidence as showing that the Claimants had turned their mind to circumstances where unwinding of the Joint Venture would be warranted and how that unwinding would be performed.

211. These background events reinforce the tribunal's decision that the Call Option provisions of Section 4.1 are valid and enforceable in accordance with their terms. Further, the tribunal disagrees with the Claimants' argument that Section 4.1 should be treated as a liquidated damages clause, arguably invalid on the grounds that it would amount to a penalty. The tribunal therefore determines that the Call Option provision is valid and enforceable under New York law. Having determined that the Call Option provision is not a liquidated damages clause, the tribunal does not find it necessary to consider whether the clause is a penalty. The tribunal therefore dismisses the Claimants' claim that the Call Option is unenforceable as a penalty and the Claimants' request for relief with respect to that claim.

---

[55] Smith Witness Statement, ¶45.

**Breach of Fiduciary Duty**

212.   The Claimants advance a second argument to defeat the exercise of the Call Option by ConocoPhillips. As joint venturers, the Claimants say the parties owed each other a fiduciary duty. The Claimants allege the Respondents breached this duty by failing to disclose material information to the Claimants that was determinative of the Claimants' future in the Joint Venture, and also by engaging in conduct designed to mislead the Claimants into believing that their future in the Joint Venture was secure in order to deprive them of the fruits of the Joint Venture.

*Position of the Claimants*

213.   The PDVSA Parties contend that New York law establishes that the fiduciary duty imposed upon joint venturers is high and exacting and requires the joint venture to act in utmost loyalty:[56]

> Joint adventurers, like co partners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate.

214.   The Claimants put particular reliance on the case of *Market Street St. Assocs. v. Frey*[57] where Judge Posner elaborated on fiduciary duty among partners:

> "A fiduciary is required to treat his principal as if the principal were he, and therefore he may not take advantage of the principal's incapacity, ignorance, inexperience, or even naïveté."[58]

---

[56] Statement of Claim, ¶96. See also Claimants' Post-Hearing Brief, ¶6 citing Exhibit CL-29, *Meinhard v. Salmon*, 249 N.Y. 458 (N.Y. 1928) at 463-464.

[57] Exhibit CL-30, *Market Street Assocs. v. Frey*, 941 F.2d 588 (7th Cir 1991).

[58] Claimants gave a detailed analysis of this case in their Statement of Claim, ¶¶102-109.

215.  Moreover, the Claimants submit, it is well established that when a fiduciary deals with the beneficiary of the duty in a matter relating to the fiduciary relationship, the fiduciary is strictly obligated to make full disclosure of all material facts.[59] The fiduciary must disclose any information that could reasonably bear on the beneficiary's decisions. Absent full disclosure, the transaction is voidable as a breach of the fiduciary duty.[60]

216.  The PDVSA Parties submit that ConocoPhillips, fully cognizant that a failure to make any payment under the COSA or SCOSA triggered a Call Event that would result in the PDVSA Parties losing their Joint Venture Interest without any compensation, took advantage of the PDVSA Parties' apparent lack of awareness of that fact and exercised the Call Option in flagrant violation of "the finest loyalty" owed by one partner to another.[61]

217.  The Claimants enumerate the facts which they allege establish the Respondents' breach of their fiduciary duty:

(a)  Starting in January 2009, Respondents were aware of and actively assessed exercising the Call Option in the Transfer Agreement and clearly anticipated that the exercise of the Call Option would result in litigation;

(b)  The PDVSA Parties did not know about the Call Option remedy in the Transfer Agreement;

(c)  The Respondents deliberately did not advise the Claimants of the Call Option in the Transfer Agreement or expressly warn that ConocoPhillips would take the PDVSA Parties' Joint Venture Interest by reason of unpaid Seller Damages; and

---

[59] Statement of Claim, ¶99 citing to Exhibit CL-32, *Frame*, 83 A.D.3d at 602, 922 N.Y.S.2d at 51; Exhibit CL-36, *Salm v. Feldstein*, 20 A.D.3d 469, 470, 799 N.Y.S.2d 104, 105-06 (N.Y. App. Div. 2d Dep't 2005).

[60] Statement of Claim, ¶99 citing to Exhibit CL-37, *Commander Terminals Holdings, L.L.C. v. Poznanski*, 84 A.D.3d 1005, 1008, 923 N.Y.S.2d 190, 193 (N.Y. App. Div. 2d Dep't 2011).

[61] Claimants' Post-Hearing Brief, ¶7.

-70-

**(d)** The reason for the Respondents' decision not to mention the Call Option was that they saw "no gain" for them in doing so.[62]

218. The Claimants allege that the Respondents made the calculated decision to remain silent about the Call Option, the Transfer Agreement, and the occurrence and consequences of any Call Event because they had assessed that there was nothing to be gained by mentioning them. They say the Respondents put their own interests ahead of the interests of their joint venture partners, a clear violation of their duty to treat their partners' interests as their own.[63]

219. The Claimants say the Respondents took advantage of their lack of awareness of the Transfer Agreement. They knew that the PDVSA Parties had suffered a massive turnover of employees in 2003 as a result of a major strike.[64] The inference contended for by the Claimants is that the current managers could not be expected to have known the contents and terms of their agreements. In effect, the Claimants contend ConocoPhillips must have known that the Claimants did not know about the Transfer Agreement and their Call Option rights. The PDVSA Parties submit that their conduct can only be explained by their unawareness of the Call Option provision and the Transfer Agreement.

220. Based on these reasons, the Claimants request that the tribunal set aside the exercise of the Call Option.

221. In reply to the Respondents' argument that any fiduciary duty they allegedly owed to the PDVSA Parties was waived by virtue of Section 4.1(e) of the LLC Agreement, the Claimants submit that defence fails for three reasons. First, the LLC Agreement governs only Sweeny Coker and is solely between ConocoPhillips and PDV Texas. Second, Section 4.1(e) of the LLC Agreement only provides that each of ConocoPhillips and PDV Texas may rely in good faith

---

[62] Claimants' Post-Hearing Brief, p. 11, citing to the cross-examination of Sheets, Transcript, p.994.

[63] Claimants' Post-Hearing Brief, ¶¶8 and 14.

[64] Claimants' Post-Hearing Brief, ¶¶16 and 27.

on provisions of the LLC Agreement. Third, the waiver in Section 4.1(e) only applies to acts of Members on the Owners' Committee. It does not eliminate the fiduciary duties with respect to the overall Joint Venture. Based on these three reasons, the Claimants contend there was no waiver of a fiduciary duty.

*Position of the Respondents*

222.  The Respondents deny the fiduciary argument of the Claimants on three grounds.

223.  First, ConocoPhillips submits the parties agreed there should be nothing in the agreements requiring it to give notice to the Claimants that they intended to exercise the Call Option.

224.  Second, the Respondents argue that the parties expressly eliminated or waived to the fullest extent permitted, any fiduciary duties owed to each other ensuring that all rights and obligations had to be expressly stipulated in the contracts.

225.  Third, the Respondents say that New York law does not support the Claimants' position. ConocoPhillips was not required to provide to the Claimants notice and information tantamount to legal advice. Under New York law, one co-venturer does not have a duty to explain to the other the applicability and consequences of contractual provisions in agreements between them.[65]

226.  Further, the Respondents indicate that New York law does not impose a duty to provide notice and to advise of the consequences of breach to a co-venturer. Rather, New York law simply requires one partner to share with the other partner those "material facts" that are in its sole possession. Since both parties executed all of the agreements at issue, the law presumes that the parties have read and understood the terms of their contracts.

_____

[65] The Respondents argue that the Claimants are essentially bringing a claim that the Respondents breached the duty of fidelity that exists between co-venturers.

**227.**   The Respondents say they repeatedly advised the Claimants to pay the Seller Damages, warned they would exercise their rights under the agreements, and provided the Claimants with copies of the COSA/SCOSA making explicit reference to the Call Option. ConocoPhillips says that, in any event, it did not possess material information that was not already in the possession of the Claimants and, as a result, it had no duty to disclose anything further to the Claimants in connection with the exercise of the Call Option.

## ARBITRAL TRIBUNAL DETERMINATION

**228.**   The tribunal has considered the relevant case law submitted and the potential scope of any fiduciary duty that might apply. The Claimants cited, among other cases, *Meinhard v. Salmon*[66], a decision from the New York Court of Appeals, *Market Street St. Assocs. v. Frey* ("*Market Street I*")[67], a decision of the 7th Circuit Court of Appeals and *Richbell Info. Servs, Inc. v. Jupiter Partners, L.P.*[68], a decision from the New York Supreme Court, Appellate Division. The Respondents cited, among other cases, *Rosiny v. Schmidt*[69], a New York Supreme Court, Appellate Division case and *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross & Blue Shield Association*[70], a decision of the 6th Circuit Court of Appeals.

**229.**   In their Statement of Claim, the Claimants have alleged that ConocoPhillips had an obligation to inform the Claimants of the potential applicability of the Call Option remedy in the Transfer Agreement and of their intention to invoke that provision based on their claim for unpaid Seller Damages. They further allege that the Respondents went further than just remaining silent. They say

---

[66] Exhibit CL-29, *Meinhard v. Salmon*, 249 N.Y. 458 (N.Y. 1928).

[67] Exhibit CL-30, *Market Street Assocs. v. Frey*, 941 F.2d 588 (7th Circ. 1991).

[68] Exhibit CL-38, *Richbell Info. Servs. v. Jupiter Partners*, 309 A.D.2d 288 (N.Y. App. Div. 2003).

[69] Exhibit RL-2, *Rosiny v. Schmidt*, 185 A.D.2d 727 (N.Y. App. Div. 1992).

[70] Exhibit RL-6, *Blue Cross & Blue Shield Mut. Of Ohio v. Blue Cross & Blue Shield Ass'n*, 110 F.3d (6th Cir. 1997), applying Illinois law.

ConocoPhillips actively misled the Claimants by threatening an additional arbitration to recover the unpaid Seller Damages, while hiding their plan to exercise the Call Option.[71]

230. In their Reply to the Statement of Defence, the Claimants say ConocoPhillips engaged in a systematic course of conduct designed to take advantage of their partners' lack of awareness of the Call Option, and to deceive and mislead them as to their true intent in order to capitalize on a relatively small damages claim to take the PDVSA Parties' Joint Venture Interest for nothing. They further allege that ConocoPhillips had "every reason to believe that the PDVSA Parties were unaware of the Call Option provision in the Transfer Agreement".[72]

231. In their Post-Hearing Brief, the Claimants argue, based on Judge Posner's decision in *Market Street I*, that a fiduciary may not take advantage of an oversight of his principal concerning his contractual rights, no matter how negligent the principal is in reading his contract, even if the principal is a sophisticated party.[73] The Claimants, however, go even further. They also argue that "regardless of whether the COP Parties reasonably believed that the PDVSA Parties were aware of the Transfer Agreement or the Call Option, they were obligated as fiduciaries to discuss the matter with their partners". And further, the Respondents' fiduciary duty "demanded that discussion regardless of whether COP actually believed or assumed that the PDVSA Parties were aware of every provision and nuance of the multiple agreements governing the Joint Venture."[74]

232. In the *Market Street I* decision, Judge Posner was addressing primarily the duties of honesty and good faith in a contractual setting. He further distinguished between what a party may do at the time of forming a contract as opposed to

---

[71] Statement of Claim, ¶101.

[72] Reply to Statement of Defence, ¶43.

[73] Claimants' Post-Hearing Brief, ¶12.

[74] Claimants' Post-Hearing Brief, ¶14.

-74-

how it may act during performance of the contract. It is in this setting that the court stated:

> It is another thing to say that you can take deliberate advantage of an oversight by your contract partner concerning his rights under the contract. Such taking advantage is not exploitation of superior knowledge or the avoidance of unbargained-for expense; it is sharp dealing.[75]

233.    It is evident that *Market Street I*, even if it accurately describes the scope of fiduciary duty, requires some element of deliberateness and sharp dealing. In order to be actionable, in other words, *Market Street I* imputes some deliberate taking advantage of a counterparty's ignorance or lack of awareness; the offending party in that case took affirmative steps intended to lull the bank into believing its position was secure when he fully intended to exploit the breach of which it was unaware. As we have already noted, however, the Claimants now argue that even if ConocoPhillips reasonably believed the PDVSA Parties were aware of the Call Option, their fiduciary duty obliged them to discuss the Call Option with their partners. The tribunal finds this argument attempts to go a bridge too far. The fiduciary duty, if any, owed in this contractual setting, in the tribunal's opinion, can only be relied upon where the Claimants, on a preponderance of the evidence, show that ConocoPhillips knew that the PDVSA Parties were unaware of the Transfer Agreement or the Call Option and sought in some affirmative manner to take deliberate advantage of the PDVSA Parties' alleged ignorance.

234.    The tribunal turns, therefore, to address what evidence there may be of such awareness by ConocoPhillips and what actions it took, or failed to take, in light of its knowledge.

