UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
PDV Sweeny, Inc., et al.,

                    Petitioners,

        —v—

ConocoPhillips Co., et al.,

                    Respondents.
```

14-cv-5183 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

This case arises out of the Partial Award issued by an International Court of Arbitration panel (the "Panel") in a commercial dispute between former joint partners in an oil refining operation. As part of that operation, PDV Sweeny, Inc. ("PDV Sweeny") and PDV Texas, Inc. ("PDV Texas" and collectively with PDV Sweeny, the "Petitioners") acted as suppliers of Venezuelan crude oil. Respondents ConocoPhillips Company ("ConocoPhillips") and Sweeny Coker Investor Sub, LLC ("Sweeny Sub" and collectively with ConocoPhillips, the "Respondents") managed the facility which processed the crude oil into saleable products. Disagreements between the parties led to the triggering of a contract provision which automatically dissolved the joint venture. After the dissolution, the parties proceeded to arbitration before the Panel. Petitioners now move to vacate a portion of the Panel's ruling, while Respondents cross-petition for the Court to confirm, recognize, and enforce the award. *See* Dkt. No. 23. For the reasons below, Petitioners' petition is DENIED and Respondents' cross-petition is GRANTED.

## I.     BACKGROUND

### A.     Parties

This case principally concerns a joint venture between ConocoPhillips and Petroleos de Venezuela, S.A. ("PDVSA").  *See* Dkt. No. 28, Ex. 1 ("Partial Award") ¶ 1.  The venture involved a number of subsidiaries and a complex web of agreements governing the supply and management of the oil refining operation.  ConocoPhillips is a Delaware corporation and the parent of Sweeny Sub.  *Id.* ¶ 13.  PDVSA is a Venezuelan corporation wholly owned by the Venezuelan government.  *Id.* ¶ 10.  PDV Sweeny and PDV Texas are both indirectly wholly owned subsidiaries of PDVSA.  *Id.* ¶¶ 8, 9.  Two entities comprised the actual joint venture: Merey Sweeny, L.P., a Delaware limited partnership, and Sweeny Coker L.L.C. ("Sweeny Coker"), a Delaware limited liability corporation.  *Id.* ¶ 16.  PDV Sweeny and Sweeny Sub were limited partners in Merey Sweeny, L.P., with each entity possessing a 49.5 percent stake.  *Id.* The remaining 1 percent interest in the partnership was controlled by Sweeny Coker, which itself was owned in equal part by PDV Texas and ConocoPhillips.  *Id.*

### B.     The Joint Venture

In the late 1990s, ConocoPhillips, PDVSA, and their respective subsidiaries commenced a joint venture to design, construct, own, supply, and operate refining facilities within the broader confines of a large refining complex owned by ConocoPhillips in Texas.  *Id.* ¶ 1.  This was known as the "Sweeny Refinery."  *Id.* ¶ 110.  PDVSA and its affiliates supplied crude oil from Venezuela which was then processed by ConocoPhillips, which had greater refining and operational expertise than PDVSA.  *Id.* ¶ 111.  ConocoPhillips' interest in the arrangement was that it was able to secure a long-term, low-cost source of crude oil from Venezuela, which it was

2

then able to convert into high-value end products.  *Id.*  The Sweeny Refinery and other ancillary

facilities were owned by Merey Sweeny, L.P.  *Id.* ¶ 114.

 A number of agreements governed the relationship between the various parties to the

joint venture.  The obligation of PDVSA and its affiliates to supply ConocoPhillips and the

Sweeny refinery with Venezuelan crude oil was governed by the Amended and Restated Crude

Oil Supply Agreement (the "COSA").  *See* Pizzurro Decl., Ex. 3; Partial Award ¶ 119.  The

COSA, signed in 1999, is governed by Venezuelan law.  *See* Partial Award ¶ 119.  A related

agreement was the Amended and Restated Supplemental Crude Oil Supply Agreement (the

"SCOSA") between PDVSA and ConocoPhillips.  The SCOSA, also governed by Venezuelan

law, obligated PDVSA to assume the responsibility for supplying replacement crude oil, or pay

seller damages, to ConocoPhillips in the event that one of its subsidiaries was prevented from

supplying crude oil under the COSA due to the actions of the Venezuelan government.  *See*

Pizzurro Decl., Ex. 4; Partial Award ¶ 121.

**C.  The Transfer Agreement and the Call Option**

 The agreement most directly at issue in this case, however, is the Transfer Agreement.

That agreement, governed by New York law, restricted the manner in which the parties could

transfer joint venture interests.  *See* Partial Award ¶ 118.  The Transfer Agreement delineated

two categories of joint venture interest transfers.  The first, "authorized transfers," were transfers

voluntarily made by the parties, which the Agreement subjected to certain restrictions.  *See*

Pizzurro Decl., Ex. 2, Art. III.  The second category, "mandatory transfers," concerned certain

compulsory transfers of joint venture assets.  *Id.*, Art. IV.  Mandatory transfers acted as a remedy

for ConocoPhillips in the event of PDVSA's breach.  *See* Partial Award ¶ 118. This was referred

to as the "Call Option," which could be triggered by one of several specifically identified "call

3

events." *See* Pizzurro Decl., Ex. 2, Art IV., Sec. 4.1. Two call events identified by the Transfer Agreement are relevant to this case. The first occurred if a PDVSA subsidiary failed to meet its obligation to supply crude oil under the COSA and that failure remained uncured for 90 days. *Id.* Second, and similarly, a call event occurred if PDVSA failed to make a payment obligation under the SCOSA and that failure remained uncured for 90 days. *Id.* Under either scenario, ConocoPhillips would have the right to exercise the Call Option, automatically allowing it to acquire the joint venture interest of PDVSA and its subsidiaries. *See* Partial Award ¶ 118.