235.    Following receipt of PDVSA's December 31, 2008 correspondence notifying ConocoPhillips of the Ministerial instruction to reduce the output of crude exports

---

[75] Exhibit CL-30, *Market Street Assocs. v. Frey*, 941 F.2d 588 (7th Cir. 1991).

and PDVSA's Board of Director's instructions to notify ConocoPhillips accordingly, ConocoPhillips took a number of actions. In addition to directing inquiries to PDVSA, ConocoPhillips undertook, with the assistance of its legal advisors, an internal review of its agreements with the PDVSA Parties. Consequently, from January 2009 onwards, ConocoPhillips' senior management was fully aware of the contractual relationships contained in the COSA, SCOSA and Transfer Agreement, among others. Specifically, Mr. Jeff Sheets confirmed his personal awareness from January 2009 onwards, that if circumstances occurred which triggered a Call Event, ConocoPhillips could potentially acquire the PDVSA Parties' entire Joint Venture Interest for virtually no additional consideration.[76]

236.  Mr. Sheets also testified, however, that internal discussions at ConocoPhillips were focused on the lack of supply to the Sweeny Refinery and how to mitigate that problem. Although there had been a broad assessment of all the contractual provisions applicable to the Merey Sweeney arrangements, ConocoPhillips was not specifically initially directing its attention to the Transfer Agreement and the Call Option.[77] Accordingly, when Mr. Sheets discussed with Mr. Gregory Goff the latter's meeting, in February 27, 2009, with Mr. Eulogio Del Pino (PDVSA's Vice-President of Exploration & Production), they did not discuss whether the Call Option or the Transfer Agreement had been mentioned to Mr. Del Pino. Mr. Sheets said at that point the focus for ConocoPhillips was to get supply back to the refinery. In cross-examination, Mr. Sheets testified:

> Q. Did you and Mr. Goff discuss the fact that he did not mention it in that discussion with Mr. Del Pino?
>
> A. No. At this point--the focus for us at this point was to get supply back to the Sweeny Refinery.
>
> Q. So, is the answer no, you and Mr. Goff did not discuss--

---

[76] Transcript, p. 1103.

[77] Transcript, pp. 922-923.

-76-

> A. We did not discuss the Call Option at this time--at that time. I mean, we had a refinery--one of our key refineries, which was-- which, you know, we were waiting on the 180,000-barrels-a-day supply from PdVSA and it wasn't showing up. So, the focus of the group at this time was how were we going to get supply to those refineries--to that refinery, to the Sweeny Refinery.[78]

237. Similarly, after Mr. Mulva, ConocoPhillips' CEO, met with Venezuelan officials, including Minister Rafael Ramírez and Dr. Bernard Mommer, in March 2009, Mr. Goff and Mr. Sheets listened to his report[79]. They understood that in that meeting, Mr. Mulva discussed a number of issues with Venezuelan officials, including the possible settlement of the ICSID arbitration. Encouraged by the tone of that meeting, Mr. Mulva suggested that a follow-up meeting be set up for mid April in Vienna with Dr. Mommer and Dr. Boué to speak to them about the lack of supply at Merey Sweeny[80]:

> We knew that they were not directly involved in Merey Sweeny, but we knew that they were influential within Venezuela, and if we would also mention to them the supply issues, that maybe they could get go back and get something broken loose on the supply side. Because at this time we had now moved into March, and the disruptions in supply that began in January were continuing on into March.[81]

238. When asked whether there was any mention of raising the Transfer Agreement or the Call Option, in the prospective meeting with Dr. Mommer and Dr. Boué, Mr. Sheets answered:

> No. At this time we were focused on trying to get supply back to the refinery. So, we didn't--there wasn't--again, we assumed that they were aware of the Transfer Agreement and every other—and the obligations around them. And we were--I mean, I think we had--it was reasonable for us to assume that. I mean, we were in discussions with them. We knew that they were well represented.

---

[78] Transcript, pp. 927-928.

[79] Transcript, pp. 962-963; Sheets Witness Statement, ¶20.

[80] Sheets Witness Statement, ¶21.

[81] Transcript, p. 964.

> We assumed that they would understand the terms of their Agreements.[82]

239. In the Statement of Claim, The PDVSA Parties summarize what they label the "Broader Context of [ConocoPhillips'] Dispute with Venezuela":

> In November 2007, ConocoPhillips and some of its subsidiaries filed a request for arbitration with the International Centre for Settlement of Investment Disputes ("ICSID") against Venezuela, claiming damages of approximately US$30 billion resulting from the alleged unlawful expropriation in June 2007 of the interests of ConocoPhillips' subsidiaries in three projects in Venezuela (the "ICSID Arbitration"). ConocoPhillips and Venezuela had engaged in negotiations in an effort to settle that dispute both before and after the ICSID Arbitration was filed.[140] Participants in those negotiations included Dr. Mommer and Dr. Boué on the Venezuelan side and Mr. Gregory Goff, one of ConocoPhillips' senior executives, on the ConocoPhillips Parties' side. From the beginning of those negotiations, ConocoPhillips proposed that a transfer of the PDVSA Parties' Joint Venture Interest be part of the compensation package in settlement of whatever claims ConocoPhillips may have against the Government.[83]

240. Mr. Sheets says the meeting in Vienna focused on potential settlement of the ICSID arbitration. In addition, Mr. Goff and Mr. Sheets brought up the Merey Sweeny relationship:

> We emphasized the importance of PDVSA Petróleo resuming crude oil supply to ConocoPhillips. We did so because it was critical to our ability to run the Sweeny Refinery efficiently and economically, and because the failure to do so could have significant consequences for PDVSA. In that context, Mr. Goff explicitly said to Drs. Mommer and Boué that PDVSA should read the Merey Sweeny agreements carefully to appreciate the extent of those consequences.[84]

241. Dr. Mommer and Dr. Boué dispute the accuracy of Mr. Sheets' recollection of their meeting. They went to the meeting assuming that the topic would be the potential settlement of the ICSID arbitration, but were surprised to discover that

---

[82] Transcript, p. 965; Sheets Witness Statement, ¶21.

[83] Statement of Claim, ¶64.

[84] Sheets Witness Statement, ¶21.

the ConocoPhillips representatives were primarily interested in discussing the claimed Seller Damages, which at the time amounted to little more that US $3 million.[85] Both Drs. Mommer and Boué testified they were not personally aware during the April 2009 meeting of the Transfer Agreement or the Call Option provisions. Neither Mr. Sheets nor Mr. Goff mentioned that ConocoPhillips believed that it had the right to take the PDVSA Parties' Joint Venture Interest based on the Call Option provision if the Claimants failed to pay the claimed Seller Damages.[86] Both parties acknowledge that, at the meeting in Vienna, Mr. Goff raised the possibility of further arbitration proceedings being commenced, either in relation to recovery of Seller Damages or the failure to supply suitable crude oil, or both. Mr. Sheets says "We warned them that ConocoPhillips would consider all options available to it for non-payment by PDVSA".[87] Both parties also confirm that Dr. Boué and Dr. Mommer assured ConocoPhillips representatives that they would discuss the supply issue in Caracas.[88]

242.    There were follow-up communications with PDVSA. In particular, on May 12, 2009, Mr. Goff spoke with Dr. Mommer and subsequently sent him copies of the Buyer Monthly Reports. Dr. Mommer does not have a precise recollection of this call, but accepts that he did speak with Mr. Goff. Dr. Mommer says he had contacted Mr. Del Pino and received assurance that this "nuisance" was going to be dealt with. He did not recall following-up on this issue.[89] There were also other ongoing communications between Mr. Goff and Mr. Del Pino.[90]

243.    Mr. Sheets testified that in spite of the assurance from Dr. Mommer, the PDVSA Parties did not pay or dispute Seller Damages that had accrued for January and

---

[85] Dr. Mommer Witness Statement, ¶¶4-5; Dr. Boué Witness Statement, ¶11.

[86] Dr. Mommer Witness Statement, ¶6; Dr. Boué Witness Statement, ¶11.

[87] Sheets Witness Statement, ¶22.

[88] Sheets cross-examination, Transcript, pp. 967-968, 978, 985; Sheets Witness Statement, ¶23; Dr. Mommer Witness Statement, ¶4; Dr. Boué Witness Statement, ¶11; Transcript pp. 324-325.

[89] Transcript, pp.1332, 1336 and 1338.

[90] Sheets Witness Statement, ¶31.

March 2009, and more importantly did not resume Crude Oil supply except on a sporadic basis.[91] Although the Claimants allege that throughout 2009 ConocoPhillips was intent on taking advantage of the Claimants' lack of understanding on the Transfer Agreement and Call Option provision, Mr. Sheets says the decision to exercise the Call Option under the Transfer Agreement was not made until August 2009.[92] He says ConocoPhillips concluded:

> By August 2009, PDVSA's intransigence made it clear that it no longer was a suitable partner for us. By August 2009, the Seller Damages for January 2009 and March 2009 had gone unpaid for 90 days. Neither PDVSA Petróleo nor PDVSA had paid the Seller Damages or disputed them, despite our warnings and repeated requests for payment. ConocoPhillips could no longer continue to excuse their wanton disregard for the terms of our agreements.[93]

244.   In other words, ConocoPhillips says that the Claimants' behavior was not that which it expected from a Joint Venture partner. The key, it says, was to ensure a steady supply of Crude Oil to the Merey Sweeny Refinery and that, despite assurances, the PDVSA Parties had failed to resume supply and continued to ignore the mounting Seller Damages.[94]

245.   The Claimants say that the conduct of ConocoPhillips belies their assertion that they assumed that PDVSA Parties were aware of their agreements, particularly the Call Option provisions. The Claimants highlight, in particular, a portion of an answer given by Mr. Sheets on cross-examination. They argue that Mr. Sheets could not adequately explain why in communicating with the PDVSA Parties on the issue of Seller Damages, ConocoPhillips mentioned the COSA and provided copies of the Buyer Monthly Reports, the COSA and the SCOSA, but never mentioned the Transfer Agreement or the Call Option provisions.[95]

---

[91] Sheets Witness Statement, ¶28.

[92] Sheets Witness Statement, ¶32; Sheets Supplemental Witness Statement, ¶11.

[93] Sheets Witness Statement, ¶32.

[94] Sheets Witness Statement, ¶31.

[95] Claimants' Post-Hearing Brief, ¶19.

**246.** The reliance by the Claimants on Mr. Sheets' testimony needs to be briefly examined. The Claimants say that, when pressed on cross-examination, Mr. Sheets finally acknowledged the real reason behind ConocoPhillips' strategy of silence:

> In our assessment, there was nothing to be gained by telling him that the Call Option – by saying that this is going to lead to that kind of event.[96]

This answer is part of a larger exchange, as follows:

> Q. Well, I understand how you might look to Dr. Mommer to convey or use his good offices to convey a message. My question simply is: What led you to conclude that it would be less efficient to mention the Transfer Agreement and the Call Option and have Dr. Mommer, now having been made aware of a provision in a Contract he had nothing to do with, convey that message on to PdVSA?
>
> A. You know, at this time, a Call Option event had not occurred. In our assessment, there was nothing to be gained by telling him that the Call Option--by saying that this is going to lead to that kind of event.
>
> Q. Right. I understand. What could you have lost if you did? I understand there is no gain –
>
> A. Right.
>
> Q. -- by mentioning it, and that's why we're here today. I want to understand what you understood to be the down side to mentioning it.
>
> A. It just did not occur to us to be mentioning that. We assumed that they--we did not assume that we needed to tell them what the Contractual provisions were.[97]

**247.** Other similar exchanges took place between Mr. Sheets and counsel for the Claimants. For example:

---

[96] Transcript, p. 994.

[97] Transcript, pp 994-995.

> Q. Well, then, why didn't Mr. Goff or you simply say, You know, there is this Call Option problem you guys have; I'm sure you're aware of it? Why didn't Mr. Goff just say that? It didn't cost you anything to say that. Why didn't you say that?
>
> A. There was no Call Option event at that time. No event had occurred. We did not think at that time that it was going to mature to a Call Option event.[98]

248. One further illustration of Mr. Sheets' evidence in this regard is found in this answer:

> THE WITNESS: I'll respond as I've responded previously, is it was--it was our assumption within ConocoPhillips that we did not need to point out to them what the provisions of the Agreement said. And there wouldn't have been any advantage to us at that time to try to elevate this to a point where we would say, you know, Because you haven't supplied crude for a couple months, we're ready to exercise a Call Option. At this point, we were hopeful that we could get the venture started back again. And we were hopeful, going into that meeting, that we could--that the meeting--you know, that Jim Mulva came out of the meeting with Mr. Ramirez with a sense that maybe we could get the discussion started again. So, that was the tone of the meeting.[99]

249. Based on the extract from Sheet's answer that "there was nothing to be gained by telling him", the Claimants have argued that the Respondents breached their fiduciary duties. They say the Respondent "made the calculated decision to remain silent about the Call Option, the Transfer Agreement and the occurrence of any Call Event because they had assessed that there was nothing to be gained by mentioning them, even though they understood that such a deliberate omission was detrimental to their partners' interests".[100]

250. Upon examination of Mr. Sheets' expanded answers to the question why Mr. Goff did not describe the Transfer Agreement and Call Option provision to Drs. Mommer or Boué in mid-April 2009 in Vienna, it is clear that he is saying that the

---

[98] Transcript, p. 992. Other examples are Transcript, pp. 979-980.