In the event that one of the parties elected to exercise the Call Option, the Transfer Agreement provided two formulas for calculating the purchase price. *Id.* ¶ 165. The party electing to exercise the option held the prerogative to choose the formula. *Id.* Under the first formula, the purchase price was equal to half of eighty percent of the fair value of Merey Sweeny, L.P.[1] *Id.* The second formula set the purchase price equal to eighty percent of the sum of the party's capital contributions to the joint venture (plus any outstanding obligations of the party), minus all capital distributions from the joint venture to the party. *Id.*

Notably, exercise of the Call Option did not automatically trigger the dissolution of the COSA and the SCOSA, meaning that PDVSA and its affiliates would still be contractually required to supply ConocoPhillips with Venezuelan crude oil even if they lost their share of the joint venture. *Id.* ¶ 176. If PDVSA and its affiliates failed to supply crude oil to ConocoPhillips, the COSA and SCOCA both specified that they would be liable for a specific sum of seller damages. *Id.* ¶¶ 119.

---

[1] The fair value was to be determined by the expected future net cash flows of the partnership. *See* Pizzurro Decl., Ex. 4 at Exhibit B.

### D.    The Dissolution of the Joint Venture

In January 2009, the PDVSA parties curtailed their supply of Venezuelan crude oil to

ConocoPhillips due, allegedly, to cutbacks in the production and export of crude oil from

Venezuela. *Id.* ¶¶ 124-126.  ConocoPhillips claimed it was due seller damages under the COSA

and SCOSA and the parties began a correspondence regarding the extent of PDVSA's liability.

*Id.* ¶¶ 127-129.  On August 28, 2009, ConocoPhillips informed PDV Sweeny and PDV Texas

that it was exercising the Call Option under the Transfer Agreement.  *Id.* ¶ 136.  ConocoPhillips

elected to buy the PDVSA share of the joint venture according to the second contractual formula,

which required ConocoPhillips to pay eighty percent of the PDVSA parties' capital contributions

to the joint venture minus all capital distributions from the joint venture to the PDVSA parties.

*Id.* ¶ 165.  Because the PDVSA parties had received dividends from the joint venture totaling

over $1.1 billion, far in excess of their capital contribution of approximately $270 million, this

formula yielded a purchase price of zero dollars.  *Id.* ¶ 168.  In keeping with the Transfer

Agreement, ConocoPhillips was also obligated to assume the PDVSA parties' outstanding debt

obligations, which amounted to approximately $195 million.  *Id.* ¶ 169.  ConocoPhillips elected

not to terminate the COSA or SCOSA and PDVSA and its affiliates resumed shipments of crude

oil in October 2009.  *Id.* ¶ 164.

### E.    The Arbitration

The PDVSA parties commenced arbitration under the ICC Rules of Arbitration on

February 25, 2010.  *Id.* ¶¶ 29-30.  The arbitration concerned a range of disputes between the

parties, only one of which is relevant to the present action.  Namely, the Petitioners challenged

the validity of the Call Option, alleging that it acted as an unenforceable penalty clause under

New York contract law.  *Id.* ¶ 2.  Petitioners contended that the Call Option acted as a penalty

because it resulted in a purchase price of zero dollars for their share of the joint venture, which the ConocoPhillips expert witness to the arbitration valued between $352 million and $540 million. *Id.* ¶¶ 172-177; Pizzurro Decl., Ex. 5. Accordingly, they theorized, its purpose was to compel their performance, rather than provide ConocoPhillips with adequate damages.

On April 14, 2014, the Panel announced its Partial Award. The Panel concluded that the Call Option was valid and enforceable under New York law and could not constitute an impermissible contractual penalty. *Id.* ¶¶ 178-187. The Panel further concluded that the Call Option acted as a valid termination provision for the joint venture, rather than as a liquidated damages or penalty clause. *Id.* ¶¶ 201-206.[2] Petitioners now move to vacate that portion of the Partial Award on the theory that it violates the public policy of New York and the United States. Respondents, in turn, cross-petition for confirmation of the Partial Award and Final Award pursuant to 9 U.S.C. § 9.

## II.    JURISDICTION

The arbitration at issue in this case involved parties from both the United States and Venezuela and is therefore subject to two international conventions concerning enforcement of arbitral awards. First, both countries are signatories to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"). *See* 21 U.S.T. 2517; 330 U.N.T.S. 38 (Dec. 29, 1970). The New York Convention governs the enforcement of arbitral awards stemming from disputes that are "commercial and . . . not entirely between citizens of the United States." *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 391 (2d Cir. 2011) (quoting *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 49 (2d Cir. 2004)). *See*

---

[2] Although it is not at issue in Petitioners' Motion to Vacate, the Panel rendered its Final Award on August 18, 2014. *See* Prevatt Decl., Ex. G. The Final Award granted ConocoPhillips certain pre- and post-award interest, in addition to ordering the Petitioners to pay forty percent of Respondents' legal costs and expenses. *Id.* Respondents' cross-petition seeks confirmation of the Final Award in addition to the entirety of the Partial Award.