[99] Transcript, pp. 984-985.

[100] Claimants' Post-Hearing Brief, ¶8.

Call Event had not yet arisen and might not occur; their purpose was to follow-up on an earlier meeting with Mr. Ramírez in order to encourage the resumption of Crude Oil supply to Merey Sweeny and to get the SCOSA and COSA agreements back on track. The tribunal does not accept the Claimants' submission that the "gain" or "advantage" to which Mr. Sheets is referring in his cross-examination denoted a secretive plan to catch the PDVSA Parties unawares by exercising the Call Option without telling them about the Transfer Agreement, thereby warning them of the consequences of not either disputing or paying the Seller Damages. The Claimants have, in our opinion, misconstrued Mr. Sheets' testimony. Mr. Sheets explained that, at the time, there was no reason for him or Mr. Goff to address the Call Option with Dr. Mommer because no Call Event had occurred at that point. The most that can be taken from his answers is that the Call Event issue was not being contemplated in April 2009, and ConocoPhillips personnel assumed that the PDVSA Parties would read and understand their own agreements.[101]

251.    The Claimants contend that the Respondents could not have justifiably assumed that the Claimants were aware of the Call Option provisions. In support of this contention, they say ConocoPhillips understood that this "complex web of agreements" was signed by the parties ten years prior, in 1999, and they knew that the PDVSA Parties had suffered a massive turnover of employees in 2003.[102] Mr. John Weichbrodt testified that in late 2002 and into 2003, the opposition to Venezuelan President, Hugo Chávez, organized a general strike.[103] He said in cross-examination the strike "...lost nearly 20,000 people from PDVSA..."[104] In addition, the Claimants highlighted the lack of experience and recent appointments of people such as Ms. Beatrice Blanco and Mr. Carlos

---

[101] Transcript, p. 979.

[102] Claimants' Post-Hearing Brief, ¶16.

[103] Weichbrodt Witness Statement, ¶34.

[104] Transcript, p.662.

-83-

Rauseo, pointing out that in Mr. Rauseo's case, he resorted to contacting ConocoPhillips' secretary for copies of corporate documents. In Ms. Blanco's case, she asked for a copy of the SCOSA from ConocoPhillips.[105]

252.  Based on these circumstances, the Claimants have argued ConocoPhillips had "ample reasons to suspect, given their frequent interaction with the PDVSA Parties, that the personnel who participated in the formation of the Joint Venture were no longer associated with the PDVSA Parties".[106] The Claimants say it should have been evident to ConocoPhillips that their counterparts at PDVSA did not know about their agreements, specifically the Transfer Agreement and the Call Option. Accordingly, the Claimants say ConocoPhillips deliberately set out on a course of conduct calculated to profit from their partner's lack of knowledge or awareness. It was, they say, a classic example of a violation of a joint venture partner's fiduciary duty to treat his partner's interest as his own and not take advantage of his partner's ignorance, inexperience or even naïveté.[107]

253.  On June 16, 2009, the Joint Venture parties were notified that they were required to pay a Mandatory Post-Completion Capital Contribution in the amount of US $8,799,898.09.[108] There was internal communication at ConocoPhillips regarding whether PDVSA would make the capital contribution payments. An internal email dated June 18, 2009 indicates that ConocoPhillips had considered the potential non-payment by PDVSA of its capital contribution as a basis to exercise a Call Option. However, they made calculations and determined that even if PDVSA did not make the payments, the projected Maya differential meant that a planned, future distribution would have covered PDVSA's capital contribution.[109] In any

---

[105] Claimants' Post-Hearing Brief, ¶¶16-19.

[106] Claimants' Post-Hearing Brief, ¶16.

[107] Claimants' Post-Hearing Brief, ¶22.

[108] Blanco Witness Statement, ¶18; Exhibit C-47, Letter from Sharon O'Brien, ConocoPhillips, to the PDVSA Parties, dated June 16, 2009.

[109] Claimants' Post-Hearing Brief, p. 11; Exhibit C-96; Email from Brian P. Mullen, ConocoPhillips to Mike Moerer, Sharon R. O'Brien and Tom J. Rich, ConocoPhillips, dated June 18, 2009.

event, PDVSA paid its full share of the capital contribution and receipt of payment was acknowledged by ConocoPhillips on July 6, 2009.[110]

254.   The Claimants characterize these events as a cynical scheme by ConocoPhillips. The Claimants say ConocoPhillips was prepared to use non-payment of the capital contribution as a further more significant Call Event than unpaid Seller Damages. But PDVSA made the payment. The Claimants say it was cynical for ConocoPhillips to receive this payment and not recognize that PDVSA's payment was made while it was in serious jeopardy of losing its whole Joint Venture Interest. ConocoPhillips denies that the potential exercise of the Call Option and the call for a capital contribution in June 2009 were related events. While the decision to exercise the Call Option based on unpaid Seller Damages could have been made at any time after June 1, 2009, the Respondents say such decision making did not occur until later, in August 2009. In any event, when ConocoPhillips decided to exercise the Call Option, it was focused on the more fundamental question of the PDVSA Parties' failure, one way or another, to supply crude oil, and their unsuitability for that reason as a partner. The Respondents say there was no connection between "a relatively minor capital contribution obligation" and the "larger partnership obligation to supply crude oil".[111] The fact remains that ConocoPhillips could have exercised the Call Option months before it did. If, as the Claimants contend, the Respondents were determined to exercise the Call Option, one would have expected ConocoPhillips to act at once, eliminating "the risk" that the PDVSA Parties would pay the outstanding Seller Damages after all.

255.   The tribunal does not find it untoward for ConocoPhillips' management to have been fully briefed on the applicable agreements or even to have contemplated what rights could be invoked. Some intermittent performance of either deliveries

---

[110] Exhibit C-55, Email from Brian Mullen, ConocoPhillips to Rainier Rada, PDVSA, dated July 6, 2009.

[111] Respondents' Post-Hearing Memorial, p. 24.

of crude oil or payment of capital contributions by PDVSA may have caused ConocoPhillips to hesitate in determining whether to terminate the Joint Venture. But the Claimants' fate was in their own hands. The tribunal further finds that ConocoPhillips did not behave improperly at the time of PDVSA's capital contribution in June 2009. The conditions for a further capital contribution arose under the applicable contractual requirements. ConocoPhillips may have considered that a failure to pay could give rise to a Call Event, but upon the PDVSA Parties making the required capital contribution, that potential development was at an end. In fact, ConocoPhillips did not decide to exercise the Call Option until approximately six weeks later.

256.  The tribunal recognizes that the parties' mistrust was very high during 2009. Amongst others, Mr. Austin testified that 2009 was an economically challenging period for Merey Sweeny and that PPSA and PDVSA "became difficult partners".[112]  The Respondents were intent upon a reliable supply to the refinery of Crude Oil or its equivalent.  They believe the Claimants' cut-off of supply of Crude Oil was retaliation against ConocoPhillips for filing the ICSID Arbitration.[113]  The tribunal does not find it necessary to determine what was the reason behind the cut-off of supply by the PDVSA Parties. The only relevant finding that the tribunal makes from this evidence, at most, is that ConocoPhillips had legitimate reasons to exercise the Call Option.

257.  Having carefully reviewed the parties' submissions and weighed the evidence, the tribunal is not persuaded by the Claimants' arguments. The PDVSA Parties' witnesses called in this case said, in each case, that they did not know about the Transfer Agreement before the Call Option was exercised. They also say that others at PDVSA were similarly unaware. The question for the tribunal, however, is whether ConocoPhillips knew of the PDVSA Parties' ignorance. There is, in the

---

[112] Austin Witness Statement, ¶29.  See also Sheet Witness Statement, ¶8.

[113] Sheets Witness Statement, ¶17.

-86-

majority view of the tribunal, no proper basis to conclude that ConocoPhillips knew that the Claimants did not have any knowledge of the Transfer Agreement or Call Option provisions. The majority of the tribunal finds that ConocoPhillips was justified in assuming that responsible persons at PDVSA and PPSA had read their agreements. As determined by the New York Supreme Court, Appellate Division "[a] party who executes a contract is presumed to know its contents and to assent to them".[114] ConocoPhillips did not act in any way so as to lull the PDVSA Parties into inaction; to the contrary, it repeatedly demanded the payments due and the supply of oil. In addition, ConocoPhillips told Drs. Mommer and Boué in the April 15, 2009 meeting in Vienna that ConocoPhillips would look at all its options.

258. Accordingly, there was no breach of any alleged fiduciary duty to discuss or bring to the PDVSA Parties' attention the Transfer Agreement, and specifically the Call Option as a potential consequence to the Claimants if they failed either to dispute the Buyer Monthly Reports or pay the Seller Damages which were due and owing.

259. The tribunal notes that the Respondents have argued that, in any event, it was the Claimants who specifically removed the provision for notice of default. The tribunal does not find it necessary to dwell on the drafting history of the Transfer Agreement, but since both parties have made reference to this evidence, the tribunal notes its finding that there was no breach of fiduciary duty is consistent with the drafting history. With respect to a predecessor section to Section 4.1 of the Transfer Agreement, Mr. David Smith testified that the PDVSA Parties first proposed the call and put option provisions in the event of a material breach.[115] He further stated that one of the early drafts of the Transfer Agreement from the PDVSA Parties' outside counsel, Cleary Gottlieb, contained a provision for notice

---

[114] Exhibit RL-58, *Moon Choung v. Allstate Ins. Co.*, 283 A.D.2d 468 (N.Y. App. Div. 2001)

[115] Smith Witness Statement, ¶43.

of default and a thirty day cure period. On the basis that a cure period was all that was required, ConocoPhillips sought the removal of a notice of default, to which the PDVSA Parties acceded. [116] Consequently, the provision for notice of default in relation to a Call Event was removed from the contract. The defaulting party, in this case the Claimants, were provided with ample warning upon the delivery of the Buyer Monthly Reports for January and March 2009 that claims were being made for Seller Damages for each of those months. Section 2.8(d) of the COSA, provides that Seller Damages "...with respect to any month shall be due within ten (10) days of the date of the Buyer Monthly Report...for such month. (the "Damages Due Date")".[117] The Damages Due Date is subject to a further proviso that neither party was obligated to pay any disputed portion of Seller Damages on the Damages Due Date if a party notified the other in writing prior to that date of such a dispute.

260.    As previously noted in this Partial Award, if a Call Event had occurred, ConocoPhillips had the right "within ninety (90) days following such Call Event" to purchase "the entire PDV Sweeny Joint Venture Interest" for a consideration which is expressed in the alternative in Section 4.1 of the Transfer Agreement. Mr. Smith testified that it was the PDVSA Parties who insisted on inclusion of the second formula for payment. That formula, initially set out in the Cleary Gottlieb draft, submitted on behalf of the PDVSA Parties, provided for payment expressed as "a percentage of the amount of PDVSA's Capital Contribution plus outstanding subordinated obligations, minus any distribution from the Joint Venture".[118]

261.    There were, therefore, contractual choices facing the PDVSA Parties upon receiving the Buyer Monthly Reports for January 2009 and following, which claimed for Seller Damages. The Claimants could have paid or disputed such

---

[116] Smith Witness Statement, ¶48.

[117] Exhibit R-1, COSA.

[118] Smith Witness Statement, ¶44.

Seller Damages. Moreover, even after failing to do either of those things, the Claimants were entitled to a "cure" interval of ninety days during which they could have satisfied the Seller Damages and avoided the exercise of any pending Call Option. Despite numerous requests for payment directed to Mr. Del Pino, Dr. Mommer, Dr. Boué, and others, the Claimants persisted in ignoring ConocoPhillips. Thus, while there was no fiduciary duty for ConocoPhillips to provide the PDVSA Parties with notice of default in respect of Seller Damages, the PDVSA Parties had ample opportunity to cure the defaults of which they had been made fully aware. The tribunal finds that there was ample protection for the Claimants to cure their default before the ninety day cure period expired.

262. The tribunal is, therefore, satisfied there was no contractual right to notice of default. Instead there was a series of moderated steps leading either to satisfaction or disputing of Seller Damages, failing which there was a ninety day cure period. In view of the numerous communications by ConocoPhillips of its requests for resumption of Crude Oil deliveries and payment of the outstanding Seller Damages, it cannot be faulted for exercising its contractual rights in the form of the Call Option.

263. Even if, contrary to these findings, the tribunal had been satisfied that there was a breach of fiduciary duty by ConocoPhillips, there appears to be one further ground on which such claim would fail. The tribunal considers this subsidiary issue for the purpose of addressing all the issues raised by the Claimants.

264. The Claimants argue that the Respondents owed them a fiduciary duty because the parties were engaged in a joint venture. Under New York and Delaware law, joint venturers automatically stand in a fiduciary relationship with each other. Respondents, on the other hand, contend that the parties expressly waived any fiduciary obligation to each other in Article IV, Section 4.1(e) of the LLC Agreement. That section expressly negates and waives any fiduciary obligation between the "Members" of Sweeny Coker, which are ConocoPhillips and PDV Texas.