*also* 9 U.S.C. § 202.  This case further falls under the Inter-American Convention on

International Commercial Arbitration ("Inter-American Convention") because it arose "from a

commercial relationship between citizens of signatory nations" to that Convention.  *Sanluis*

*Developments, L.L.C. v. CCP Sanluis, L.L.C.*, 498 F. Supp. 2d 699, 702 (S.D.N.Y. 2007).

      The Inter-American Convention specifies that "when both Conventions apply, if a

majority of the parties to the arbitration agreement are citizens of states that are signatories to the

Inter–American Convention and are member states of the Organization of American States, the

Inter–American Convention must govern." *Energy Transp., Ltd. v. M.V. San Sebastian*, 348 F.

Supp. 2d 186, 199 (S.D.N.Y. 2004) (citing 9 U.S.C. § 305).  The parties to this case hail from

Venezuela and the United States, both of which are signatories to the convention and members of

the Organization of American States. The Inter-American Convention therefore governs.  This is

not particularly consequential, as the Inter-American Convention is substantively identical to the

New York Convention and applies concomitantly in this case.  *See, e.g.*, *Productos Mercantiles*

*E Industriales, S.A. v. Faberge USA, Inc.*, 23 F.3d 41, 45 (2d Cir. 1994) (discussing history of

the conventions and concluding that "Congress intended the Inter-American Convention to reach

the same results as those reached under the New York Convention."); *TermoRio S.A. E.S.P. v.*

*Electranta S.P.*, 487 F.3d 928, 933 (D.C. Cir. 2007) ("the relevant provisions of the [Inter-

American] Convention and the New York Convention are substantively identical").

      The Federal Arbitration Act ("FAA") implements the New York Convention and Inter-

American Convention domestically and provides that "[a]n action or proceeding falling under

[either] Convention shall be deemed to arise under the laws and treaties of the United States.

The district courts of the United States . . . shall have original jurisdiction over such an action or

proceeding, regardless of the amount in controversy."  9 U.S.C. § 203. *See also* 9 U.S.C. § 302.

Two kinds of actions or proceedings fall under the New York Convention and therefore give rise

to subject matter jurisdiction in this Court: first, a petition for an order confirming an arbitration

award, *see* 9 U.S.C. § 207, and second, a petition for an order compelling arbitration pursuant to

an arbitration agreement. *See* 9 U.S.C. § 206.  Only one kind of action falls under the Inter-

American Convention, namely, a petition for an order to confirm an arbitration award. *See* 9

U.S.C. § 302.  Because Respondents cross-petition for an order confirming the Partial Award and

Final Award, both the New York Convention and Inter-American Convention, as implemented

by the FAA, provide a jurisdictional basis for this dispute under 28 U.S.C. § 1331.

However, it is important to note that Petitioners' motion to vacate, standing alone, would

necessitate a distinct basis for jurisdiction.  Neither the New York Convention nor the Inter-

American Convention "makes [any] mention of vacatur actions. Courts that have spoken on the

issue, even in dicta, universally agree that federal district courts do not have original jurisdiction

to hear a motion to vacate an arbitral award pursuant to the Convention, *when the motion to

vacate is the sole basis for subject matter jurisdiction.*" *Ingaseosas Int'l Co. v. Aconcagua

Investing Ltd.*, 09-cv-23078, 2011 WL 500042, at *3 (S.D. Fla. Feb. 10, 2011) *aff'd,* 479 F.

App'x 955 (11th Cir. 2012) (collecting cases) (emphasis added).  This is ultimately a moot

consideration here because, first, Respondents' cross-petition for confirmation establishes

jurisdiction and, second, both conventions allow for review of an arbitral award under the

domestic law of the state in which the arbitration occurred and the arbitration in this case

occurred in New York. *See* 21 U.S.T. at 2520, Art. V(1)(e); Inter-American Convention, Art.

V(1)(e). *See also Lander Co. v. MMP Investments, Inc.,* 107 F.3d 476, 478 (7th Cir. 1997)

(Posner, J.) ("[T]he New York Convention contains no provision for seeking to vacate an award,

although it contemplates the possibility of the award's being set aside in a proceeding under local

law . . . and recognizes defenses to the enforcement of an award.")  However, this presages a critical issue in this case; namely, that the Inter-American Convention provides no independent basis for vacatur except for those bases available under domestic law.

## III.   PETITION TO VACATE THE AWARD

Petitioners request that the Court vacate the Partial Award to the extent it found the Call Option provision of the Transfer Agreement to constitute a valid and enforceable contract clause, which they contend in fact acted as an unenforceable penalty.  As a legal basis for vacatur, petitioners argue that "Article 5(2)(b) of the Inter-American Convention empowers this Court to vacate an arbitral decision if 'the recognition or execution of the decisions would be contrary to the public policy ('ordre public') of that State.'"  *See* Pet.'s Br. ¶ 45.  Petitioners' argument is premised on a misreading of the Inter-American Convention and a misunderstanding of the statutory framework governing the Court's ability to vacate and confirm awards.  As the Court now explains, Petitioners' motion to vacate must be denied.