265.   Section 4.1(e) defines the "Nature of Relationship, Duties" of the Members and
       reads as follows:

> The Members expressly acknowledge and agree hereby that their
> relationship to the Company [Sweeny Coker] and to each other is
> strictly contractual in nature. To the extent that, at law or in equity,
> a Member or a Representative has duties (including fiduciary
> duties) and liabilities relating thereto, such Person shall not be
> liable to [Sweeny Coker] or to any Member for its good faith
> reliance on the provisions of this Agreement...

266.   Each Member is entitled, through its Representative, to act "in its sole discretion"
       and "without regard to the interests of the other Members, it being understood
       that each such Member shall have no fiduciary duty or other duty to represent or
       act in the best interests of the other Members." In addition, Section 4.1(e)
       provides that "[e]ach Member waives, to the fullest extent permitted by Law and
       this Agreement, any and all claims which it may assert at any time against any
       other Member or any of such other Member's Representatives for breach of any
       such fiduciary or other duty."

267.   The Claimants do not contest the Respondents' authorities that indicate parties to
       a joint venture are empowered by Delaware law to negate and/or waive fiduciary
       duties to one another. The Claimants argue, instead, that the exclusion and
       waiver of fiduciary duties in the LLC Agreement is inapplicable to the duties of
       ConocoPhillips under the Transfer Agreement for essentially two reasons. They
       note, firstly, that the LLC Agreement includes as Members (and parties to that
       Agreement) "only two of the four Joint Venture partners." They also contend that
       the LLC Agreement has limited significance to the relationship among the parties
       and "is limited to the exercise of certain voting rights in connection with the
       governance of Sweeny Coker, L.L.C." By contrast, they note, "the Transfer
       Agreement, to which all four Joint Venture partners are parties and which
       contains the Call Option provisions relied upon by ConocoPhillips to take the
       PDVSA Parties' Joint Venture Interest, has no clause waiving any fiduciary
       duties." Consequently, they contend, "the limited waiver in the LLC Agreement

could not have permitted ConocoPhillips to engage in conduct in clear violation of their fiduciary duty under the applicable law."[119]

268.    The Respondents argue that this analysis disregards the fundamental importance of the LLC Agreement. The parties from the start contemplated a Joint Venture between ConocoPhillips and the PDVSA Parties to take advantage of the Crude Oil that the PDVSA Parties would provide and the refinery that ConocoPhillips previously owned (Sweeny) that was converted in order to process that Crude Oil.

269.    The "project documents" drafted by the parties, in particular the COSA and SCOSA, provided for the supply of crude oil and the obligations of the PDVSA Parties and ConocoPhillips regarding their respective roles. The Merey Sweeny Joint Venture was created to implement these project documents through the creation of additional, operating companies that were fully owned by the parties. Specifically, PDVSA created its wholly owned subsidiary, PDV Holding, to hold its interest in the Joint Venture, as well as PDV Texas, a PDV Holding subsidiary, which was assigned the role of representing the PDVSA interests in the operations of the Joint Venture. The parties to the LLC Agreement, COP and PDV Texas, were wholly-owned by and authorized to represent ConocoPhillips and PDVSA Parties respectively.

270.    The Respondents have correctly characterized the significance of the role played by ConocoPhillips and by PDV Texas under the LLC Agreement, as reflected in several provisions of the LLC Agreement itself. In Section 3.4(a)(i), PDV Texas represents and warrants that it "has all requisite power and authority to perform its obligations under the Project Transaction Documents to which it is a party." In Section 3.4(a)(ii) PDV Texas represents and warrants that "Each of the Project Transaction Documents to which PDV Texas is a party is the legal, valid and

───────────────

[119] Claimants' Post-Hearing Brief, p.12.

binding obligation of PDV Texas, enforceable against PDV Texas in accordance with its terms," except for such situations as bankruptcies.

271. The LLC Agreement further states that "'Project Documents' has the meaning set forth in Exhibit A to the Operating Agreement."[120] In the Operating Agreement, "Project Documents" is defined to mean "the Processing Agreement, this Agreement, the Lease, the Transfer Agreement, the Improvements Agreement, the Partnership Agreement and the LLC Agreement," and "Project Transaction Documents" is defined to mean "the Project Documents, the Phillips Guarantee, the PDVSA New York Guarantee, the PDVSA Venezuela Guarantee, the Crude Oil Supply Agreement and the Supplemental Crude Oil Supply Agreement."[121] The LLC Agreement specifically defines "PDV Texas" as "a Delaware corporation and wholly-owned subsidiary of PDV Holding," and defines "PDV Holding" as "a Delaware corporation and wholly-owned subsidiary of PDVSA."[122]

272. The parties to the LLC Agreement, therefore, were clearly described and referred to as representing the companies that owned and controlled them, and were committing themselves to require those companies to abide by the agreements reached in the LLC Agreement.

273. The clearest evidence of the intention of the ConocoPhillips and PDVSA Parties to be bound by the commitments made by ConocoPhillips and PDV Texas in the LLC Agreement is found in the provision excluding and waiving any fiduciary duties to one another. After agreeing to waive any claims based on fiduciary or other duty, the LLC Agreement provides:

> No Member or Representative shall take or cause or permit its Affiliates, officers, employees or agents to take, any action that would bind or obligate the Company in any manner not expressly authorized in writing by the Owners' Committee or in any Project

[120] Exhibit R-5, LLC Agreement, Exhibit A at A-6.

[121] Exhibit R-6, Operating Agreement, Exhibit A at A-22.

[122] Exhibit R-6, Operating Agreement, Exhibit A at A5-6.

-92-

> Document. Any attempted action in contravention of the preceding sentence shall not be binding upon the Company, unless ratified or authorized in writing by the Owners' Committee.[123]

274.    This language not only demonstrates that the Members are responsible for implementing the Project Documents, it also makes clear that the Owners' Committee, operating under the LLC Agreement, have the power in writing to bind the parties to commitments that vary those in the Project Documents themselves. The Owners, as understood in the LLC Agreement, are, therefore, not just the entities that are Members under that LLC Agreement, but the parties who own those entities. Significantly, moreover, the LLC Agreement gives "Affiliates" the meaning it is given in the Operating Agreement,[124] which is, "with respect to any Person, any other Person that directly controls, is controlled by, or is under common control with such other Person."[125] This definition includes as affiliates of PDV Texas both PDV Holding and PDVSA, establishing that PDV Texas is bound to ensure that those entities do not create obligations for Sweeny Coker other than those authorized by the Owners' Committee or the Project Documents.

275.    In addition, the LLC Agreement has an explicit reference to the Transfer Agreement. It notes that "A Member may Transfer its LLC interest only if such Transfer is an Authorized Transfer or a Mandatory Transfer pursuant to the Transfer Agreement . . . ," and the LLC Agreement provides that transfers of interests in Sweeny Coker "shall become effective in accordance with the Transfer Agreement."[126] At the very least, this provision reflects the integral role played by the LLC Agreement in the overall transaction, including an express recognition and commitment to implement the Transfer Agreement's authorization of the Put and Call Options.

---

[123] Exhibit R-5, LLC Agreement, Section 4.1(e).

[124] Exhibit R-6, Operating Agreement, Exhibit A at A-1.

[125] Exhibit R-6, Operating Agreement, Exhibit A at A-2.

[126] Exhibit R-5, LLC Agreement, Article XI, Sections 11.1 and 11.4.

276.  Finally, it is significant in considering what entities were intended to be bound by the exclusion and waiver of fiduciary duties in the LLC Agreement, and by its other terms, that notice to PDV Texas under the LLC Agreement must be given to three entities: PDV Texas, c/o PDV Holding; to PDVSA; and to PPSA (Notice to PDV Sweeny and Texas is also deemed effective when given to the Partnership Representative).[127] In the event the Partnership is not renewed, it is the LLC Agreement that requires ConocoPhillips or Sweeny Sub to "purchase the PDVSA Joint Venture Interest at a price equal to one half of [the Fair Value as determined pursuant to Section 11.22 of the Partnership Agreement]."[128]

277.  The Claimants' description of the function and purpose of the LLC Agreement is also untenable. The LLC Agreement is far more than a mechanism by which the owners exercise certain voting rights. As the Respondents note, the LLC Agreement is the document that describes the joint venture relationship upon which any fiduciary relationship would be based. It recites the background of the partnership, specifically that ConocoPhillips and PDV Texas formed the limited liability company Sweeny Coker and entered into a Limited Liability Company Agreement; and it spells out as its "purposes" to "acquire, own, hold, make, participate in and exercise rights as general partner with respect to a limited partnership interest in the Partnership" and to engage in any other business activity "necessary, incidental, proper, advisable or convenient to accomplish the foregoing purposes" and which are lawful under the Delaware Act.[129]

278.  While the "Members" operate Sweeny Coker through their representatives, all the powers related to the conduct of the business are assigned to an Owners' Committee, which is to carry out the business on the Members' behalf, in general through an Operating Committee. Those functions include: "full, exclusive and complete discretion to manage and control the business and affairs of the

---

[127] Exhibit R-5, LLC Agreement, Article XIV, Section 14.1.

[128] Exhibit R-5, LLC Agreement, Section 14.20

[129] Exhibit R-5, LLC Agreement, Article III, Section 2.1

Company," and through the Committee to be responsible for the construction budget, and reviewing and consulting on all operational and budgetary aspects of the partnership. Sweeny Coker also is assigned the duty of determining when it needs more funding in the form of capital contributions, and for applying the remedies provided for any failure by a party to make such contributions. It allocates distributions and handles all tax matters, and is in charge of the partnership's banking and accounting, including making reports to the Members. It is, in short, the operating vehicle for the partnership, run by the owners themselves, and not a formal mechanism that can be separated from the rest of the components in the overall transaction, and in particular not from the Transfer Agreement, to which it expressly makes reference as the basis for Mandatory Transfers.

279.  Finally, in this regard, it is difficult to see what purpose the exclusion and waiver of fiduciary duties could serve if that provision were read only to relate to activities conducted by the Members of Sweeny Coker pursuant to the LLC Agreement. What could the language of Section 4.1(e) of the LLC Agreement mean if the only fiduciary duties waived are those that relate strictly to that agreement and only to the two parties to the LLC Agreement, i.e., PDV Texas and ConocoPhillips? Could the Transfer Agreement be read to contain a fiduciary duty even though the partnership agreement --- upon which the fiduciary duty would be based -- expressly negates and waives such a duty?

280.  The distinction attempted to be made in this regard is unpersuasive based on the text of the LLC Agreement, the context of the LLC Agreement relative to the ownership structure and other Project Documents, and the fact that PDV Texas and ConocoPhillips are the vehicles formed and assigned the role of representing the Owners in the Joint Venture the Owners created.

281.  In summary therefore, the tribunal finds with respect to the alleged fiduciary duty owed to the Claimants:

-95-

(a)  The communications leading up to the exercise of the Call Option establish with reasonable clarity that ConocoPhillips intended to assert its rights under the agreements;

(b)  Fiduciary duties should not be found to replace the express contract terms, particularly where the parties have entered arms length contracts, were independently advised, and were expected to behave as sophisticated commercial actors;

(c)  It is unfortunate if PDVSA's turmoil in 2003 led to the departure of experienced middle managers in charge of its affairs. That development cannot, however, be regarded as a sufficient basis to prevent ConocoPhillips from later exercising its full rights under the agreements. ConocoPhillips was entitled to assume PDVSA Parties knew of their agreements; and

(d)  There was no breach of fiduciary duty, even if such a duty can be found in this contract setting. There was, moreover, no dishonest dealing between ConocoPhillips and the PDVSA Parties in the circumstances preceding the exercise of the Call Option.

The tribunal therefore dismisses the Claimants' claim that ConocoPhillips breached its fiduciary duty.

## Breach of the Implied Covenant of Good Faith and Fair Dealing

282.  In addition to their claim based on fiduciary duty as joint venturers, the Claimants submit ConocoPhillips also owed a duty of good faith and fair dealing to the Claimants.

*Position of the Claimants*

283.  The PDVSA Parties take the position that the Respondents breached the standard of good faith and fair dealing implied under every contract governed by New York law, including the Transfer Agreement. The duty "embraces a pledge

that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"[130]

284. The Claimants also cite the *Uniform Commercial Code* and the *Restatement (Second) of Contracts* in support of their interpretation of New York law on this issue.