### A.    Relevant Legal Standard

In their motion papers, Petitioners conflate two distinct issues before the Court: the power to vacate an award and the power to recognize, confirm, and enforce an award under the Inter-American Convention.  Petitioners move the Court to vacate a portion of the Panel's Partial Award, yet fail to delineate the proper legal basis for vacating awards under the Convention, instead concluding without basis that "this Court is tasked with undertaking a *de novo* review of the tribunal's legal analysis." Pet.'s Br. ¶ 55.  Petitioners cite no precedent holding that a *de novo* review of arbitral award is appropriate.  Moreover, such a standard of review would contradict "the strong public policy in favor of international arbitration," which mandates a "very limited" review of arbitral awards under the Inter-American Convention "in order to avoid

9

undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.,* 403 F.3d 85, 90 (2d Cir. 2005).  Because Petitioners have failed to do so, the Court now sets out the appropriate standard for reviewing their petition.

The logical starting point for the Court's analysis is the Inter-American Convention, which, as explained, governs the parties' petitions.  "The [Inter-American Convention], however, does not discuss vacating or modifying arbitration awards."  *Am. Life Ins. Co. v. Parra*, 269 F. Supp. 2d 519, 524 (D. Del. 2003).  *See also Lander*, 107 F.3d at 478 ("[T]he [Inter-American] Convention contains no provision for seeking to vacate an award").  Rather, Article V of the convention provides that "recognition and execution of the decision may be refused" on a number of grounds.  *See* Inter-American Convention, Art. V.  These grounds have been described within this Circuit as providing "carefully specified defenses" to the *recognition* of an award.  *Corporacion Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploracion y Produccion*, 962 F. Supp. 2d 642, 654 (S.D.N.Y. 2013) (quoting *Figueiredo Ferraz E Engenharía de Projeto Ltda. v. Republic of Peru,* 665 F.3d 384, 397 (2d Cir. 2011)).  The New York Convention provides identical grounds for refusing to recognize an arbitral award and courts within this Circuit have similarly described these grounds as "defenses" to enforcement.  *See, e.g.*, *Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 405 (2d Cir. 2009); *Zeiler v. Deitsch*, 500 F.3d 157, 164 (2d Cir. 2007) (citing *Encyclopaedia Universalis*, 403 F.3d at 90); *MGM Prods. Grp., Inc. v. Aeroflot Russian Airlines*, 573 F. Supp. 2d 772, 775 (S.D.N.Y. 2003) *aff'd,* 91 F. App'x 716 (2d Cir. 2004) ("In enforcement proceedings under the [New York] Convention, a court may consider only the specific defenses listed in Article V as grounds for refusing to enforce an award.")  In other words, the Convention contemplates

various defenses to a petition to enforce an award, but does not provide an independent basis for seeking vacatur. *See Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 22 (2d Cir. 1997).

While the Inter-American Convention provides no explicit allowance for vacatur, this does not mean that no grounds for vacatur exist for awards governed by the Convention. As part of its implantation by the FAA, the "Inter–American Convention incorporates the [Federal Arbitration Act's] terms unless they are in conflict with the Inter–American Convention's terms." *Productos Mercantiles,* 23 F.3d at 45 (citing 9 U.S.C. § 307). The FAA's provisions regarding vacatur "do not conflict with the Inter-American Convention's terms." *Hernandez v. Smart & Final, Inc.*, 09-cv-2266 (BEN) (NLS), 2010 WL 2505683, at *4 (S.D. Cal. June 17, 2010). "Accordingly, a court applying the [Inter-American] Convention may vacate an arbitration award based on the grounds recognized under the FAA." *Sanluis Developments*, 498 F. Supp. 2d at 702. *See also Banco de Seguros del Estado v. Mut. Marine Offices, Inc.*, 257 F. Supp. 2d 681, 684-85 (S.D.N.Y. 2003) (holding that a court applying the Inter-American Convention may vacate an arbitration award based on the grounds recognized in 9 U.S.C. § 10(a)) (citing *International Ins. Co. v. Caja Nacional de Ahorro v Seguro,* 00-cv-6703, 2001 WL 322005, at *3 (N.D. Ill. Apr. 2, 2001), *aff'd,* 293 F.3d 392 (7th Cir. 2002)). Section 10 of the FAA provides that a district court "may make an order vacating the award upon the application of any party to the arbitration" in four circumstances: "(1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing . . . or in refusing to hear evidence . . .; or (4) where the arbitrators exceeded their powers . . ." *See* 9 U.S.C. § 10(a).

Finally, the Second Circuit has recognized one non-statutory path to vacatur under the

New York Convention and the Inter-American Convention. "In addition to the statutory

provisions, an award may be vacated if it was rendered in 'manifest disregard of the law.'"

*Banco de Seguros*, 257 F. Supp. 2d at 685 (quoting *Greenberg v. Bear, Stearns & Co.,* 220 F.3d

22, 28 (2d Cir. 2000)).  The continued existence of this doctrine has been cast into doubt by the

Supreme Court's decision in *Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576 (2008),

which held that parties to an arbitration could not contract around provisions of the FAA

governing vacatur and modification.  *See T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592

F.3d 329, 342 (2d Cir. 2010) (noting the "ambiguity surrounding the interpretation of the

manifest disregard standard in the wake of *Hall Street*").  *See also* J.P. Duffy, Hall Street One

Year Later: The Manifest Disregard Debate Continues, 19 Am. Rev. Int'l Arb. 193, 196 (2008)

(detailing the emergence of a circuit split on the continued applicability of the manifest disregard

doctrine).