285. As with the analysis of fiduciary duty, the duty of good faith and fair dealing is also fact specific. The Claimants posit the following evidence in support of their position: [131]

(a) The Claimants were not aware of the provision regarding the Call Option in the Transfer Agreement and therefore did not know that failure to pay the Seller Damages could lead to the exercise of the Call Option by the Respondents;

(b) The Respondents were interested in acquiring the Claimants' interest in the Joint Venture; they had proposed that the Claimants prepay any potential award in a US $30 billion dispute between ConocoPhillips and the Government pending before an ICSID arbitration panel by ceding their Merey Sweeny Joint Venture Interest;[132]

(c) The Respondents already knew in January 2009 that pursuant to the Call Option they could potentially take the Claimants' Joint Venture Interest without paying any consideration;

(d) The Respondents realised that the Claimants were unaware of the Call Option provision in the Transfer Agreement;

---

[130] Statement of Claim, ¶110, citing Exhibit CL-40, *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 639 N.Y.S.2d 977 (N.Y. 1995) and Exhibit CL-41, *Kirke La SHelle Co. v. Armstrong Co.*, 263 N.Y. 79 (N.Y. 1933).

[131] Dr. Mommer Witness Statement, ¶¶3-4; Dr. Boué Witness Statement, ¶¶10-11.

[132] See Sheets cross-examination, Transcript, pp. 977-983 and 985; Sheets Supplemental Witness Statement, ¶9; Dr. Mommer cross-examination, Transcript, pp. 1339-1344.

(e)    The Respondents purposefully decided not to bring the Call Option to the Claimants' attention and schemed to take advantage of the Claimants' ignorance of the Call Option;

(f)    The Respondents understood that their conduct could lead to litigation;

(g)    ConocoPhillips initiated a high level meeting in Vienna in April 2009. The PDVSA Parties' representatives assumed that the topic for discussion would be the pending US $30 billion dispute between ConocoPhillips and the Government. Instead, ConocoPhillips wanted to discuss the relatively miniscule Seller Damages claim. The ConocoPhillips representatives never mentioned the Call Option remedy. They stated only that the likely consequence of a failure to resolve the matter of Seller Damages would be another arbitration between the parties;

(h)    In the meantime, it was business as usual in the Joint Venture, with no mention of the possibility of termination of the Joint Venture at any time, including at the meetings of the Owners' Committee reviewed earlier; and

(i)    The Respondents tried to trigger a Call Event with a demand for a mandatory capital contribution, hoping that the Claimants would not comply.

286.    The PDVSA Parties say ConocoPhillips engaged in a deliberate course of conduct designed to take advantage of their contracting partners' lack of knowledge, to conceal their intent to exercise the Call Option remedy and to mislead the PDVSA Parties' representatives by asserting that its interest was only to be paid Seller Damages.

287.    The Claimants ask that the purported exercise of the Call Option be set aside on account of the Respondents' breach of their duty of good faith and fair dealing.

*Position of the Respondents*

288.   The Respondents submit they did not breach the implied duty of good faith and
       fair dealing because such duty does not require a party to give notice when no
       notice requirement is to be found in the agreements, especially where the parties
       intentionally chose to delete this requirement in the final, executed agreements.
       The Respondents further assert that a party does not breach the implied duty of
       good faith and fair dealing by merely exercising its rights under a contract.

289.   The Respondents contend that what the Claimants are seeking is to reinsert a
       notice requirement into the contract that the parties specifically agreed to
       exclude. Under New York law, this is not proper for the following reasons:

       **(a)**   The duty of good faith and fair dealing cannot be used to undo the express
               terms of an agreement duly arrived at by sophisticated parties in arms
               length negotiations;

       **(b)**   Courts cannot imply a covenant inconsistent with the terms of an
               agreement nor can they supply additional terms which the parties did not
               bargain for (in this case, the parties considered and rejected the notice
               requirement);

       **(c)**   Courts cannot insert a notice requirement into a contract that
               unambiguously does not contain such a requirement; and

       **(d)**   A party does not breach an implied covenant of good faith and fair dealing
               merely by exercising its rights under the contract even if it seeks thereby
               to maximize its own recovery available under the contract.[133]

290.   The Respondents argue that in addition to the lack of legal support, the facts do
       not demonstrate any basis for the Claimants' argument. The Respondents say
       that it was the Claimants' failure to fulfill in good faith their obligations under the

---

[133] Rejoinder, Reply to Counterclaims and Statement of Defence to New Claims, ¶159.

COSA/SCOSA (to pay or to dispute the Seller Damages) and the Transfer Agreement (to cure outstanding payment obligations within 90 days) which resulted in the exercise of the Call Option. ConocoPhillips says it repeatedly reminded the Claimants about the importance of paying the Seller Damages with ConocoPhillips providing the PDVSA Parties documents containing references to the Call Option. The Respondents state they did not intentionally mislead the PDVSA Parties by making false misrepresentations nor did they fail to fulfill in good faith any express obligation in the agreements. The Respondents submit, therefore, that the Claimants' good faith and fair dealing claim should be dismissed.

**ARBITRAL TRIBUNAL DETERMINATION**

**291.** It is uncontested and well established that under New York Law, the implied covenant of good faith and fair dealing inheres in every contract.[134] This covenant is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under the agreement[135]

**292.** However, the covenant of good faith and fair dealing cannot be construed so broadly as to effectively nullify express terms of the contract. Nor should the tribunal re-write the terms of the parties' contracts. In *Fesseha v TD Waterhouse Inv. Servs., Inc.*, the United States District Court for the Southern District of New York held that:

> The implied covenant of good faith and fair dealing does not provide a court carte blanche to rewrite the parties' agreement. Thus, a court cannot imply a covenant inconsistent with the terms expressly set forth in the contract. Nor can a court imply a

---

[134] Exhibit CL-67, *Travelers International Ag v. Trans World Airlines Inc.*, 41 F. 3d 1570, 1575 2d Circle 1994.

[135] Exhibit CL-42, *Fourth Branch Assocs. Mechanicville v. Niagara Mohawk Power Corp.*, 235 A.D.2d 962. (N.Y. App. Div. 3d Dep't 1997); Exhibit CL-40, *Dalton v. Educ. Testing Serv.*, 87 N Y.2d 384 639 (N.Y. 1995).

covenant to supply additional terms for which the parties did not bargain.[136]

293. The Claimants rely extensively on the case of *Market Street* to found their claim that ConocoPhillips violated their implied duty of good faith and fair dealing during their exercise of the Call Option as stipulated in the Transfer Agreement.

294. The tribunal finds this quote from Judge Posner the *Market Street* case to be of significance:

> "But it is one thing to say that you can exploit your superior knowledge of the market . . . or that you are not required to spend money bailing out a contract partner who has gotten into trouble. It is another thing to say that you can take deliberate advantage of an oversight by your contract partner concerning his rights under the contract. Such taking advantage is not the exploitation of superior knowledge or the avoidance of unbargained-for expense; it is sharp dealing.
>
> ...
>
> [D]eliberately [taking] advantage of your contracting partner's mistake during the performance stage…is a breach of good faith. To be able to correct your contract partner's mistake at zero cost to yourself, and decide not to do so, is a species of opportunistic behavior that the parties would have expressly forbidden in the contract had they foreseen it.[137]

295. For the *Market Street* case to be invoked, there must, in the tribunal's view, be a showing that ConocoPhillips deliberately deceived or misled the PDVSA Parties or took advantage of the PDVSA Parties' ignorance. ConocoPhillips must be found to have known that the PDVSA Parties did not know what was in their agreements and ConocoPhillips was stealthily (for example, without fair warning) waiting for an opportunity to take their Joint Venture interest.

296. Thus, to find a breach of the duty of good faith and fair dealing, there must be sufficient evidence of bad faith, namely, trickery, misconduct, an intention to

---

[136] Exhibit RL-7, *Fesseha v TD Waterhouse Inv. Servs., Inc*, 193 Misc.2d 253 (N.Y. Sup. Ct. 2002), *aff'd*, 305 A.D.2d 268 (N.Y. App. Div. 2003).

[137] Exhibit CL-30, *Market Street Assocs. v. Frey*, 941 F.2d 588 (7th Cir. 1991), at 594 and 597.

deceive or evidence that one party is taking advantage of the other party's ignorance.

297.    The tribunal has considered the evidence presented by both parties and determines that there is not sufficient evidence on the record to find that ConocoPhillips acted in bad faith either in its conduct before exercising the Call Option or in the exercise of the Call Option itself. ConocoPhillips did nothing to deceive the PDVSA Parties in relation to the applicable agreements nor to its ongoing intention to insist upon and enforce the Claimants' obligations to resume crude oil deliveries and to pay the Seller Damages.

298.    It is true that ConocoPhillips did not alert the PDVSA Parties to the Call Option provision, but is this silence proof of misconduct or an act of bad faith? The tribunal has concluded that the decision to remain quiet was nothing more than a strategic decision taken without guile or deceit. There is nothing to show that this silence was opportunistic conduct by ConocoPhillips. ConocoPhillips was a well informed party and it reasonably expected that its co-venturer was also a well informed party. ConocoPhillips had no obligation to explain to a highly sophisticated counterparty, represented at all times by expert external counsel, the content of agreements it freely negotiated and signed.

299.    Further, in the previous section of this Partial Award dealing with the Claimants' fiduciary claim, the tribunal referred to the evidence on the issue of whether ConocoPhillips knew that the PDVSA Parties did not know about the Call Option or the Transfer Agreement. The tribunal is not persuaded that ConocoPhillips knew that the PDVSA Parties did not have ready access to the Transfer Agreement, or that responsible persons at PDVSA or PPSA did not know of it or of the existence of the Call Option. The tribunal accepts the evidence of Mr.

Sheets that, throughout 2009, ConocoPhillips had the working assumption that the PDVSA Parties knew of their agreements concerning the Joint Venture.[138]

300.   Further, the tribunal is not persuaded that ConocoPhillips representatives, Mr. Sheets and Mr. Goff, deceived Dr. Mommer and Dr. Boué during the April 15, 2009 meeting in Vienna. The evidence of Mr. Sheets was that their purpose was to follow up on an earlier meeting with the Venezuelan Energy Minister, Mr. Ramirez, and to get the Crude Oil supply going again to the refinery:

> Q. Did Mr. Mulva suggest to you that in any such subsequent meeting the Seller Damages of Merey Sweeny be a subject of discussion?
>
> A. We--yeah, we did discuss going into--once we had the meeting set up in mid-April, we did discuss that this would be an opportunity to also tell Dr. Mommer and Dr. Boué about what's going on.
>
> We knew that they were not directly involved in Merey Sweeny, but we knew that they were influential within Venezuela, and if we would also mention to them the supply issues, that maybe they could get go back and get something broken loose on the supply side. Because at this time we had now moved into March, and the disruptions in supply that began in January were continuing on into March.
>
> Q. And did you discuss--strike that. Did you have any discussions with Mr. Mulva concerning raising the Merey Sweeny issue at this meeting with Drs. Mommer and Boué?
>
> A. Yeah. We talked about what we were going to discuss with Mommer and Boué with Jim Mulva and the rest of the management team before we went to that meeting, including the fact that we were going to raise the Merey Sweeny issue. But the larger part of that meeting, the reason for us going there, was really as a follow-up to Mulva's meeting with Ramirez about the larger case.
>
> Q. And in that discussion that you've just described, was there any mention of, perhaps, raising the issue of the Transfer Agreement and the Call Option?

---

[138] Sheets cross-examination Transcript, pp. 956-957.

> A. No. At this time we were focused on trying to get supply back to the refinery. So, we didn't--there wasn't--again, we assumed that they were aware of the Transfer Agreement and every other—and the obligations around them. And we were--I mean, I think we had--it was reasonable for us to assume that. I mean, we were in discussions with them. We knew that they were well represented. We assumed that they would understand the terms of their Agreements.[139]

301. The tribunal also finds it noteworthy that there was not yet a Call Event as of the date of that April 2009 meeting. The possibility of a Call Event was not the point of the meeting and the tribunal finds it plausible that ConocoPhillips had considered its options and was primarily, if not exclusively, concerned about the resupply of Crude Oil to the Sweeny Refinery. The parties were in a Joint Venture together, to operate a refinery that was expressly built to receive Merey Crude and refine it. The PDVSA Parties were perceived to be reneging on that arrangement.

302. Finally, it is the Claimants' own continued breach of their obligation to supply Crude Oil, their obligation to supply alternative crude oil and their obligation to pay Seller Damages that led ConocoPhillips to conclude, after multiple demands that PDVSA start supplying Crude Oil again, that the relationship it had with its co-venturer was completely dysfunctional. The Claimants' own conduct was the cause and basis for ConocoPhillips' decision to terminate the Joint Venture.

303. The tribunal is not persuaded that the facts of this case and the evidence presented by the Claimants rise to the necessary level to establish a breach by the Respondents of their implied covenant of good faith and fair dealing. Therefore, the tribunal dismisses the Claimants' good faith and fair dealing claim.

**No Call Event Occurred**

304. The fourth argument the Claimants raise in opposition to the exercise of the Call Option is that there was no Call Event to justify the Respondents' exercise of the

---

[139] Sheets cross-examination, Transcript, pp. 963-965.

Call Option. It seems to be common ground among the parties that a failure to pay Seller Damages, which remain uncured for 90 days, is a Call Event under the Mandatory Transfers provisions of Article IV, and Exhibit A of the Transfer Agreement.