The Second Circuit has concluded that the manifest disregard doctrine "remains a valid

ground for vacating arbitration awards," but cautions that it be treated primarily as a form of

"judicial gloss" on the specific grounds for vacatur specified by the FAA.  *See Stolt-Nielsen SA*

*v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 94 (2d Cir. 2008).  On separate grounds, that decision

was reversed and remanded by the Supreme Court, although the Court's opinion explicitly

refused to opine on the continued vitality of the manifest disregard doctrine.  *See Stolt-Nielsen*

*S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n.3 (2010).  Accordingly, courts within the

Second Circuit have continued to routinely apply the doctrine.  *See, e.g., Pasha v. Janseshki*, 14-

cv-1870, 2015 WL 1061164, at *1 (2d Cir. Mar. 12, 2015); *Sayigh v. Pier 59 Studios, L.P.*, 11-

cv-1453 (RA), 2015 WL 997692, at *5 (S.D.N.Y. Mar. 5, 2015); *Trustees for the Mason Tenders*

12

*Dist. Council Welfare Fund, Pension Fund, Annuity Fund, & Training Program Fund v.*

*Nacirema Envtl. Servs. Co.*, 13-cv-3574 (SAS), 2015 WL 1026695, at *1 (S.D.N.Y. Mar. 9,

2015).

The doctrine allows for the vacatur of an award "only if a reviewing court . . . find[s]

both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored

it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly

applicable to the case." *Wallace v. Buttar*, 378 F.3d 182, 189-90 (2d Cir. 2004) (internal

citations removed).  The Second Circuit has emphasized that the doctrine requires more than

"error or misunderstanding with respect to the law." *Id.* (quoting *Hoeft v. MVL Group, Inc.*, 343

F.3d 57, 69 (2d Cir. 2003)).  In sum, "[a] federal court cannot vacate an arbitral award merely

because it is convinced that the arbitration panel made the wrong call on the law. On the

contrary, the award should be enforced, despite a court's disagreement with it on the merits, if

there is a *barely colorable justification* for the outcome reached." *Id.* (internal quotations

removed) (emphasis in original).

The Second Circuit has steadfastly refused to expand the possible routes to vacatur under

the Inter-American Convention and the New York Convention beyond the manifest disregard

doctrine and those grounds explicitly enumerated in the FAA.  *See Porzig v. Dresdner,*

*Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007) ("To the extent our sister

courts may have broadened somewhat the path to vacatur of an arbitration award, we decline to

wander from the narrow one embodied in our own jurisprudence. Thus, we will vacate an award

only upon finding a violation of one of the four statutory bases [in the FAA], or, more rarely, if

we find a panel has acted in manifest disregard of the law.") *See also Vaughn v. Leeds, Morelli*

*& Brown, P.C.*, 315 F. App'x 327, 330 (2d Cir. 2009) (only the "severely limited" and "highly

deferential" doctrine of manifest disregard exists as a non-statutory basis for vacatur).

Accordingly, the Court now must determine whether or not Petitioners are entitled to vacatur

under the statutory grounds of the FAA or the doctrine of manifest disregard.

### B.    Application

Because Petitioners seek to set aside the Partial Award on the basis of a non-existent

public policy rationale for vacatur, their motion does not directly address whether the arbitral

Panel manifestly disregarded the law or whether one of the four statutory grounds for vacatur

under the FAA is applicable.  The Court will construe Petitioners' motion as seeking to vacate

the Partial Award under those legal grounds actually available to them.

Fundamentally, Petitioners contend that the Panel grossly misapplied well-established

New York contract law regarding the enforceability of contract provisions operating as a penalty.

*See* Pet.'s Br. ¶¶ 55-82.  They do not allege anything falling within the ambit of the FAA's

vacatur provisions, such as that any members of the Panel were impartial, corrupt, refused to

hear evidence, exceeded their powers, or otherwise engaged in some form of malfeasance.

Accordingly, Petitioners' only recourse for vacatur is the "severely limited" doctrine of manifest

disregard.  *See Vaughn*, 315 F. App'x at 330.  The Second Circuit has held that manifest

disregard may only be found where "the arbitrator knew of the relevant principle, appreciated

that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted

the governing law by refusing to apply it."  *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.,* 304

F.3d 200, 217 (2d Cir. 2002).

There is no dispute about the existence of New York's well-established policy of refusing

to enforce penalty provisions in contracts.  *See, e.g., Rattigan v. Commodore Int'l Ltd.*, 739 F.

Supp. 167, 169 (S.D.N.Y. 1990) (citing *Brecher v. Laikin*, 430 F.Supp. 103, 106 (S.D.N.Y.

1977)).  However, it is far from clear that that doctrine controlled the disposition of this case. Respondents took the position that a contract clause can only be deemed an unenforceable penalty if it may also be categorized as a liquidated damages clause.  *See* Partial Award ¶¶ 178-187.  Petitioners, on the other hand, argued that contractual penalties were not necessarily concomitant with liquidated damages clauses and that any clause could be deemed a penalty so long as it met one of a number of tests established by New York law.  *Id.* ¶¶ 172-177.  The Panel ultimately credited the Respondents' position, concluding that to "find that the concept of unenforceable penalty is independent from the concept of liquidated damages would unduly depart from New York law."  *Id.* ¶ 189.  Because the Panel further concluded that the Call Option acted as a termination provision, rather than a liquidated damages provision, it concluded there was no need to determine whether the clause could be deemed a penalty.  *Id.*

Petitioners insist that the Panel erred.  The Court does not discount that possibility, but Petitioners have nonetheless failed to meet their "burden of demonstrating the existence of a clearly governing legal principle and the arbitrator's manifest disregard of such a principle."  *In re Arbitration Between Atherton & Online Video Network, Inc.*, 274 F. Supp. 2d 592, 595 (S.D.N.Y. 2003) (internal quotation removed).  "A legal principle clearly governs the resolution of an issue before the arbitrator if its applicability is 'obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator.'"  *Westerbeke*, 304 F.3d at 209 (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 933 (2d Cir. 1986)).