305. A Call Option can only be exercised when a Call Event has occurred under Section 4.1 of the Transfer Agreement. The term "Call Event" is defined in Exhibit A to the Transfer Agreement as follows:

> "Call Event" means (i) any transfer by PDV Sweeny or PDV Texas in violation of the Transfer Agreement; (II) the failure by PDV Sweeny to make Pre-Certification Capital Contribution or a Mandatory Post-Completion Capital Contribution within ninety (90) days of the due date thereof pursuant to the Partnership Agreement; (iii) a breach by PDVSA P&G of any of its payment obligations under the Crude Oil Supply Agreement which remains uncured for ninety (90) days; (iv) a breach by PDVSA of any of its payment obligations under the Supplemental Crude Oil Supply Agreement which remains uncured for ninety (90) days; (v) a breach by PDVSA under the PDVSA New York Guarantee or the PDVSA Venezuela Guarantee which remains uncured for ninety (90) days; (vi) any event the result of which is that PDV Texas or any permitted transferee of its LLC Interest ceases to be a direct or indirect wholly-owned subsidiary of PDVSA or (vii) any event the result of which is that PDV Sweeny or any permitted transferee of its Partnership Interest ceases to be a direct or indirect wholly-owned subsidiary of PDVSA, except in either case as set forth in Section 3.3(b) or Section 3.3(c).

*Position of the Claimants*

306. In essence, the Claimants argue that no Call Event occurred for two reasons. Firstly, although notice was sent to both PDVSA and PPSA, ConocoPhillips never specifically claimed Seller Damages from PPSA under the COSA. It is said to have claimed Seller damages from PDVSA only.[140] Thus, the Claimants argue it is too late now to claim Seller Damages from PPSA or to allege that PPSA's failure to pay such damages gave rise to a Call Event.

---

[140] Claimants' Post-Hearing Brief, ¶¶47-48. ConocoPhillips requested payment of Seller Damages from PDVSA under the SCOSA. Buyer Monthly Reports are found at Exhibits R-23 to R-28.

307.  Secondly, and in the alternative, the Claimants submit that the Order of the Ministry was an Event of Force Majeure that excused PPSA's obligation under the COSA and was not an event that triggered PDVSA's obligation under the SCOSA.[141] The Claimants note that the Respondents, in their letter dated February 10, 2009, indicated that they assumed that the force majeure provisions of the COSA applied.[142] Further, the Claimants refer to the processing fee reports prepared by ConocoPhillips wherein ConocoPhillips indicated that the failure to supply Crude Oil under the COSA was "excused".[143] The Claimants argue that this conduct is consistent with the fact that ConocoPhillips only requested Seller Damages from PDVSA, and not PPSA, as it had assumed PPSA's performance to be excused.

308.  The Claimants assert that the Ministry's Order qualifies as an Event of Force Majeure. Section 10.1 of the COSA provides as follows:

> 10.1 Force Majeure: Neither Party shall be liable for failure to perform any or all of its obligations under this Agreement if performance has been delayed, hindered or prevented by reason of any Event of Force Majeure. An "Event of Force Majeure" is an event or circumstance resulting from a cause beyond the reasonable control of Seller, Buyer and their respective Affiliates, which could not have been prevented or remedied by any such Person's exercise of due diligence, and shall be deemed to include, but not be limited to: expropriation, requisition, confiscation or nationalization; embargo or export or import restriction; restriction of production, rationing or allocation of same, whether imposed by law, decree or regulation of any governmental authority; wars, hostilities, public enemy or belligerent's actions, sabotage, boycott, blockade, revolutions, insurrections, riots or commotions; acts of God; fires, frost or ice, earthquakes, storms, lightning, weather or sea conditions, tidal

---

[141] Claimants' Post-Hearing Brief, ¶¶50-51.

[142] Exhibit C-22, letter from Samantha Hudgins, ConocoPhillips to Merey Sweeny c/o Sweeny and ConocoPhillips, dated February 10, 2009.

[143] Exhibit C-26, E-mail from Samantha Hudgins, ConocoPhillips, to Merey Sweeny, L.P., c/o PDV Sweeny and ConocoPhillips, dated Apr. 17, 2009; Exhibit C-27, E-mail from Samantha Hudgins, ConocoPhillips, to Merey Sweeny, L.P., c/o PDV Sweeny and ConocoPhillips, dated May 18, 2009; Exhibit C-29, E-mail from Samantha Hudgins, ConocoPhillips, to Merey Sweeny, L.P., c/o PDV Sweeny and ConocoPhillips, dated July 17, 2009 and Exhibit C-59, E-mail from Samantha Hudgins, ConocoPhillips, to Merey Sweeny, L.P., c/o PDV Sweeny and ConocoPhillips, dated Sept. 16, 2009.

wave or perils of the sea, navigational accidents, vessel damages or breakdowns, loss of tanker due to sinking; accidents or closing of ports, docks, dams, channels, river-beds and other maritime or navigational aids; epidemics and quarantines; strikes or agreements among workers, lookouts or other labor disturbances; explosions or accidents caused by fire or other causes to, or mechanical failure of, any of the following: wells, pipelines, storage deposits, Refinery facilities (including but not limited to Unit 25.1), machinery and other facilities; and also included are faults or omissions caused or due to the restriction or other regulations imposed by any government authority to whose jurisdiction any of the Parties is subject to, whether civil or military, legal or de facto, or which purports to act under any constitution, decree or act. Without limiting the foregoing provisions, an Event of Force Majeure shall also be deemed to include any event or condition described above that delays or prevents (i) Buyer from loading, transporting, importing, receiving, storing or processing any Crude Oil to be purchased hereunder or (ii) the removal from the Sweeny Complex or the proper disposal (in accordance with legal requirements) of any coke produced as a by-product of processing the Crude Oil to be purchased hereunder. Notwithstanding the above, the Buyer shall not be released from its obligation to make payments for Crude Oil actually delivered hereunder and Seller shall not be released from its obligations to make payments for any Negative Margin Adjustment or Lookback Adjustment.

309.   The Claimants submit that the Ministry's instruction to reduce the production and export of crude oil qualifies as an "embargo or export or import restriction", a "restriction to production" or a "rationing or allocation of [production]", "imposed by law, decree or regulation of any governmental authority..." Also, under Venezuelan law, instructions by the Ministry to PDVSA can take any form and may be communicated verbally, and their effectiveness does not depend on any requirement of form.[144] Consequently, PPSA's obligations under the COSA were excused.

310.   As regards PDVSA, the Claimants argue that PDVSA's obligation to pay Seller Damages was never triggered because the instruction to stop the production and export of Crude Oil was within the scope of Section 2.1 of the SCOSA. In

_____

[144] Claimants' Post-Hearing Brief, ¶52; Reply, ¶¶77-82.

accordance with that provision, PDVSA had no obligation to pay Seller Damages if the Ministry's instruction to PDVSA was a "regulatory measure of general applicability having the effect of temporarily impeding the production or export of Crude Oil in the Republic of Venezuela."[145]

311.   The Claimants ask the tribunal to set aside the exercise of the Call Option as no Call Event occurred.

*Position of the Respondents*

312.   The Respondents reject the Claimants' submission that there was no Call Event on account of ConocoPhillips requesting Seller Damages from PDVSA rather than PPSA. The Respondents say that the Buyer Monthly Reports, submitted to PDVSA and PPSA, summarize the impact on the Sweeny Refinery's Net Variable Margin of operating with the different types of crudes that ConocoPhillips was able to obtain in order to mitigate the damages. Also, the subject field of each cover letter to the Buyer Monthly Reports cites both the COSA and the SCOSA. Moreover, each cover letter requests payment for Seller Damages pursuant to Section 2.8(d) of the COSA which, since it is incorporated by reference into the SCOSA, applies to both PPSA and PDVSA.

313.   The Respondents also reject the force majeure argument of the Claimants. The Respondents point out that it is the PDVSA Parties' failure to challenge or pay the Seller Damages that gave rise to the Call Option. Accordingly, the Claimants are estopped from raising a force majeure defence to the non-payment of Seller Damages as they never disputed those payment demands.[146] The Respondents further submit that no Event of Force Majeure excused PPSA's breach of its obligation to supply Crude Oil under the COSA and there was no "general embargo" or "regulatory measure of general applicability" in place that prohibited the export of Crude Oil. Consequently, nothing excused PDVSA from its

---

[145] Claimants' Post-Hearing Brief, ¶56; Exhibit R-3, SCOSA, Section 2.1.

[146] Respondents' Post-Hearing Brief, ¶22.

obligation under Section 2.1 of the SCOSA to step into PPSA's shoes and either supply Replacement Crude Oil or pay the Seller Damages.[147]

314.    The Respondents say that what is critical to the analysis of the SCOSA is the use of the capitalized term "Crude Oil" to define the subject of the embargo or regulatory measure of general applicability. The Respondents interpret "Crude Oil" in both agreements to mean both Merey Crude Oil (defined in Exhibit B to the COSA) and Substitute Crude Oil (defined in Exhibit C to the COSA as BCF-17). The Respondents contend, therefore, that under the SCOSA, there can be no excuse unless the embargo or regulatory measure of general applicability prohibited the export of both Merey Crude Oil and Substitute Crude Oil (*i.e.*, BCF-17) to the United States.[148]

315.    The Respondents note that at the same time the PDVSA Parties stopped delivering Crude Oil to the Joint Venture, other U.S. refineries were receiving Crude Oil from the PDVSA Parties.[149] It is argued, therefore, that this evidence shows there was no force majeure as there was no embargo and no regulatory measure of general applicability that impeded delivery to ConocoPhillips. The Respondents say the Claimants intentionally targeted ConocoPhillips because of the overall dispute between ConocoPhillips and Venezuela.[150]

316.    The Respondents accordingly ask the tribunal to dismiss the Claimants' defence.

ARBITRAL TRIBUNAL DETERMINATION

317.    The Claimants have argued that there was no Call Event on account of ConocoPhillips requesting Seller Damages from PDVSA rather than PPSA under

---

[147] Respondents' Post-Hearing Brief, ¶¶16-18; Statement of Defence and Counterclaims, ¶216.

[148] Respondents' Post-Hearing Brief, ¶32; Statement of Defence and Counterclaims, ¶213.

[149] Respondents' Post-Hearing Brief, ¶32; Statement of Defence and Counterclaims, ¶¶214-215; Exhibit R-95, Letter from Curtis, Mallet-Provost, Colt & Mosle LLP to Counsel for Respondents, October 19, 2011; Exhibit R-85, Documentation of Merey shipments to Houston Refining and Hovensa between January 1, 2009 and August 28, 2009 (produced by the Claimants on December 7 and 16, 2011, pursuant to the Tribunal's Ruling of November 22, 2011).

[150] Respondents' Post-Hearing Brief, ¶21; Statement of Defence and Counterclaims, ¶217.

the COSA. The tribunal agrees with the Respondents that this argument is misplaced. The cover letters to the Buyer Monthly Reports are addressed to PDVSA and PPSA. Both the COSA and the SCOSA are cited in the subject field of those cover letters and each cover letter requests payment for Seller Damages pursuant to Section 2.8(d) of the COSA. Clearly, by requesting payment under the COSA, the highly sophisticated addressees would understand who would be responsible for paying the Seller Damages. New York law presumes that parties have understood the terms of their agreements.[151] The obligation rests on the Claimants, having received the Buyer Monthly Report to understand their obligations and the potential consequences of receiving such demands.

318.  Contrary to the Claimants' contention, the tribunal finds that the Respondents were careful in the detail put in each Buyer Monthly Report and both PDVSA and PPSA had ample opportunity to dispute the Buyer Monthly Reports. They did not do so. The Claimants cannot now bring this objection. Accordingly, the tribunal finds that Buyer Monthly Reports sent to PPSA and PDVSA were proper notice of payments due and owing to ConocoPhillips.

319.  The next issue is whether a force majeure existed which would excuse both PPSA's and PDVSA's obligations under the COSA and SCOSA respectively.

320.  Under the COSA, the force majeure clause provides the following, in part:

> An "Event of Force Majeure" is an event or circumstance resulting from a cause beyond the reasonable control of Seller, Buyer and their respective Affiliates, which could not have been prevented or remedied by any such Person's exercise of due diligence, and shall be deemed to include, but not be limited to:… embargo or export or import restriction; restriction of production, rationing or allocation of same, whether imposed by law, decree or regulation of any governmental authority;…[152]

---

[151] Exhibit RL-58, *Moon Choung v. Allstate Ins. Co.*, 283 A.D.2d 468, 724 N.Y.S.2d 882 (N.Y. App. Div. 2001).

[152] Exhibit R-1, COSA, Section 10.1.

**321.** In order to rely on this force majeure clause, the Claimants have the onus of proving that: (1) there was a restriction/rationing "imposed by law, decree or regulation of any governmental authority"; and (2) such governmental restriction was beyond the reasonable control of PPSA.