No such clarity exists in this case.  Neither party has introduced any legal authority that conclusively answers the question put before the Panel concerning whether the Call Option acted as a penalty.  Petitioners introduce two authorities on the issue.  The first, the Restatement

(Second) of Contracts, notes in a comment that a "court will look to the substance of the agreement to determine whether . . . the parties have attempted to disguise a provision for a penalty," including those that "purport[] to place a valuation on property to be delivered." Restatement (Second) of Contracts § 356 cmt c (1981). But the actual substance of that section of the Restatement, notably titled "Liquidated Damages and Penalties," states unequivocally that a "*term fixing unreasonably large liquidated damages* is unenforceable on grounds of public policy as a penalty." *Id.* § 356(1) (emphasis added). It was hardly unreasonable for the Panel to conclude on the basis of this authority that a 'term fixing unreasonably large liquidated damages' is a prerequisite to deeming a clause 'unenforceable on grounds of public policy as a penalty.'

Petitioners further cite *In re O. P. M. Leasing Servs., Inc.*, 23 B.R. 104 (Bankr. S.D.N.Y. 1982), which stands only for the proposition that labels are irrelevant in determining whether a clause acts as a penalty. But nothing in the Partial Award contradicted that basic proposition. In fact, the Partial Award plainly stated that the "Tribunal agrees with the Claimants [i.e. Petitioners] that the label given to a provision does not matter." *See* Partial Award ¶ 189. Nothing else in that case supports the Petitioners' argument that unenforceable penalties exist independently of liquidated damages clauses. Indeed, the facts of that case specifically concerned a liquidated damages clause and the court held nothing more than that it would "not enforce a liquidated damages clause that is in reality a penalty." *Id.* at 111. Petitioners may therefore have demonstrated the existence of a well-established doctrine of New York law, but they have not demonstrated its obvious application to this case.

Additionally, Petitioners have failed to demonstrate that the Panel, though aware of governing precedent, "refused to apply it or ignored it altogether." *Wallace*, 378 F.3d at 189-90. In fact, the Panel considered the position of both parties extensively, including the Petitioner's

16

argument that the Call Option acted as a penalty.  *See* Partial Report ¶¶ 172-187.  That the Panel ultimately credited the Respondents' position is not evidence of manifest disregard for the law. In sum, "[t]here is no explicit evidence in the record that any of the arbitrators believed that [unenforceable penalty] law applied.  Nor is there any deliberateness or willfulness exhibited within the award that shows the arbitrators' intent to flout the law. The arbitrators' reasoning . . . does not strain[ ] credulity."  *See Wien & Malkin LLP v. Helmsley-Spear, Inc.*, 6 N.Y.3d 471, 484 (2006) (citing *Westerbeke,* 304 F.3d at 216) (internal quotations removed).  The Panel was aware of the legal principles that the Petitioners believe supported their position, but ultimately determined that they did not apply.  That is not a flouting of the adjudicative process, but rather its usual functioning.  *See Shanghai Foodstuffs Imp. & Exp. Corp. v. Int'l Chem., Inc.*, 99-cv-3320 (RCC), 2004 WL 213019, at *3 (S.D.N.Y. Feb. 4, 2004) (citing *Banco de Seguros del Estado v. Mutual Marine Office, Inc.,* 344 F.3d 255, 263 (2d Cir. 2003)) ("There is nothing to suggest that the tribunal determined that the UCC applied, or, more importantly, that it acknowledged its application but consciously decided to ignore the provisions. There can be no *manifest* disregard if there is no acknowledgment by the arbitrators that the UCC applied.") (emphasis in original).

Ultimately, Petitioners argue that the Panel identified the relevant rule, but erred in its application.  But manifest disregard "requires more than a mistake of law or a clear error in fact finding."  *Goldman v. Architectural Iron Co.*, 306 F.3d 1214, 1216 (2d Cir. 2002) (citing *Siegel v. Titan Indus. Corp.,* 779 F.2d 891, 892-93 (2d Cir. 1985)).  *See also Saxis S.S. Co. v. Multifacs Int'l Traders, Inc.,* 375 F.2d 577, 582 (2d Cir. 1967) (holding that manifest disregard requires "something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law.")  Regardless of whether the Panel was correct in its

17

ultimate conclusion, it considered the arguments of both parties, reviewed the pertinent facts and state case law, and attempted its own reasoned application of New York law to the facts of the case. *See* Partial Award ¶¶ 188-211. The Partial Award provides an explanation of why the Panel credited the Respondents' version of the law over Petitioners' and certainly offers a "barely colorable justification" of the result. *See Wallace*, 378 F.3d at 190. "Clearly there did not exist here 'more than error or misunderstanding with respect to the law.'" *In re Arbitration Between PHS. VAN OMMEREN N.V. v. JNO. McCall Coal Exp. Corp.*, 89-cv-5668 (JMW), 1990 WL 114744, at *4 (S.D.N.Y. Apr. 27, 1990) (quoting *Bobker,* 808 F.2d at 933).