**322.** The Claimants did not present any evidence of a written law, decree or regulation from the Ministry. It seems that this ministerial instruction was oral only. The only evidence of the ministerial instruction referenced in the PDVSA letter of December 31, 2008 is that a direction was issued to PDVSA orally. Ms. Blanco testified:

> Q. Now the Order from the Ministry to PdVSA, was given in writing, to your knowledge?
>
> A. No.[153]

**323.** It is clear that Ms. Blanco herself only learned second hand of the supposed ministerial instruction. The central terms in which such instruction may have been issued were not directly proven in this case. The best evidence of the ministerial order is the wording in the correspondence sent by PDVSA to the ConocoPhillips Parties on December 31, 2008. What weight can be given by the tribunal to a ministerial order given "orally"? The Claimants have argued that since Venezuelan law permits ministerial instructions to be given verbally to PDVSA, the order from the ministry has the force of law.[154] The formality of a published resolution for an internal decision by the Ministry directed to PDVSA is not required.[155] The tribunal accepts this. It is understood that not all administrative orders from a Ministry to a specific decentralized entity need to be published in the Official Gazette. The concept that is being confused by the Claimants

---

[153] Transcript, pp. 517-518.

[154] Reply to Statement of Defence, Statement of Defence to Counterclaims and Statement of New Claims, ¶81.

[155] Exhibit CL-78, Allan R. Brewer-Carias, 23 Revista de Derecho Publico 77 (1985), pp. 85-86; Reply to Statement of Defence, Statement of Defence to Counterclaims and Statement of New Claims, ¶82.

however is the *nature* of the instruction given to the decentralized entity, in this case PDVSA. The Claimants summarize Venezuelan law on this point as follows:

> The Organic Law of Administrative Proceedings establishes different notice requirements for administrative acts depending on whether the act is general or specific. Under Article 72 of the Organic Law of Administrative Proceedings, general administrative acts, which are acts that **affect a non-specific amount of parties**, must be published in the Official Gazette unless the act is inter-administrative....Under Article 73 of the Organic Law of Administrative Proceedings, specific administrative acts, which are acts that **affect a determinate amount of parties** require notification to all interested parties in order to give the interested parties an opportunity to avail themselves of any administrative or judicial remedies.[156] [emphasis added]

324.   The question, therefore, is reduced to determining who was affected by the Ministry's instruction? The tribunal, for the reasons that follow, finds that the instructions affected ConocoPhillips specifically and accordingly notification should have been issued to that party. Since a written notification was not issued to ConocoPhillips, the Ministry's instruction does not qualify as a "law, decree or regulation of any governmental authority".

325.   What was the instruction given to PDVSA? There is a lack of direct evidence on the ministerial instruction. The Claimants submitted that the Ministry gave general directions to PDVSA to "reduce the production and export of crude oil".[157] On the face of it, the instruction does appear to be of general applicability and affect a non-specific number of parties. However, the tribunal is persuaded, for the reasons developed in Paragraph 331, *infra*, that even though the instruction may have been general, it was in effect carried out as a specific instruction, directed at ConocoPhillips.

---

[156] Reply to Statement of Defence, Statement of Defence to Counterclaims and Statement of New Claims, ¶78 citing to Exhibit CL-76, Organic Law of Administrative Proceedings, Article 72.

[157] Blanco Witness Statement, ¶¶6-7. Reply to Statement of Defence, Statement of Defence to Counterclaims and Statement of New Claims, ¶81.

Ms. Blanco testified on this issue during her cross-examination:

> Q. We agree that OPEC itself does not decide upon which specific types of crude should be restricted in production or export; correct?
>
> A. Yes
>
> Q. Let's see if I understand how this worked, Ms. Blanco. The Ministry took the OPEC curtailment and ordered PdVSA to implement the reduction decided by OPEC; correct?
>
> A. Yes, that is my understanding.
>
> Q. So effectively, the Ministry passed on the OPEC curtailment to PdVSA, and PdVSA then executed that in accordance with its— then PdVSA simply executed that OPEC curtailment; correct?
>
> A. Yes, that is what I understand.[158]

326.   Ms. Blanco further testified that:

> Q…PdVSA would have to implement the OPEC restrictions and consequently decide the specific crudes that would be selected for curtailment in order to comply with the general requirement; correct?
>
> A. Yes.
>
> Q. So PdVSA would decide, for example, that it would limit production of crude such as Merey or BCF-17 or other crudes to comply with the OPEC curtailment?
>
> A. Yes.[159]

327.   Based on this evidence, the tribunal finds that the decision to limit the production and export of Merey Crude, specifically, came down to PDVSA. The Ministry did not explicitly ask PDVSA to curtail the crude oil that was shipped to Merey Sweeny. It simply gave general curtailment directions. It is PDVSA that made the decision to cut the supply to ConocoPhillips and therefore interpreted the ministry's order how it saw fit. The tribunal finds this problematic. PDVSA was at

---

[158] Transcript, pp. 517-518.

[159] Transcript, p. 519.

the heart of the decision to cut-off supply to Merey Sweeny. Since the tribunal has very limited evidence as to what were the terms of the ministerial instruction and since the actions of PDVSA show that, in practice, PDVSA curtailed the supply to ConocoPhillips specifically, the tribunal is not persuaded that the Ministry's instruction was general in nature and did not need to be formalized or published. Accordingly, the Claimants have not proven their claim that the Ministry's instructions to reduce the production and export of Crude Oil was a decree, law or regulation made pursuant to Section 10.1 of the COSA.

328.   Moreover, the Claimants' force majeure claim also fails on the second element of the force majeure test found in Section 10.1 of the COSA. The ministerial direction was not "a cause beyond the reasonable control of Seller". This notion of "beyond reasonable control" is crucial to any force majeure claim.   The PDVSA Parties must prove that they were unable to control the Event of Force Majeure. It cannot be said that the decision to cut-off Merey Crude was beyond the reasonable control of PPSA and its parent, PDVSA. On that basis, the Claimants' force majeure claim falls short. Neither PPSA nor PDVSA can rely on their own decision as an excuse not to perform under the COSA.

329.   The tribunal is therefore satisfied that no Event of Force Majeure excused PPSA's breach of its obligation to supply Crude Oil under the COSA. Accordingly, the tribunal determines that PPSA's failure to pay Seller Damages under the COSA gave rise to a Call Event.

330.   In relation to the SCOSA, the tribunal finds that the evidence on the record does not support the Claimants allegation that there was a "general embargo" or "regulatory measure of general applicability" in place that prohibited the export of Crude Oil.

331.   As the tribunal has already determined, the OPEC curtailment notice was given orally by the Ministry to PDVSA and the Ministry did not specify which specific types of crude should be restricted in production or export. It was PDVSA that effectively decided to cut Crude Oil to Merey Sweeny. For the embargo to be

general, it would be expected to be enforceable in the same way against all the crude oil purchasers. The evidence shows, however, that at the same time PPSA stopped delivering crude oil to the Joint Venture, other U.S. refineries were receiving crude oil from PPSA. Mr. Calvert testified that he learned that Hess Corporation had received a regular supply of Venezuelan heavy crude oil, including Merey Crude, and that Lyondell's supply of Venezuelan crude (including Merey) was reduced by less than 50 percent.[160]

332.   While the evidence is indirect, it appeared to be well known that PDVSA gave the instruction to PPSA to stop the supply of Crude Oil to Merey Sweeny specifically. The fact that other crude oil purchasers like Hess, Lyondell, Houston Refining and Hovensa continued to receive heavy crude oil is persuasive evidence that no "general embargo" or "regulatory measure of general applicability" existed in this case. In the tribunal's opinion, to be able to successfully argue a defence of force majeure, PDVSA was obliged to show that the cut-off of Crude Oil was beyond its reasonable control. PDVSA was the directing mind behind the specific cut-off that happened at Merey Sweeny. PDVSA could have supplied alternative crude oil because it was supplying heavy crude oil to other companies. The tribunal therefore finds that the PDVSA Parties' force majeure defence fails.

333.   Pursuant to these findings, the tribunal is satisfied that PDVSA was not excused from its obligation under Section 2.1 of the SCOSA to either supply Replacement Crude Oil or pay the Seller Damages. Accordingly, PDVSA's and PPSA's payment obligations for Seller Damages under the SCOSA and COSA were breached. The tribunal determines, as a result, that a Call Event occurred.

334.   In view of the tribunal's determination that there was a Call Event and that no alleged fiduciary duty or duty of good faith or fair dealing prevented ConocoPhillips from exercising its rights under the Transfer Agreement, it follows that the Call Option was validly exercised. In summary, the requisite elements of

---

[160] Calvert Witness Statement, ¶21.

Section 4.1 of the Transfer Agreement were satisfied when ConocoPhillips exercised the Call Option:

**(a)**   PPSA stopped delivering Crude Oil to the Joint Venture;

**(b)**   ConocoPhillips submitted Buyer Monthly Reports to PPSA and PDVSA detailing Seller Damages for January, March, April, June, July and August 2009, all in accordance with Section 2.8 of the COSA;

**(c)**   Neither PPSA nor PDVSA disputed the Seller Damages in the 10 days allocated for such challenge under Section 2.8(d) of the COSA or 2.1 of the SCOSA;

**(d)**   PDVSA did not supply Replacement Crude Oil pursuant to Section 2.6 of the SCOSA;

**(e)**   PPSA did not pay the Seller Damages in the ninety day cure period;

**(f)**   PDVSA did not pay the Seller Damages in the ninety day cure period; and

**(g)**   As of June 1, 2009, the conditions for a Call Event were satisfied under the Transfer Agreement, Exhibit A at A-1.

**335.**   When ConocoPhillips exercised the Call Option on August 28, 2009, it did so fully in accord with the contractual requirements of the Transfer Agreement. There will, therefore, be an award for a declaration that ConocoPhillips' exercise of the Call Option was valid and effective. The Claimants' claims are denied.

## The Respondents' Counterclaims

**336.**   The Respondents' first counterclaim, the Aggregate Lookback Adjustment claim, originated in the Amended Request for Arbitration in the ICC Case No. 17366/JRF, which was later consolidated with ICC Case No. 16982/JRF to form the present consolidated case, ICC Case No. 16982/JRF/CA/ASM (C-

17336/JRF). The Respondents' other counterclaims were raised in the consolidated case.[161]

## Counterclaim I – Aggregate Lookback Adjustment

337. ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████

338. ████ ████████ ████████ ███████ ██████ █████ ██████ ████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████ ███████

339. ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████ ████████████████████ █ ██
███████████████████████████████████████████
██████████

---

[161] Respondents' Amended Answer with Counterclaims, dated February 18, 2011.
[162] ████████████████████████ █████



340.

341.

342.

343.

163

164



**344.**

**345.**









357.

358.

359.







**368.**

**369.**



**370.**

**371.**

**372.**



**373.**

**374.**





**375.** ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

**376.** ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████

**377.** ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████

**378.** ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████

**379.** ████████████████████████████████████████████
████████████████████████████████████████████

191 ████████████████████████



380.

381.

382.

383.





386.



















**406.**

**407.**

217

-141-



**Counterclaim II – Seller Damages Claims**

412.    Following notice from the PDVSA Parties that they would not supply Crude Oil
under the COSA or Replacement Crude Oil under the SCOSA for February 2009,
the Respondents informed the Claimants that they would seek alternate crude

supplies and would submit Buyer Monthly Reports detailing Seller Damages accruing as a result of the cessation in supply.[218]

413.   Respondents claim approximately US $16 million in Seller Damages from PPSA and PDVSA pursuant to the COSA and SCOSA, respectively, for the months of January, March, April, June, July and August 2009.

*Position of the Respondents*

414.   The Respondents submit PPSA and PDVSA are liable for six months' worth of Seller Damages on the following basis:

(a)   PPSA and PDVSA are obligated under the COSA and the SCOSA, respectively, to provide ConocoPhillips with monthly volumes of Crude Oil;

(b)   Section 2.7 of the COSA makes PPSA liable to ConocoPhillips for Seller Damages if PPSA fails to meet its supply commitments for a given month, unless that failure is excused by an Event of Force Majeure or an Operational Limitation. Section 2.6 of the SCOSA incorporates Section 2.7 of the COSA, rendering PDVSA liable for the performance of PPSA's COSA obligations, including its liability for Seller Damages;

(c)   As required by Section 2.8(b) of the COSA, ConocoPhillips notified both PPSA and PDVSA of serial breaches of their COSA and SCOSA obligations through the delivery of Buyer Monthly Reports for January 2009, March 2009, April 2009, June 2009, July 2009 and August 2009. PPSA and PDVSA were obligated to pay the Seller Damages claimed in each Buyer Monthly Report by the Damages Due Date (as that term is defined in the COSA); and

---

[218] Calvert Witness Statement, ¶20; Exhibit R-72, E-mail from John Calvery (ConocoPhillips), Beatriz Blanco (PDVSA) and Carola Bejarano (PDVSA), February 26 through March 4, 2009.

**(d)**     PPSA and PDVSA neither paid nor disputed the Seller Damages claimed by ConocoPhillips in the Buyer Monthly Reports in accordance with the relevant contractual terms.

415.   As a result, the Respondents claim they are entitled to Seller Damages in the amount of US $16,487,833 in addition to the Call Option remedy.