Because Petitioners have failed to demonstrate that the Panel manifestly disregarded relevant law, and because the statutory grounds for vacatur in the FAA are clearly inapposite to this case, Petitioners' motion to vacate is denied.

## IV.    CROSS-PETITION TO CONFIRM, RECOGNIZE, AND ENFORCE THE AWARD

Respondents cross-petition for confirmation of the Panel's Partial Award and Final Award. For the reasons below, the cross-petition is granted.

### A.    Legal Standard

The Respondents' cross-petition is similarly governed by the Inter-American Convention, which applies co-extensively with the New York Convention. *See Productos Mercantiles*, 23 F.3d at 45. Typically, "[u]nder the Convention, the district court's role in reviewing a foreign arbitral award is strictly limited: 'The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.'" *Yusuf,* 126 F.3d at 19 (quoting 9 U.S.C. § 207). *See also* 9 U.S.C. § 302. "Normally, confirmation of an arbitration award is 'a summary proceeding that merely makes what is already a final arbitration award a judgment of the court.'" *D.H. Blair & Co. Inc. v.*

18

*Gottdiener,* 462 F.3d 95, 110 (2d Cir. 2006).  *See also F. Hoffmann-La Roche Ltd. v. Qiagen Gaithersburg, Inc.*, 730 F. Supp. 2d 318, 332 (S.D.N.Y. 2010).  This limited review is necessary to "avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation.'" *Encyclopaedia Universalis,* 403 F.3d at 90 (quoting *Yusuf,* 126 F.3d at 23).

Despite the normally routine nature of confirming arbitral awards, Article V of the Inter-American Convention provides that the "recognition and execution of an arbitral decision may also be refused if the competent authority of the State in which the recognition and execution is requested finds: . . . [t]hat the recognition or execution of the decision would be contrary to the public policy ("ordre public") of that State." *See* Inter-American Convention, Art. V(2)(b).[3] Accordingly, the Petitioners' public policy arguments do find a home in the Convention's specifically enumerated defenses to enforcement, recognition, and confirmation of an arbitral award, even though public policy provides no affirmative ground for vacatur under the Inter-American Convention or FAA. *See, e.g., Lander*, 107 F.3d at 478; *Yusuf,* 126 F.3d at 22.

Nonetheless, "the public policy defense should be construed narrowly." *Waterside Ocean Navigation Co. v. International Navigation Ltd.*, 737 F.2d 150, 152 (2d Cir. 1984) (quoting *Fotochrome, Inc. v. Copal Co.*, 517 F.2d 512, 516 (2d Cir. 1975)).  A more "expansive construction of this defense would vitiate the Convention's basic effort to remove preexisting obstacles to enforcement." *Karen Mar. Ltd. v. Omar Int'l, Inc.*, 322 F. Supp. 2d 224, 226 (E.D.N.Y. 2004) (quoting *Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier,* 508 F.2d 969, 973–74 (2d Cir. 1974)).  Accordingly, Article V(2)(b) has been read to "encompass only those circumstances where enforcement would violate our most

---

[3]  The New York Convention contains an identical provision.  *See* 21 U.S.T. 2517, Art. V(2)(b).

basic notions of morality and justice." *Telenor*, 584 F.3d at 411 (quoting *Europcar Italia S.p.A. v. Maiellano Tours, Inc.,* 156 F.3d 310, 315 (2d Cir. 1998)).  Moreover, the public policy at stake must be "well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Yukos Capital S.A.R.L. v. OAO Samaraneftegaz*, 963 F. Supp. 2d 289, 299 (S.D.N.Y. 2013) (quoting *United Paperworkers Int'l Union,* 484 U.S. at 43).

Unlike the manifest disregard doctrine and the FAA, the Second Circuit has sanctioned no extra-statutory grounds for refusing to recognize, confirm, or enforce an arbitral award under the New York Convention or Inter-American Convention.  Accordingly, "the grounds for relief enumerated in Article V of the Convention are the only grounds available for setting aside an arbitral award." *Encyclopaedia Universalis*, 403 F.3d at 92 (quoting *Yusuf*, 126 F.3d at 20). "The party opposing enforcement of an arbitral award has the burden to prove that one of the seven defenses under the [Inter-American] Convention applies." *Telenor,* 584 F.3d at 405 (citation omitted).  "The burden is a heavy one, as the showing required to avoid summary confirmance is high." *Id.* (citation omitted).  As the Court now explains, Petitioners have failed to meet that heavy burden.

### B.   Application

As an initial matter, the Court again acknowledges that the prohibition on penalty clauses in contracts is well-established public policy in New York.  *See, e.g.*, *Wells Fargo Nw. Bank, Nat'l. Ass'n. v. Varig-S.A.*, 02-cv-6078 (JSR), 2003 WL 21508341, at *5 (S.D.N.Y. June 27, 2003) (under New York law, contractual penalties are "void *ab initio* as a matter of public policy").  Nonetheless, in light of Petitioners' failure to explain how enforcement of the Partial

Award would violate the "most basic notions of morality and justice," the cross-petition must be granted.