*Position of the Claimants*

416.   The Claimants argue that the Respondents never claimed Seller Damages from PPSA as required by Section 2.8(b) of the COSA, and say that it is now too late to do so. In the alternative, the Claimants submit that an Event of Force Majeure excused PPSA's non-supply of Crude Oil.

417.   The PDVSA Parties note that under Sections 2.7 and 10.1 of the COSA, an Event of Force Majeure excuses any obligation to pay Seller Damages. The Claimants say that the Respondents had accepted that an Event of Force Majeure under the COSA had occurred, thus excusing PPSA from paying Seller Damages.[219] Accordingly, it is argued that ConocoPhillips never claimed Seller Damages from PPSA within 20 days following the end of each relevant month as required by Section 2.8(b) of the COSA. As a result, the Claimants say ConocoPhillips lost its right to claim Seller Damages for each of the months at issue.

418.   Alternatively, the Claimants argue that an Event of Force Majeure excused any obligation to pay Seller Damages. As stated previously, under Section 2.1 of the SCOSA, PPSA has no obligation to pay Seller Damages if the governmental act qualifies as:

> [A] "regulatory measure of general applicability having the effect of temporarily impeding the production or export of Crude Oil in the Republic of Venezuela."

---

[219] Exhibit C-22, Letter from Samantha Hudgins, ConocoPhillips, to Merey Sweeny, c/o PDV Sweeny and ConocoPhillips, dated February 10, 2009.

419.  As for PDVSA's liability for Seller Damages, the Claimants submit PDVSA's obligation under the SCOSA was never engaged. Furthermore, they say the Respondents cannot claim both the PDVSA Parties' Joint Venture interest and Seller Damages. This would result in a compounded penalty and accumulated remedies are impermissible under Section 4.1 of the Transfer Agreement.

420.  Section 4.1 of the Transfer Agreement provides that the acquisition of Claimants' Joint Venture Interest pursuant to the exercise of the Call Option must be the "sole and exclusive remedy" for the Call Event:

> "If [ConocoPhillips] exercises the Call Option, the resulting Transfer following its consummation shall constitute the sole and exclusive remedy of [ConocoPhillips] and its Affiliates for such Call Event, without prejudice, however, to the right of [ConocoPhillips] to recover damages it suffered prior to such consummation as a result of such Call Event...."

421.  The Claimants dismiss the Respondents' argument that the Seller Damages themselves are "separate damages incurred prior to the Call Event." They say the purported Call Event – the failure to pay Seller Damages for the months of January and March 2009 within ninety days – constitutes precisely the same damages that Respondents seek here. Moreover, to the extent that the Call Event includes a ninety-day delay in payment, the COSA itself provides for the inclusion of any interest that has accrued on the Seller Damages claims, and Claimants submit the Respondents are seeking compensation for that interest here.

422.  In any event, the Claimants argue that the accumulation of remedies to address the same purported injury further solidifies the penal nature of the Call Option, and makes the Call Option even more draconian and violative of New York public policy. Therefore, the tribunal is asked to dismiss the Respondents' Second Counterclaim.

**ARBITRAL TRIBUNAL DETERMINATION**

423.   *Prima facie*, the tribunal is persuaded by the Respondents' evidence that they followed the proper procedure under Sections 2.7 and 2.8 of the COSA for the demand of Seller Damages from the PDVSA Parties. For the months of January, March, April, June and July and August, ConocoPhillips submitted Buyer Monthly Reports within 20 days following the end of each month as required by Section 2.8(b).

424.   Moreover, the tribunal has already determined at paragraph 332 that the force majeure defence raised by the Claimants with regard to the Call Option fails. It follows that the Claimants' argument that they did not have to pay Seller Damages, because an Event of Force Majeure excused their obligation to pay Seller Damages, also fails for the same reasons.

425.   It is necessary to address the issue of whether the Call Option is effectively the "sole and exclusive" remedy of ConocoPhillips, as argued by the Claimants. If so, it would bar any additional remedy for Seller Damages. The tribunal considers two provisions. The first is found in Section 2.8(e) of the COSA:

> ...Except for claims filed by Buyer under Section 5.6 or Section 5.7, the payment of any Seller Damages due under Section 2.7 shall be Seller's sole and exclusive liability and **Buyer's sole and exclusive remedy** with respect to any failure by Seller to supply and sell Crude Oil to Buyer under this Agreement.

426.   The second relevant provision is Section 4.1 of the Transfer Agreement, which provides in part:

> ...If Phillips exercised the Call Option, the resulting Transfer following its consummation, shall constitute the **sole and exclusive remedy** of Phillips and its Affiliates **for such Call Event**, without prejudice, however, to the right of Phillips **to recover damages it suffered prior to such consummation as a result of such Call Event**...[emphasis added]

427.   The tribunal is of the view that the only reasonable interpretation of Section 2.8(e) is that had PDVSA paid the Seller Damages, then the Seller Damages received by ConocoPhillips would have been the Respondents' sole and

exclusive remedy. Because PDVSA did not pay any Seller Damages, Section 2.8 does not apply to the facts of this case.

**428.** Section 4.1 of the Transfer Agreement, however, is applicable in this case. The tribunal interprets this section to mean that the Transfer is the sole and exclusive remedy of ConocoPhillips except for damages that had accrued prior to the effective date of the Transfer.

**429.** The Respondents' basis for exercising the Call Option is the PDVSA Parties' failure to pay the Seller Damages for the months of January and March, 2009 which gave rise to Call Events on June 1st and August 1st, 2009 respectively. Based on the letter ConocoPhillips sent on August 28, 2009, the day it exercised the Call Option, the consummation of the Transfer occurred as of that date:

> In particular, both PDVSA P&G and PDVSA failed to perform their respective obligations under the COSA and SCOSA. Such failure occasioned damages as set forth in the Buyer Monthly Reports (as defined in the COSA) for January 2009, March 2009, April 2009, June 2009, and July 2009. **The payment obligations detailed in the January 2009 and March 2009 Buyer Monthly Reports have remained uncured for 90 days**, giving ConocoPhillips the right to exercise the Call Option at this time.
>
> […]
>
> As no funds are required to be transferred pursuant to this exercise, the consummation of the acquisition is self-executing and ConocoPhillips and Sweeny Coker Investor Sub, Inc. shall assume the PDV Sweeny/PDV Texas Joint Venture Interest **as of the date of this notice**.[220] [emphasis added]

**430.** It follows that the Respondents cannot recover the Seller Damages for the months of January and March 2009, as these damages would constitute an additional remedy "for such Call Event" which is impermissible from the language of Section 4.1 of the Transfer Agreement. The tribunal is also satisfied that the Respondent cannot recover the Seller Damages for the month of August 2009 as

---

[220] Exhibit C-2, Letter from Janet L. Kelly, ConocoPhillips Company, to PDV Sweeny, Inc. and PDV Texas, Inc., dated August 28, 2009.

those damages were not incurred "prior to such consummation" of the Transfer. Tellingly, the Respondents did not include the August Seller Damages in their letter of August 28, 2009.

431. The tribunal accepts, however, that the Respondents are entitled to their claimed Seller Damages for the months of April, June and July 2009. The amounts of Seller Damages for those months are set out in the Buyer Monthly Reports for those months, as follows:

> Seller Damages for April 2009: $2,174,245[221]
>
> Seller Damages for June 2009: $276,713[222]
>
> Seller Damages for July 2009: $2,613,080[223]

432. The tribunal will therefore award Seller Damages in favor of the Respondents in the total amount of US $5,064,038.

## Counterclaim III – Demurrage Claims

433. 

434.

---

[221] Exhibit R-25, Buyer Monthly Report for April 2009, submitted by ConocoPhillips to Petroleo and PDVSA, May 19, 2009.

[222] Exhibit R-26, Buyer Monthly Report for April 2009, submitted by ConocoPhillips to Petroleo and PDVSA, July 20, 2009.

[223] Exhibit R-27, Buyer Monthly Report for April 2009, submitted by ConocoPhillips to Petroleo and PDVSA, August 20, 2009.

[224]

███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████

████████████████████████████

**435.**  ████  ████████  ███  █████  ████████  ██████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████████

**436.**  ████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████

**437.**  ████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████





**438.**

**439.**



440. ███████████████████████████████████████████████████

441. ███████████████████████████████████████████████████

442. ███████████████████████████████████████████████████

228 ████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

## The Claimants' New Claims

443. ████████████████████████████ ████████ ████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████

444. ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████

445. ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████

## New Claim I – Transfer to Phillips 66 is a Breach of the Transfer Agreement

███████████████

446.  ████████████████████████████████████████████
      ████████████████████████████████████████████
      ████████████████████████████████████████████
      ██████████████████████████

447.  ████████████████████████████████████████████
      ████████████████████████████████████████████
      ████████████████████████████████████████████
      ████████████████████████████████████████████
      ████████████████

448.  ████████████████████████████████████████████
      ████████████████████████████████████████████
      ████████████████████████████████

449.  ████████████████████████████████████████████
      ████████████████████████████████████████████
      ████████████████████████████████████████████
      ████████████████████████████████████████████
      ███████████████████████████████

450.  ████████████████████████████████████████████
      ███████████████████████████████

      ██    ███████████████████████████████████
            ███████████████████████████████████
            ███████████████████████████████████
            ██████████████████████████████

      ██    ███████████████████████████████████
            ███████████████████████████████████







**New Claim II – Transfer to Phillips 66 Violates the COSA and SCOSA**

457.

458.

459.















481.

482.

**483.** 

**484.**

**485.**

-164-



**Negative Margin Adjustment Issue**

488. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████

489. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

490. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████

251 ████████████████████████
252 ███████████████████████████████████████████



491.



492.



**493.**

**494.**

## J.   INTEREST

**495.**   In a separate Procedural Order, the tribunal will invite the parties to make submissions on interest together with the parties' submissions on costs following the issuance of this Partial Award.

## K.   COSTS

**496.**   By correspondence dated 27 March 2013, the tribunal has previously advised the parties that it will address costs after this Partial Award has been issued. The tribunal will issue a Procedural Order with further directions with respect to costs submissions upon notification of this Partial Award to the parties.

## L.   PARTIAL AWARD

**497.**   Having considered the evidence in this case and the submissions and arguments of the parties, and for the reasons given in this award, the tribunal determines and awards, as follows:

**Claimants' Claims in Statement of Claim**

   **(a)**   With respect to the Claimants' claims brought in its Statement of Claim:

   **(i)**   Denies the Claimants' claims in their entirety; and

   **(ii)**   Declares that the Respondents properly exercised the Call Option on August 28, 2009, and that COP and Sweeny Sub thereby validly acquired the Merey Sweeny interests of PDV Texas and PDV Sweeny on that date.

**Counterclaims of Respondents**

   **(b)**   With respect to the Respondents' Counterclaims:

   **Counterclaim I – Aggregate Lookback Adjustment**

(i)     Declares that this tribunal has jurisdiction to determine breaches of the COSA;

(ii)    Declares that PPSA is not in breach of the COSA with regards to its obligation to jointly calculate the Aggregate Lookback Adjustment as provided in Exhibit D to the COSA;

(iii)   Denies the Respondents' claim for damages in relation to their Aggregate Lookback Adjustment claims;

(iv)    Declares that the Respondents' Aggregate Lookback Adjustment claims for the second semester of 2008 and the first and second semesters of 2009 were validly and timely brought, and the duty for the parties to jointly calculate the Aggregate Lookback Adjustment for those periods remains outstanding together with all their other rights and obligations under the COSA;

(v)     Declares that there is no Event of Force Majeure pursuant to the COSA and as a result, the value of $U_F$ in the lookback formula in the COSA is not zero;

**Counterclaim II – Seller Damages Claims**

(vi)    Declares that the Respondents are entitled to payment by PPSA (under the COSA) and by PDVSA (under the SCOSA and the COSA Guarantee) of Seller Damages and awards Seller Damages to the Respondents in the amount of US $5,064,038;

**Counterclaim III – Demurrage Claims**

(vii)   Reserves its decision on whether to award costs in favor of the Respondents in relation to the demurrage claims based on the submissions on costs by the Parties following the release of this Partial Award, but makes no other award in relation to such claims;

**Claimants' New Claims**

**(c)**    With respect to the Claimants' New Claims:

    **(i)**    Dismisses New Claim I in its entirety;

    **(ii)**    Dismisses New Claim II in its entirety; and

    **(iii)**    Declares that the Transfer was valid and that Phillips 66 Company now validly holds the interests in the agreements relating to the Merey Sweeny joint venture, including but not limited to the COSA and the SCOSA, previously held by ConocoPhillips Company and Sweeny Sub.

**Negative Margin Adjustment Claim**

**(d)**    With respect to the Negative Margin Adjustment Claim, dismisses the Respondents' claim for a Negative Margin Adjustment; and

**Other Claims**

**(e)**    Dismisses all other claims and matters in dispute.

**Place of arbitration:**      New York City, New York, U.S.A.

**Date:**                     April _14_, 2014.


**BRUNO W. BOESCH, ESQ.**
Co-Arbitrator

**ABRAHAM D. SOFAER, ESQ.**
Co-Arbitrator


**DAVID. R. HAIGH, Q.C.**
Chairman