Despite resting their arguments for vacatur and denial of confirmation on public policy grounds, Petitioners fail to mention the well-established standard for refusing confirmation of an award due to public policy. *See, e.g., Agility Pub. Warehousing Co. K.S.C., Prof'l Contract Administrators v. Supreme Foodservice GmbH*, 495 F. App'x 149, 151 (2d Cir. 2012) ("We have repeatedly held that Article V(2)(b) must be construed *very narrowly* to encompass only those circumstances where enforcement would violate our most basic notions of morality and justice.") (internal quotations removed) (emphasis in original). Petitioners offer no explanation of how enforcement of the Partial or Final Award would violate the most basic notions of morality and justice.

Indeed, even if they had ventured an argument, Petitioners are unable to meet their heavy burden of establishing a public policy defense. Assuming, *arguendo*, the Panel misinterpreted New York contract law by refusing to deem the Call Option an unenforceable penalty, it is still the case that "the public policy exception 'is not available for every party who manages to find some generally accepted principle which is transgressed by the [arbitration] award. Rather the award must be so misconceived that it 'compels the violation of law or conduct contrary to accepted public policy.'" *A. Halcoussis Shipping Ltd. v. Golden Eagle Liberia Ltd.*, 88-cv-4500 (MJL), 1989 WL 115941, at *2 (S.D.N.Y. Sept. 27, 1989) (quoting *Revere Cooper & Brass, Inc. v. Overseas Private Investment Corp.,* 628 F.2d 81, 83 (D.C. Cir. 1980), *cert. denied,* 446 U.S. 983 (1980)). This is prudent because "[a]ll laws, be they procedural or substantive, are founded on strong policy considerations. Yet not all laws represent this country's 'most basic notions of morality and justice.' Were it otherwise, the Convention's public policy exception would

eviscerate the very goal of the Convention." *Coutinho Caro & Co. U.S.A. v. Marcus Trading, Inc.*, 95-cv-2362(AWT), 2000 WL 435566, at *12 (D. Conn. Mar. 14, 2000).

The Panel's alleged misapplication of New York contract law concerning unenforceable penalties does not violate the state or nation's "most basic notions of morality of justice." Such notions might be tarnished "if the defendant's due process rights had been violated – for example, if defendant had been subject to any coercion or any part of the agreement had been the result of duress." *Ameropa AG v. Havi Ocean Co. LLC*, 10-cv-3240 (TPG), 2011 WL 570130, at *2 (S.D.N.Y. Feb. 16, 2011) (citing *Transmarine Seaways Corp. of Monrovia v. Marc Rich & Co. A.G.*, 480 F. Supp. 352, 358 (S.D.N.Y. 1979)). Petitioners do not allege any violations of due process or that their right to a fair hearing before the Panel was impugned, only that New York contract law was misapplied. But "[e]rroneous legal reasoning or misapplication of law is generally not a violation of public policy within the meaning of the [Inter-American] Convention." *Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 306 (5th Cir. 2004). Accordingly, even if the Panel did misapply the law, that misapplication was not so severe as to threaten core notions of morality and justice.

An opinion from the New York Court of Appeals confirms that the prohibition on contractual penalties, while significant and well-established, is not so consequential as to warrant judicial disturbance of an arbitral award. In *Matter of Associated Gen. Contractors, New York State Chapter, Inc.*, the parties submitted to arbitrators a number of questions regarding interpretation of a contract, "including specifically the determination that the damages clause was not a penalty and was therefore enforceable." 36 N.Y.2d 957, 958-59 (1975). The majority of the Court concluded that the case posed "no question involving public policy of such magnitude as to call for judicial intrusion." *Id.* at 959. Accordingly, the Court of Appeals

affirmed the lower appellate court's determination that the arbitral award should be confirmed despite "clearly imposing a penalty." *See Associated Gen. Contractors, New York State Chapter, Inc. v. Savin Bros.*, 45 A.D.2d 136, 144 (N.Y. App. Div. 1974). This case has been cited for the same proposition by a court within this District. *See AT&T Corp. v. Pub. Ser. Enterp. of Pa., Inc.*, 98-cv-6133 (LAP), 1999 WL 672543, at *5 (S.D.N.Y. Aug. 26, 1999) (citing *Matter of Associated Gen. Contractors*, 36 N.Y.2d at 957) ("any public policy against enforcing a penalty provision is insufficient to overcome the strong public policy in favor of arbitration."). *See also Crestwood Mech. Co. v. Main St. Lofts Yonkers, LLC*, 927 N.Y.S.2d 815 (N.Y. Sup. Ct. 2011) ("Inasmuch as the Arbitrator had already determined that the award of an additional $82,000 did not constitute an improper penalty, respondent is bound by that determination."). These cases strongly reinforce the Court's conclusion that enforcement of the Partial Award does not implicate the 'most basic notions of morality and justice.'

In sum, Petitioners have established little more than that they disagree with the decision of the Panel. That is insufficient to meet their 'heavy burden' of demonstrating that summary affirmance is not appropriate. *See Telenor*, 584 F.3d at 405. Accordingly, Respondent's Cross-Petition is GRANTED and the Panel's Partial Award and Final Award are both confirmed.

## V. CONCLUSION

In conclusion, the Petitioners' petition to vacate is DENIED, while the Respondents' cross-petition to confirm, recognize, and enforce the award is GRANTED. This resolves Dkt. No. 23. The Clerk of Court is instructed to terminate the case.

SO ORDERED.

Dated: _____Sept 1____, 2015
       New York, New York

_____
ALISON J. NATHAN
United States District Judge